# Exhibit 9

## IN THE CIRCUIT COURT FOR BALTIMORE COUNTY, MARYLAND

**DEMOCRACY CAPITAL CORPORATION** }
}
      Plaintiff, }
}
**v.** }       **Case No.** C-03-CV-20-004048
}
**TESSEMAE'S LLC,** *et al.* }
}
      Defendants. }
}

### SECOND AMENDED COMPLAINT

COMES NOW the Plaintiff, Democracy Capital Corporation, by its attorneys, Mark J. Dimenna, Joyce A. Kuhns, and Offit Kurman, P.A., and pursuant to Rule 2-341(a) does hereby submit this Second Amended Complaint and in support thereof states:

### STATEMENT OF CASE

Democracy Capital Corporation saved Tessemae's from demise. At the time Tessemae's agreed to terms for a $3,000,000 loan from Democracy, Tessemae's was in dire financial straits: it was in default on a loan from another creditor; it owed over $4,000,000 to vendors and suppliers; and it was in disputes with nearly 20 other parties – including other Members of Tessemae's – with a total of over $2,000,000 in controversy. Although, the loan Democracy provided rescued Tessemae's from its financial difficulties, nonetheless it is clear that Tessemae's never intended to perform in accordance with the terms of the Loan. Instead, Tessemae's has repeatedly engaged in precisely the same bad faith conduct that placed it in default with its prior senior creditor and that caused disputes with its own Members. The terms that Tessemae's negotiated for and agreed to do not tolerate this conduct, and the facts of this case demonstrate that Tessemae's was at all relevant times, and remains today, in clear breach of its obligations to Democracy.

### PARTIES, JURISDICTION AND VENUE

1

1.      Plaintiff Democracy Capital Corporation ("Democracy" or "Plaintiff") is a corporation formed and existing under the laws of the State of Delaware, with a principal office located at 4800 Montgomery Lane, 10th Floor, Bethesda, Maryland 20814.

2.      Defendant Tessemae's LLC ("Tessemae's") is a limited liability company formed and existing under the laws of the State of Maryland, with a principal office located at 8805 Kelso Drive, Essex, Maryland 21221.

3.      Defendant Gregory Vetter ("Mr. Vetter") is a natural person residing in Maryland.

4.      Defendant Genevieve Vetter ("Mrs. Vetter") is a natural person residing in Maryland.  (Mr. and Mrs. Vetter shall collectively be referred to as the "Vetters").

5.      This Court has jurisdiction over this matter pursuant to Section 1-501 of the Courts and Judicial Proceedings of the Annotated Code of Maryland and pursuant to a forum selection clause in the Loan Documents at issue.

6.      Venue for this Court is appropriate under Section 6-201 of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland.

**TESSEMAE'S DESPERATE NEED FOR CAPITAL**

7.      Tessemae's was founded in 2009 by three brothers, Gregory, Brian and Matthew Vetter and is in the business of selling salad dressing, marinades, condiments, salad kits and grab-to-go free food items.

8.      Tessemae's is a recognized brand, with its products being sold nationwide in large grocery chains, such as Harris Teeter, Safeway, Sprouts and Fresh Market, as well as other stores like Wal-Mart and Amazon Marketplace.

9.      Since its formation, Tessemae's has obtained various investments as well as loans and other credit accommodations in order to finance its growth.

2

10.    Howard Bank became one such creditor when it extended to Tessemae's on March 27, 2013 a term loan in the principal amount of $600,000 and a line of credit in the principal amount of $1,000,000 (collectively, the "Howard Bank Loans").

11.    During the five-year period following March 2013, Tessemae's requested multiple changes and modifications to the terms of the Howard Bank Loans as well as certain additional financing from Howard Bank.

12.    Tessemae's defaulted on the terms of the Howard Bank Loans on several occasions, including a breach of the debt service coverage ratio covenant for the period ending December 31, 2016, which breach Howard Bank agreed to waive.

13.    Howard Bank eventually grew weary of Tessemae's actions and ultimately declared a default in early 2018, citing the following breaches and defaults by Tessemae's of the terms of the Howard Bank Loans:

    a.    Failing to fulfill its financial reporting requirements, including failing to provide annual financial statements, tax returns and monthly reports as required;

    b.    Failing to notify Howard Bank of litigation instituted or threatened against Tessemae's;

    c.    Failing to pay when due indebtedness owing to third persons;

    d.    Failing to comply with the financial covenants, including failing to maintain the required cash flow to debt service ratio;

    e.    Failing to pay to Howard Bank 10.00% of the amount of any convertible debt issued to third parties as required;

    f.    Incurring unpermitted indebtedness; and

    g.    Increasing compensation paid to certain of its officers beyond amounts permitted.

*See* Exhibit 1, Seventh Modification and Consent Agreement, Schedule 1.

3

14.     At the same time Tessemae's was violating the terms of the Howard Bank Loans, Tessemae's was also experiencing significant trouble with many of its vendors, suppliers, investors and members.

15.     By way of example, in early 2018, Tessemae's had nearly 20 discrete matters of pending and threatened litigation against it with a combined total of over $2,000,000 in dispute. *See* Exhibit 2, Loan Agreement, Schedule 4.1(h).

16.     Additionally, Tessemae's then had over $4,100,000 due and owing to its vendors and suppliers, of which $2,900,000 was more than 90 days overdue. *See id.*

17.     Tessemae's was on the verge of imminent demise and in desperate need of a lifeline, so it attempted to solicit a multi-million-dollar credit facility from another commercial lender.

18.     Before approaching Democracy, Tessemae's attempted to negotiate a loan with at least one other lender and, upon information and belief, Tessemae's was willing to agree to terms with that lender that were more onerous than the terms eventually agreed upon with Democracy.

19.     Ultimately, all suitors other than Democracy walked away from their negotiations with Tessemae's as a result of Tessemae's history of defaults with Howard Bank and its poor financial health.

## ENTER DEMOCRACY

20.     In early 2018, Tessemae's approached Democracy for rescue, proposing loan terms similar to, but actually less onerous than those it had previously presented to other lenders.

21.     The parties agreed upon a term sheet on March 5, 2018 (the "Term Sheet"), which provided for a loan to Tessemae's in the amount of $3,000,000, plus interest (the "Interest Rate"),

4

with a maturity date 24 months from the date of execution of the loan documents (the "Loan"). *See* Exhibit 3, Term Sheet.

22.     The proceeds of the Democracy Loan were intended to be used to repay the Howard Bank Loans (but not all of the debt outstanding to Howard Bank) as well as some, but not all, of Tessemae's other indebtedness.

23.     In addition to repayment terms, the Term Sheet also included certain additional requirements, such as a requirement that Tessemae's grant to Democracy a first lien on all of its assets as security and a requirement that Tessemae's deliver a warrant to Democracy at closing on the Loan, which warrant would entitle Democracy to an equity interest in Tessemae's of 5.00%, provided that Democracy would be guaranteed to receive a minimum of $7,500,000 in the event of a sale of the business or other capital event (the "Warrant"). *See id.*

24.     Inclusion of the Warrant provisions in the Term Sheet, as well as the requirement that the relevant Warrant be delivered at closing and that it provides for a minimum value upon the occurrence of a capital event, were essential terms underscoring that the Warrant was additional consideration to Democracy and an inducement to engage in further negotiations with Tessemae's.

25.     The Term Sheet was signed by Mr. Vetter, Tessemae's CEO, on the one hand, and Democracy's President, J.R. Schuble, on the other hand. *See id.*

26.     The parties agreed that Democracy would structure this new Loan as a purchase of the existing Howard Bank Loans, thus paying Howard Bank the amounts then outstanding on the Howard Bank Loans, and then consolidating, increasing, amending and restating the existing Howard Bank loan documents as necessary to reflect the changes between the terms of the Loan and the terms of the Howard Bank Loans.

5

27.    As such, Democracy essentially stepped into Howard Bank's shoes, including with regards to Howard Bank's lien positions; and the parties used the same form loan documents that had governed the Howard Bank Loans for the prior 5 years as its benchmark for creating the Democracy documents.

28.    During negotiations regarding the documentation for the Loan, Tessemae's was involved in disputes with many parties, including with some of its members (*i.e.*, William Militello, Mark C. Proulx, Abacos Capital, LLC and Gill Satinder), and Tessemae's was unable to obtain approval of its members to issue the Warrant, as required pursuant to Tessemae's operating agreement (the "Operating Agreement").

29.    Because of these pending member disputes, Tessemae's requested a substantial change to the terms of the Loan:  Tessemae's asked Democracy to permit it to either a) issue the Warrant for 5.00% of the equity in Tessemae's (with a minimum value of $7,500,000), provided the Warrant was properly authorized and issued prior to the Maturity Date and prior to any default by Tessemae's, or b) pay an exit fee in the amount of $7,500,000 upon maturity (the "Exit Fee").

30.    Put simply, when Tessemae's determined that it could not issue the Warrant without member consent, Tessemae's requested (and Democracy agreed) to amend the terms to permit Tessemae's to issue a Warrant with a value of at least $7,500,000 at a later date (prior to maturity and/or the occurrence of a default), or to pay cash in the same amount at maturity.

31.    Furthermore, because the parties were unable to determine then precisely what the members of Tessemae's would approve in the future, Tessemae's delivered to Democracy a template warrant as well as copies of existing warrants that Tessemae's had issued to others, while also representing the warrant it would issue in the future, if possible, would conform to the terms of the warrants it provided to Democracy as samples.

6

32.     Tessemae's also understood and agreed that Democracy would require additional terms be included in the Warrant, which terms would be negotiated by the parties, and that Democracy would have broad discretion to accept or reject the Warrant in its "sole discretion exercised in good faith." *See* Exhibit 5, §1.5.

## THE LOAN DOCUMENTS

33.     The parties' completed their negotiations on April 10, 2018, at which time Howard Bank sold the Howard Bank Loans to Democracy, as evidenced by a Loan Sale Agreement between Howard Bank and Democracy, pursuant to which the Howard Bank Loans, including all collateral and security interests, were assigned to Democracy. *See* Exhibit 4, Loan Sale Agreement.

34.     Tessemae's consented to the sale and assignment of the Howard Bank Loans to Democracy as evidenced by a certain Seventh Modification and Consent Agreement between Democracy on the one hand, and Tessemae's and multiple obligors of the Howard Bank Loans (including the Vetters, Teresa Vetter, Stephen Vetter and Brian Vetter) on the other hand. *See* Exhibit 1.

35.     Once Democracy stepped into Howard Bank's shoes, the parties restated the Howard Bank documents to become Democracy's documents, which included a Second Amended and Restated Loan and Security Agreement (the "Loan Agreement"), and a Consolidated, Amended and Restated Promissory Note from Tessemae's payable to the order of Democracy in the principal amount of $3,000,000.00 (the "Note"). The Loan Agreement, the Note and the other documents executed in connection with the Loan are hereinafter referred to as the "Loan Documents."

36.     The Note provides, in relevant part, that "[t]he final and absolute maturity date of this Note ('Maturity Date') shall be April 10, 2020." *See* Exhibit 5, Note, §1.1.

37.     The Note also provides that:

> interest shall accrue on the unpaid balance of this Note at a rate of an aggregate of 15.00% per annum ("Interest Rate"); provided, however, ***that on the date of each scheduled payment of interest on the outstanding principal balance under this Note, Borrower shall only be required to pay in cash an amount of interest equal to 10.00% ("Cash Interest Rate") on the outstanding principal balance of this Note***. The payment of the balance of the Interest Rate of 5.00% per annum ("PIK Interest Rate") on the outstanding principal balance of this Note shall be deferred at the option of Borrower (the aggregate amount of such deferred payments of interest are called the "PIK Interest") until the Maturity Date. All unpaid PIK Interest shall: (a) ***be added to the unpaid principal balance of this Note at the end of each month and on the Maturity Date***; (b) be due and payable, together with all interest accrued thereon, in cash, on the Maturity Date or acceleration of this Note pursuant to the terms hereof; and (iii) bear interest at a fixed rate per annum equal to the Interest Rate or the Interest Rate plus the Default Rate, as applicable. ***Accrued interest (other than PIK Interest) shall be payable monthly in arrears on the first day of each month in each year, commencing May 1, 2018, and continuing on the same day of each month thereafter until the principal amount of, and all accrued interest on, this Note, including, without limitation, the PIK Interest, have been paid in full***.

*See* Exhibit 5, §1.2 (emphasis added).

38.     The terms of the Note permitted Tessemae's to bifurcate its obligation to make interest payments such that only a portion of the total interest accruing on the outstanding balance of the Loan, in the amount of up to 10.00% *per annum* (the "Cash Interest Rate"), would be paid monthly; giving Tessemae's the option to defer the remainder of up to 5.00% *per annum* (the "PIK Interest Rate," with the interest that accrues at the PIK Interest Rate being hereinafter referred to as the "PIK Interest"). *Id.*

39.     The clear and unambiguous terms of the Note also informed Tessemae's that all PIK Interest it elected to defer would be compounded and added to the outstanding principal

8

balance of the Loan for purposes of calculating the minimum monthly payment going forward (*i.e.*, the amount that would be subject to the Cash Interest Rate).

40.    The Note also memorialized the requirement to pay the Exit Fee, or in the alternative, the conditions upon which Tessemae's could issue a Warrant in lieu of paying the Exit Fee, by stating:

> Upon repayment of this Note in full, at any time, by any means or any source, whether at maturity, voluntary or after notice, declaration, acceleration, foreclosure or otherwise, in addition to all other principal, interest, charges and fees payable by Borrower under this Note or any other Loan Document, Borrower shall be required to pay to Lender simultaneously with such repayment a fee ("Exit Fee") equal to $7,500,000. The Exit Fee shall be deemed additional interest, shall be added to the outstanding principal balance of this Note when it becomes due and shall be secured by the Loan Documents.

> [Line break added for readability]

> In lieu of paying the Exit Fee, at any time prior to the earlier to occur of the Maturity Date or the occurrence of an Event of Default, Borrower shall have the option of issuing to Lender or its designee a warrant related to the debt investment evidenced hereby on the terms set forth below in this Section 1.5 and such other terms as may be mutually agreed upon by Borrower and Lender ("Warrant").

*See id.*, §1.5.

41.    The Note further provides:

> The Warrant shall grant to Lender the right to purchase, at an exercise price of $0.01, units of a new class of ownership interest in Borrower, which class shall have priority over and be senior in all respects to all other ownership interests in Borrower now or hereafter existing ("Warrant Units"), with such Warrant Units constituting a 5.00% interest in Borrower calculated on a fully diluted basis; provided that, in any event, the holder of the Warrant Units shall receive a minimum of $7,500,000 in the event of a sale, merger, consolidation, reorganization or other capital event of Borrower or liquidation of Borrower or its assets.

*See id.*

42.    Regarding what is required to issue the Warrant, the Note states:

> Borrower agrees to modify or cause to be modified the operating agreement of Borrower, and any other organizational document of Borrower, as is necessary to

9

permit issuance of the Warrant and the Warrant Units on the terms described herein and such other terms as may be mutually agreed upon by Borrower and Lender. The form and substance of the Warrant, any documents modifying the organizational documents of Borrower in connection with the issuance of the Warrant and any other documents required in connection with the issuance of the Warrant shall be acceptable to Lender in Lender's sole discretion exercised in good faith.

*See id.*

43.     The Loan Agreement enumerated many "Affirmative Covenants" that Tessemae's

was required to fulfill.  For example, Tessemae's was obligated to:

> a.     Provide Democracy with certified: 1) annual financial statements; 2) tax returns; 3) monthly reports; 4) reports from accountants; and 5) "such other information concerning the operations, business, affairs, and financial condition of [Tessemae's] as [Democracy] may reasonably request", *see* Exhibit 2, Loan Agreement, §5.6;

> b.     Maintain a ratio of "Total Liabilities" to "Owner's Equity" (as those terms are specifically defined in the Loan Agreement) of 1.50x with step-downs to 1.25x and 1.0x on December 31, 2018 and June 30, 2019, respectively, tested quarterly beginning on the first full fiscal quarter following closing, provided however, that it would only be an Event of Default if Tessemae's fails to satisfy this "debt-to-equity ratio" covenant for two consecutive fiscal quarters, *see id.*, §5.31; and

> c.     Provide Democracy with certain observer rights concerning Tessemae's Board meetings and a requirement that such meetings be held "on an as needed basis, but not less frequently than once per calendar quarter", *see id.*, §5.32.

44.     Additionally, the Loan Agreement contains Affirmative Covenants concerning

subordinated debt of Tessemae's that states, in relevant part:

> All indebtedness of Borrower to any direct or indirect owner or member, officer, trustee or affiliate of Borrower, or to any other Person for non-purchase money obligations, shall be subordinated to repayment of the Loan pursuant to a subordination agreement in form and substance acceptable to Lender in Lender's sole discretion ("Subordinated Debt"). The parties acknowledge that certain of the Subordinated Debt is subject to a subordination agreement between Howard Bank and the holder of the Subordinated Debt, and that Lender has succeeded to the interests of Howard Bank under such subordination agreement. Each such subordination agreement with Howard Bank shall be deemed acceptable to Lender,

subject to the following provisions of this Section 5.4. Borrower has delivered to Lender copies of all documents executed in connection with any Subordinated Debt existing on the date hereof. Upon request by Lender, Lender shall have possession of all notes evidencing the Subordinated Debt. Borrower shall not suffer or permit any change, amendment or modification of any Subordinated Debt existing on the date hereof and shall not obtain any new Subordinated Debt after the date hereof, in each case except upon Lender's prior written consent[.]

*See id.*, §5.4.

45.     In the Loan Agreement, Tessemae's grants to Democracy "a security interest in the Collateral", *see id.*, §3.1, with the Loan Agreement broadly defining "Collateral" to mean all of the tangible and intangible assets of Tessemae's, including all of Tessemae's inventory, accounts receivable, general intangibles, chattel paper, equipment and fixtures and the other items that are more fully defined in the definition of "Collateral" contained in Exhibit A to the Loan Agreement.

46.     In addition to the guaranty agreements that the Vetters had signed in connection with the original Howard Bank Loans, which were assigned to Democracy by Howard Bank, the Vetters also entered into a new Guaranty Agreement for the benefit of Democracy (the "Guaranty Agreement"), pursuant to which, the Vetters confirmed their absolute and unconditional guarantee of all of Tessemae's obligations of payment and performance in connection with the Loan. *See* Exhibit 6, Guaranty Agreement, §2.1.

47.     Specifically, the Guaranty Agreement provides:

*Guaranty of Payment and Performance.* Guarantors unconditionally and irrevocably guarantee to Lender: (a) the full and punctual payment of all past, present, and future indebtedness, liabilities, and obligations of Borrower to Lender of any kind, nature, and description whatsoever in connection with the Loan, when and as the same shall become due and payable; and (b) the performance of all of Borrower's obligations under the Loan Agreement and the other Loan Documents. This Guaranty is an unconditional guaranty of payment and performance and not a guaranty of collection. This Guaranty is a continuing guaranty which shall remain in full force and effect until all amounts payable by Borrower to Lender under the Loan Documents have been paid in full; and neither Guarantor shall be released from any obligations to Lender under this Guaranty as long as any amount payable by Borrower to Lender under the Loan Documents is not satisfied, settled or paid

11

in full. The obligations of payment and performance described in this Section 2.1 are collectively called "Guaranteed Obligations."

*See* Exhibit 6, Guaranty Agreement, §2.1.

48.     The Guaranty Agreement also includes a number of covenants that the Vetters were obligated to comply with including, but not limited to, the following financial reporting requirements:

> ***Reporting Requirements.*** Guarantors shall submit to Lender: (a) within 120 calendar days after the end of each calendar year, annual personal financial statements for each Guarantor, in form and substance acceptable to Lender; (b) within 30 calendar days after filing, copies of all federal and state income tax returns of each Guarantor, in form and substance acceptable to Lender; and (c) all other reports and information requested by Lender or otherwise required by the Loan Documents. The costs of submitting all financial statements and other reports shall be paid by Guarantors.

*See id.,* §4.1

49.     Tessemae's was required by its Operating Agreement to obtain the consent of its Board of Managers (the "Board") and the holders of a majority of the outstanding Series B Preferred Units (the "Series B Members") in order to enter into the Loan Agreement.

50.     On or about April 9, 2018, Tessemae's Board and a majority of the Series B Members satisfied this requirement when they authorized Tessemae's to enter into the Loan Agreement, approved of the Loan's terms, and also "authorized and empowered [Tessemae's] to enter into and perform its obligations under the Democracy Capital Loan Documents, including without limitation … [Tessemae's] future issuance of a warrant to Democracy Capital for a new class of units of membership in [Tessemae's], as further described in the Note ***and subject to the future amendment of the Operating Agreement***." *See* Exhibit 7, Joint Written Consent of the Board and the Series B Majority Member of Tessemae's LLC (the "Joint Written Consent").

12

51.     Regarding the "future amendment of the Operating Agreement", Section 22 of Tessemae's Operating Agreement provides:

> **22.    Amendments.** Except as provided in Section 6(b)(vi) [which is the section requiring a vote of the majority of the Series B Members], the terms and provisions of this Agreement may be modified or amended at any time and from time to time with the written consent of the Board, ***provided that such modification or amendment shall not adversely affect the rights hereunder of any Member without written consent of that Member***.

*See* Exhibit 8, Excerpt from Operating Agreement, with redactions.

52.     As the Operating Agreement makes clear, existing equity in Tessemae's cannot be diluted without Member consent, as acknowledged by the Tessemae's Board and Series B Members in the Joint Written Consent.

53.     The ownership interest that the Warrant would convey to Democracy would, in fact, dilute ***all*** other Members' ownership interest because the Warrant was intended to create "a new class of ownership in [Tessemae's], which class shall have priority over and be senior in all respects to all other ownership interests in [Tessemae's]."

54.     Therefore, since the "new class of ownership" would dilute ***all*** other Members' interests and since the "new class of ownership" did not yet exist at the time the Loan was commenced, Tessemae's could only issue the Warrant after first obtaining approval from ***all*** of its Members to amend the Operating Agreement in order to create the "new class of ownership." *See* Exhibit 8.

55.     To date, Tessemae's Members have not agreed to amend the Operating Agreement to create the new class of ownership contemplated by the Warrant.

56.     The closing checklist for the Loan (the "Closing Index"), which details the required Loan Documents as well as all of the due diligence materials required to be submitted by

13

Tessemae's and/or obtained by Democracy prior to closing on the Loan, requires delivery of an opinion of Tessemae's counsel (the "Opinion Letter"). *See* Exhibit 9, Closing Index.

57.    The Opinion Letter was issued by the law firm of Nemphos Braue on April 10, 2018, the same day the Loan Documents are dated, and identifies this firm as "counsel to Tessemae's, LLC … in connection with the $3,000,000 loan from Democracy Capital Corporation … to [Tessemae's] pursuant to the terms and conditions of the Second Amended and Restated Loan and Security Agreement". *See* Exhibit 10, Opinion Letter.

58.    Nemphos Braue further states in the Opinion Letter that it "also acted as special counsel to Gregory Vetter and Genevieve Vetter … in connection with the" Loan. *See id.*

59.    Nemphos Braue represents that it examined the Loan Agreement, the Note, the Guaranty Agreement and the other Loan Documents, and provides a number of opinions regarding the Loan Documents, including but not limited to opinions that Tessemae's has the authority to enter into and perform its obligations under the Loan Documents and that the Loan Documents are enforceable against Tessemae's and the Vetters in accordance with their terms. *See id.*

60.    Regarding the Warrant, Nemphos Braue concurred with the Joint Written Consent and the requirements set forth in the Operating Agreement, by specifically noting in its Opinion Letter that "performance is subject to future approval by the Board and the members of the Company [Tessemae's] of the issuance of the Warrant (as defined in the Note) and the Warrant Units (as defined in the Note) issuable upon the exercise of the Warrant, the creation of a new series of membership units in the Company to be issued as the Warrant Units and the amendment to the Operating Agreement for such creation in the event [Tessemae's] elects to issue the Warrant in lieu of paying the Exit Fee (as defined in the Note)." *See id.*, §V.iii; *see also* Exhibit 7, Joint Written Consent.

14

61.     Given the requirements contained in Section 22 of Tessemae's Operating Agreement, combined with the qualifications contained in the Joint Written Consent of the Board and the Series B Members as well as the Opinion Letter of Nemphos Braue, Democracy included in Section 1.5 of the Note a specific requirement that, if Tessemae's elects to issue the Warrant in lieu of paying the Exit Fee, it must modify its Operating Agreement as "necessary to permit issuance of the Warrant and the Warrant Units." *See* Exhibit 5, §1.5.

## PERFORMANCE ON THE LOAN DOCUMENTS AND GUARANTY

62.     With the assurances of the representations and terms contained in the Loan Documents, and the hope that the Loan would put Tessemae's back on the right track and allow it to grow and prosper in a sustainable manner, the parties consummated the Loan.

63.     Tessemae's first payment was due on May 1, 2018, and on that date, the Loan had accrued $26,250 in interest, with the amount accruing at the Cash Interest Rate equal to $17,500 and PIK Interest of $8,750.

64.     If Tessemae's elected to defer the full $8,750 of PIK Interest, this sum would be added to the $3,000,000 original principal balance, increasing the total unpaid principal balance to $3,008,750, which total amount would then be used to calculate the Cash Interest Rate and PIK Interest for June 1, 2018.

65.     Tessemae's, in fact, only paid accrued interest at the Cash Interest Rate of $17,500 on May 1, 2018, thereby causing the full $8,750 of accrued PIK Interest to be added to principal.

66.     Tessemae's second payment was due on June 1, 2018 and, on that date, the Loan had accrued $38,863.03 in interest (based on the increased principal balance to $3,008,750), of which Tessemae's was obligated to pay a minimum of $25,908.68 at the Cash Interest Rate, with the option of deferring the remaining PIK Interest in the amount of $12,954.34.

15

67.     However, Tessemae's paid only $25,833.33 on June 1, 2018, ostensibly using the original principal balance of the Loan to compute this amount instead of the increased principal balance of $3,008,750 (the original principal balance plus the amount of accrued PIK Interest).

68.     While the June 1, 2018 Cash Interest Rate payment was short by only $75.35, Tessemae's would repeat this same pattern of short-paying its monthly Cash Interest Rate obligations throughout the term of the Loan, due to its repeated failures to add the deferred PIK Interest to the unpaid principal balance.

69.     Tessemae's made this payment shortfall mistake monthly throughout the life of the Loan, leading to the accrual of several hundred thousand dollars in unpaid Cash Interest Rate payments (collectively, all allegations concerning Tessemae's payment history shall be referred to as the "Payment History").

70.     Under the Note, Tessemae's had no obligation to advise Democracy in advance of the amount of PIK Interest it elected to defer each month and, correspondingly, Democracy had no obligation to send notice to Tessemae's advising it of the total amount of PIK Interest that had accrued and been added to interest.

71.     In fact, there would be no way for Democracy to know the amount of PIK Interest that had accrued until after Tessemae's actually made its payment.

72.     Tessemae's was also failing to deliver to Democracy all of the financial information required by the Loan Documents.

73.     The Loan Agreement sets forth that Tessemae's was required to provide: (a) annual financial statements by September 30, 2018 for the calendar year ending December 31, 2017 and within 120 days after the end of each year thereafter; (b) federal and state income tax returns within 30 days after filing; (c) monthly internally prepared financial statements within 10 days after the

16

end of each month; (d) reports from accountants promptly upon delivery or filing; and © any other information reasonably requested by Democracy. *See* Exhibit 2, §5.6.

74.     All financial statements required to be delivered by Section 5.6 of the Loan Agreement were to be "certified to be true and correct in all material respects by the chief executive officer of Borrower" or another officer approved by Democracy. *See* Exhibit 2, §5.6.

75.     Nonetheless, Tessemae's all but ignored its financial reporting and disclosure obligations, failing to ever provide Democracy with any annual financial statements, federal or state income tax returns or reports from accountants.

76.     Tessemae's also failed to have its CEO certify the handful of monthly reports it did deliver in the early months of the Loan term (collectively, all allegations concerning Tessemae's lack of compliance with the financial reporting covenants shall be referred to as the "Financial Reporting History").

77.     Similarly, Tessemae's also frustrated and interfered with Democracy's observer rights at Tessemae's Board Meetings, which were required by the Loan Agreement to be conducted not less than quarterly.

78.     Specifically, Tessemae's was either not holding its Board Meetings when required and/or not notifying Democracy of its Board Meetings, in breach of the Affirmative Covenants set forth in Section 5.32 of the Loan Agreement.  (The allegations concerning Tessemae's lack of compliance with the Board observer covenants shall be referred to as the "Observer Facts").

79.     As the Financial Reporting History and the Observer Facts demonstrate, Tessemae's frustrated, interfered with and prevented, hindered and delayed Democracy's ability to assess and evaluate the financial health of Tessemae's and the integrity and preservation of its Collateral against unnecessary waste or impairment and to properly service the Loan.

17

80.     The limited financial information that Tessemae's provided established that from January 2018 to October 2018, Tessemae's failed to maintain the required 1.50:1.00 debt-to-equity ratio in violation of the Affirmative Covenant set forth in Section 5.31 of the Loan Agreement. *See id.*

81.     Upon information and belief, Democracy asserts that Tessemae's financial health did not recover at any point thereafter and, as such, Tessemae's was in violation of the debt-to-equity ratio covenant for the balance of the term of the Loan.

82.     The Vetters similarly ignored their obligations under the Guaranty Agreement.

83.     Specifically, the Vetters failed entirely to provide any financial information whatsoever, even though the Guaranty Agreement required them to produce (a) annual personal financial statements within 120 days after the end of each year; (b) federal and state income tax returns within 30 days after filing; and (c) any other information reasonably requested by Democracy. *See* Exhibit 6, §4.1.

## DECLARING EVENTS OF DEFAULT

84.     Throughout 2018 and during the early months of 2019 when Tessemae's violations of the Loan Documents began to mount, Democracy attempted to work with Tessemae's to resolve these deficiencies.

85.     In particular, Democracy shareholder and designated representative James E. Plack ("Mr. Plack") was in periodic contact with Mr. Vetter and/or Tessemae's then Chief Financial Officer, Lindsay Thomas ("Ms. Thomas"), to discuss the Financial Reporting History as well as Tessemae's other performance deficiencies.

86.     Despite Democracy's efforts, Tessemae's failed to remedy its non-compliance with the Loan Documents and, as a result, Democracy exercised its right to assess default interest commending on or about July 1, 2019.

87.     The right to assess default interest is set forth in the Section 2.2.b. of the Note, which provides:

> Default Interest Rate.  Lender, in Lender's sole discretion and ***without notice or demand***, may raise the rate of interest accruing on the principal balance outstanding under this Note by 5.00 percentage points ("Default Rate") above the rate of interest otherwise applicable, independent of whether the holder elects to accelerate the principal balance outstanding under this Note.  For the avoidance of doubt, upon application of the Default Rate the aggregate interest payable shall be 20.00% consisting of 10.00% of Cash Interest Rate, 5.00% of PIK Interest Rate and 5.00% of Default Rate.

*See* Exhibit 5, §2.2.b.

88.     Beginning on or about July 1, 2019, Democracy began assessing default rate interest ("Default Interest"), after months of Tessemae's many failures to comply with the terms of the Loan Documents and after extensive, good faith efforts by Democracy to cause Tessemae's to cure its noncompliance.

89.     Toward the end of 2019, and notwithstanding continued efforts by Mr. Plack to engage with Tessemae's, Mr. Vetter and others at Tessemae's refused to engage in any discussions with Mr. Plack whatsoever.

90.     At this time same, Tessemae's was engaged in litigation with its Members and, because Tessemae's was clearly in default of the terms of the Loan Documents, Tessemae's could no longer issue a Warrant.  Thus, the Exit Fee was certain to become due and owing upon maturity.

91.     The Note and the Loan Agreement both provide that the failure to pay any amount within 10 calendar days after it is due constitutes an Event of Default, without requirement of notice by Democracy or further opportunity to cure.  *See* Exhibit 2, §7.1.a.

19

92.    Additionally, the Loan Agreement states that the failure to observe or perform any of the Affirmative Covenants constitutes an Event of Default. *See id.*, §7.1.c.

93.    The Loan Agreement is clear that there is no notice requirement applicable to Tessemae's failures to make timely payments nor is there any notice requirement or cure period for Tessemae's failure to satisfy the debt-to-equity ratio covenant, financial reporting requirements or observer obligations, as each of these provisions contains separate timelines for performance. *See id.*

94.    Despite this, Democracy provided numerous opportunities for Tessemae's to cure, including by virtue of Mr. Plack's consistent attempts to communicate with Tessemae's regarding its breaches.

95.    Similarly, the Guaranty Agreement provides that the Vetter's failure to satisfy their financial reporting requirements constitutes an Event of Default, and that there is no separate notice-and-cure period applicable. *See* Exhibit 6, §5.1.

96.    Nonetheless, Democracy again provided numerous opportunities to the Vetters to cure these defaults Mr. Plack's numerous attempts to communicate with Mr. Vetter regarding these performance deficiencies.

97.    The Note also provides:

*Remedies*.  Upon the occurrence of an Event of Default, in addition to all other rights and remedies available to Lender under the Loan Documents and applicable law, Lender shall have the following rights and remedies:

Acceleration.  Lender, in Lender's sole discretion and without notice or demand, may declare the entire principal balance outstanding under this Note, plus accrued interest and all other sums owed under this Note, immediately due and payable. Reference is made to the Loan Agreement and the other Loan Documents regarding the entire balance outstanding under this Note, plus accrued interest and all other sums owed under this Note, becoming automatically due and payable upon the occurrence of certain events.

20

*See* Exhibit 2, §2.2.b.; *see also* Exhibit 6, §5.2.a. (providing similar right to accelerate under the Guaranty Agreement).

98.    Based on the Payment History, Financial Reporting History, Observer Facts and debt-to-equity ratio covenant defaults as described herein, and in reliance on the clear and unambiguous terms of the Loan Documents, on or about February 21, 2020, Democracy elected to formally notify Tessemae's and the Vetters that Democracy had declared a default and was accelerating the full amount of the Loan.  *See* Exhibit 11, Notice of Default dated February 21, 2020 ("Notice of Default").

99.    When Democracy elected in the Notice of Default to accelerate the unpaid principal balance, Democracy specifically advised that the Exit Fee also became due and owing as a result. *See id.*

100.    Nine days after issuing the Notice of Default, Tessemae's and the Vetters responded, through George Nemphos ("Mr. Nemphos"), of Nemphos Braue, by disputing Democracy's declaration of default. *See* Exhibit 12 response to Notice of Default dated March 2, 2020.

101.    Tessemae's then attempted to "issue" an instrument purportedly pursuant to Section 1.5 of the Note even though Tessemae's could only do so prior to the occurrence of an Event of Default. *See id.*

102.    Nevertheless, Tessemae's delivered its instrument, which purportedly was a warrant (hereinafter, the "Defective Instrument")[1] to Democracy together with correspondence dated March 2, 2022.

---

[1] Because the instrument Tessemae's delivered on March 2, 2022 was not duly authorized, was not marketable, did not include terms remotely resembling those Tessemae's represented during negotiations that it would provide, and for many other reasons, failed entirely to conform to Section 1.5 of the Note, it

21

103.    The Defective Instrument had only been sanctioned by the Board without approval by Tessemae's members, as required by the clear and unambiguous terms of the Note and Section 22 of the Operating Agreement, and as acknowledged by Tessemae's itself in the Joint Written Consent and by Tessemae's own legal counsel, Nemphos Braue and Mr. Nemphos, in the Opinion Letter. *See id.*; *see also* Exhibit 7, Joint Written Consent.

104.    Additionally, even if the Defective Instrument had been duly authorized and issued, it failed to comply with the express terms of the Note because, for example, the Defective Instrument delivered by Tessemae's only entitled the holder to 5.00% of any "Liquidated Event Net Proceeds" (described in the Defective Instrument) but not a 5.00% ownership interest in Tessemae's as mandated by the Note: Tessemae's is keenly aware that payment of 5.00% of the proceeds from the sale of Tessemae's business is not the same thing as a 5.00% ownership interest in that entity, given that equity ownership entitles the holder to other benefits beyond the payment of liquidation proceeds (e.g., periodic distributions of free cash flow, voting rights, and other incidents of ownership).

105.    Furthermore, the Defective Instrument provided did not remotely conform to the sample warrants delivered by Tessemae's to Democracy prior to closing and did not contain reasonable and customary market terms, including but not limited to the Warrant Units not affording voting rights to Democracy and not being freely transferrable.

106.    Since Tessemae's did not have the ability to provide a Warrant after the occurrence of a default and the Defective Instrument that Tessemae's attempted to provide to Democracy was not properly authorized or issued, did not comply with the express requirements of the Note and

---

is wholly improper to refer to this as a warrant or Warrant. As such, Democracy believes it is more accurate to refer to this instrument as the Purported Warrant Delivered, or "Defective Instrument." Additionally, and for the purposes of clarity, reference to the "Warrant" shall mean and refer to the term that is defined by Section 1.5 of the Note.

did not include market terms, Democracy exercised its sole discretion in good faith and rejected it. *See* Exhibit 13, Letter from Democracy dated March 10, 2020.

107.    The Defective Instrument that was delivered by Tessemae's was signed by Tessemae's, never affording Democracy an opportunity to negotiate its form or substance beforehand.

108.    Even though Democracy believed that the existence of Events of Defaults prevented Tessemae's from issuing a Warrant, Democracy nonetheless provided substantive comments to Tessemae's prior to the Maturity Date regarding identifying certain issues with the Defective Instrument. *See* Exhibit 15, E-mail dated April 7, 2020.

109.    Tessemae's never attempted to cure the defaults described in Democracy's Notice of Default and it instead double-downed on its arguments that Democracy was not within its rights to accelerate the unpaid principal balance, demand payment of the Exit Fee, or to reject the Defective Instrument (despite there being a number of good faith bases to do so).

110.    To that end, Tessemae's attempted to make a partial payment using its incorrect calculation of the unpaid principal balance and ignoring the fact that Democracy had previously accelerated the Note. Tessemae's claimed that this partial payment was in full satisfaction of the amounts owing. *See* Exhibit 14, Letter from George Nemphos dated April 3, 2020.

111.    The April 3, 2020 payment was the last payment Tessemae's would make on the Loan, despite the fact that this payment did not include the Exit Fee and was less than the unpaid accelerated balance.

112.    Then, in its April 3, 2020 letter to Democracy, Tessemae's made a complete about-face concerning the requirements to ***properly*** issue a Warrant pursuant to the Note when it argued

23

for the first time that "Tessemae's is not required to obtain the approval of any of its members to issue the [Defective Instrument]." *See* Exhibit 14, §5.

113.    Critically, this assertion is directly contradicted by the clear and unambiguous terms of Tessemae's Operating Agreement, which requires approval of ___**all**___ of Tessemae's Members in order to issue the Warrant because the Warrant would "affect the rights … of any Member". *See* Exhibit 8, Operating Agreement, §22, Amendments.

114.    Additionally, Tessemae's April 3, 2020 assertion is also directly contradicted by the clear and unambiguous terms of Section 1.5 of the Note, the Joint Written Consent and the Opinion Letter. *See* Exhibit 10.

115.    Democracy was permitted to accept partial payment without waiving its claim to the remaining balance of all amounts due and owing, and it did so while reiterating to Tessemae's the good faith reasons it was relying upon in support of its decision to reject the Warrant. *See* Exhibit 15, E-mail dated April 7, 2020.

116.    The Loan matured on April 10, 2020. Prior to the Loan's maturity, Tessemae's made no attempt to negotiate (in good faith) any of the deficiencies identified by Democracy regarding the Defective Instrument , and made no attempt to obtain member approval to properly amend its Operating Agreement so as to duly issue a Warrant conforming with Section 1.5 of the Note.

117.    As noted above, Tessemae's was w unable to obtain the required unanimous member approval its Operating Agreement and issue a conforming Warrant because it was still actively engaged in litigation with several of its members on the Maturity Date.

118.    Even if Tessemae's and the Vetters were not in default of the Loan Documents prior to Tessemae's providing the Defective Instrument, the terms of the Defective Instrument were not

in conformity with the requirements of the Note and were otherwise unacceptable to Democracy (in its good faith judgment). As Tessemae's made no efforts to cure these defects prior to the Maturity Date, Tessemae's has no basis to dispute that the Exit Fee became due and owing in full on the Maturity Date and remains due and owing to date.

### ADDITIONAL BREACHES OF THE LOAN DOCUMENTS

119.    Contemporaneous with the escalation of disputes between Tessemae's and Democracy, Tessemae's was involved in active litigation with a group of its members and investors, namely Satinder Gill, Abacos Capital LLC, Mark Proulx and William Militello (collectively, the "Abacos Group"), all of whom filed suit against Tessemae's on or about September 25, 2019, in the Circuit Court for Montgomery County, Maryland, Case No. 472699V (the "Abacos Litigation").

120.    In the Abacos Litigation, the Abacos Group alleged that Tessemae's and Mr. Vetter had defaulted on various contractual obligations and owed $1.25 million to the Abacos Group as a result.

121.    Democracy was joined in the Abacos Litigation as a necessary party and learned that Tessemae's and Mr. Vetter were seeking to make a monetary payment to settle that lawsuit.

122.    Upon information and belief, and over Democracy's objections, Tessemae's and Mr. Vetter ultimately made a monetary settlement payment to the Abacos Group resulting in these parties stipulating to a dismissal of the Abacos Litigation on or about October 30, 2020.

123.    The monetary settlement made by Tessemae's and Mr. Vetter was in clear violation of the Affirmative Covenant set forth in Section 5.4 of the Loan Agreement, which subordinates payment of all debt to members or affiliates of Tessemae's so long as obligations are outstanding to Democracy.

25

124.    Any such settlement payment was also a direct violation of the various subordination agreements executed by the members of the Abacos Group for the benefit of Howard Bank, which subordination agreements were specifically assigned by Howard Bank to Democracy.

125.    The assignment of these subordination agreements by Howard Bank to Democracy was specifically acknowledged and agreed to by Tessemae's in Section 5.4 of the Loan Agreement, which states "[t]he parties acknowledge that certain of the Subordinated Debt is subject to a subordination agreement between Howard Bank and the holder of the Subordinated Debt, and that Lender has succeeded to the interests of Howard Bank under such subordination agreement."

126.    More specifically, since Tessemae's still owed millions of dollars to Democracy at or around the time it entered into its settlement with Abacos Group, any payment by Tessemae's to the Abacos Group was a direct violation of the Loan Documents.

127.    Additionally, in or around November 2022, a group of Tessemae's creditors filed multiple lawsuits, wherein each creditor confirms that Tessemae's breached a number of contractual obligations arising out of loans that these creditors provided to Tessemae's (the "Prohibited Loans").

128.    Many of the Prohibited Loans were incurred by Tessemae's without Democracy's prior written consent during the term of the Democracy Loan as mandated by the Loan Agreement (the "Prohibited Pre-Maturity Loans", as further described below).

129.    Each of the holders of the Prohibited Loans has moved for summary judgment contemporaneously with the commencement of their lawsuits, which motions are supported by affidavits testifying to the debt Tessemae's incurred.

130.    As of the date of this filing, Tessemae's has not responded to any of the claims made by the holders of the Prohibited Loans.

26

131. Additionally, two landlords filed actions in the District Court for Baltimore County, Maryland, arising out of Tessemae's failure to pay certain rents when due and owing, Case Nos. D-08-LT-22-513-001 and D-08-LT-22-760-001, and a certain vendor and/or contractor of Tessemae's filed suit in the District Court for Baltimore County, Maryland, Case No. D-08-CV-22-023398, arising out of Tessemae's failure to pay a $9,000 invoice. Each of these plaintiffs has obtained judgment in its favor. The landlord in Case No. D-02-LT-22-513-001 has petitioned for the issuance of a writ of restitution for Tessemae's headquarters at 8805-23 Kelso Drive, Essex, MD 21221.

132. Additionally, at least five additional investors filed suit against Tessemae's in early December 2022.

133. Pursuant to Section 5.20 of the Loan Agreement, Tessemae's was required to provide prompt notice of all litigation to Democracy threatened or instituted against it.

134. Tessemae's did not provide notice to Democracy of the filing of any litigation involving the Prohibited Indebtedness, nor did Tessemae's provide Democracy with notice of any of the other pending litigation including, but not limited to, actions commenced by landlords for Tessemae's failure to pay rent when due and owing, actions commenced by other members arising out of Tessemae's defaults, and actions commenced by vendors, suppliers and other contractors for defaulting on payment obligations, all of which actions Tessemae's has failed to defend.

135. The failure to provide notice of all litigation matters pending against Tessemae's is a breach of Section 5.20 of the Loan Agreement that is not subject to any notice or cure provision. *See* Ex. 2, §7.1.c. Breach of Affirmative Covenant (expressly stating that a notice-and-cure period "shall not apply to the failure to give Lender any required notice...").

27

136.    Moreover, the lawsuits involving the Prohibited Pre-Maturity Loans unequivocally prove that Tessemae's breached the negative covenant in the Loan Agreement which prohibit Tessemae's from incurring certain additional indebtedness during the term of the Loan.

137.    Specifically, Section 6.6 of the Loan Agreement provides:

> No Additional Indebtedness. Borrower shall not incur or permit to exist any indebtedness or liability on account of deposits or advances or for borrowed money or for the deferred purchase price of any property or services, except: (a) the Loan; (b) current accounts payable arising in the ordinary course of business; (c) past due indebtedness outstanding on the date hereof to (i) Clearview Consulting, Inc. for accounting and financial services that is subordinated to the Loan …, (ii) Nemphos Braue LLC for legal services, and (iii) Brown Goldstein Levy for legal services; (d) past due accounts payable of Borrower arising in the ordinary course of business …; (e) indebtedness of Borrower to Bibby pursuant to the Bibby Agreement …; (f) purchase money indebtedness approved by Lender and incurred by Borrower in connection with the acquisition or lease by Borrower of equipment; and (g) the Subordinated Debt, including any Approved Modifications thereto ….

*See* Exhibit 2, Loan Agreement, §6.6.

138.    Despite these unequivocal terms, Tessemae's incurred $13.5 million in Prohibited Pre-Maturity Loans during the term of the Loan without seeking (let alone obtaining) Democracy's consent, in direct violation of this negative covenant.

139.    Specifically, the Prohibited Pre-Maturity Loans include the following:

1.  On or about **August 21, 2019**, Tessemae's borrowed $500,000 from Benjamin H. Griswold, IV, *see* Complaint for *Griswold, IV v. Tessemae's LLC*, in the Circuit Court for Baltimore County, Maryland, Case No. C-03-CV-22-004605;

2.  On or about **August 21, 2019**, Tessemae's borrowed $500,000 from Jupiter Fund LLC, *see* Complaint for *Jupiter Fund LLC v. Tessemae's LLC*, in the Circuit Court for Baltimore County, Maryland, Case No. C-03-CV-22-004601;

3.  On or about **August 21, 2019**, Tessemae's borrowed $500,000 from K2 Trust, *see* Complaint for *K2 Trust v. Tessemae's LLC*, in the Circuit Court for Baltimore County, Maryland, Case No. C-03-CV-004652;

28

4.  On or about **November 27, 2019**, Tessemae's borrowed $1,500,000 from Jupiter Fund LLC, *see* Complaint for *Jupiter Fund LLC v. Tessemae's LLC*, in the Circuit Court for Baltimore County, Maryland, Case No. C-03-CV-22-004601;

5.  On or about **November 27, 2019**, Tessemae's borrowed $1,500,000 from K2 Trust, *see* Complaint for *K2 Trust v. Tessemae's LLC*, in the Circuit Court for Baltimore County, Maryland, Case No. C-03-CV-004652;

6.  On or about **December 18, 2019**, Tessemae's borrowed $20,000 from Jupiter Fund LLC, *see* Complaint for *Jupiter Fund LLC v. Tessemae's LLC*, in the Circuit Court for Baltimore County, Maryland, Case No. C-03-CV-22-004601;

7.  On or about **January 14, 2020**, Tessemae's borrowed $3,000,000 from Jupiter Fund LLC, *see id.*;

8.  On or about **January 21, 2020**, Tessemae's borrowed $1,200,000 from Fleet Street Club III, LP, *see* Complaint for *Fleet Street Club III, LP v. Tessemae's LLC*, in the Circuit Court for Baltimore County, Maryland, Case No. C-03-CV-00004600;

9.  On or about **January 22, 2020**, Tessemae's borrowed $100,000 from Gabriel Poggi and Denise Poggi, *see* Complaint for *Poggi, et al. v. Tessemae's LLC,* in the Circuit Court for Baltimore County, Maryland, Case No. C-03-CV-22-004607;

10. On or about **February 3, 2020**, Tessemae's borrowed $1,000,000 from K2 Trust, *see* Complaint for *K2 Trust v. Tessemae's LLC*, in the Circuit Court for Baltimore County, Maryland, Case No. C-03-CV-004652;

11. On or about **February 7, 2020**, Tessemae's borrowed $100,000 from Jonathan and McKensie Kish, *see* Exhibit 5, Complaint for *Kish, et al. v. Tessemae's LLC*, in the Circuit Court for Baltimore County, Maryland, Case No. C-03-CV-22-004602;

12. On or about **February 14, 2020**, Tessemae's borrowed $500,000 from M&C Irrevocable Trust, *see* Complaint for *M&C Irrevocable Trust v. Tessemae's LLC*, in the Circuit Court for Baltimore County, Maryland, Case No. C-03-CV-22-004604;

13. On or about **February 14, 2020**, Tessemae's borrowed $500,000 from C&J Irrevocable Trust, *see* Complaint for *C&J Irrevocable Trust v. Tessemae's LLC*, in the Circuit Court for Baltimore County, Maryland, Case No. C-03-CV-22-004603;

14. On or about **February 24, 2020**, Tessemae's borrowed $1,000,000 from GPS Family Trust, *see* Complaint for *GPS Family Trust v. Tessemae's LLC*, in the Circuit Court for Baltimore County, Maryland, Case No. C-03-CV-004598;

15. On or about **March 12, 2020**, Tessemae's borrowed $600,000 from Benjamin H. Griswold, IV, *see* Complaint for *Griswold, IV v. Tessemae's LLC*, in the Circuit Court for Baltimore County, Maryland, Case No. C-03-CV-22-004605; and

16. On or about **March 27, 2020**, Tessemae's borrowed $1,000,000 from Jupiter Fund LLC, *see* Complaint for *Jupiter Fund LLC v. Tessemae's LLC*, in the Circuit Court for Baltimore County, Maryland, Case No. C-03-CV-22-004601.

140.    None of the loans identified in the preceding paragraph qualify for any of the exceptions described in Section 6.6 of the Loan Agreement; and, as such, each constitutes an Event of Default that is not subject to any notice or cure provision. *See* Exhibit 2, §7.1.d. Violation of Negative Covenant, which contains no notice or cure provisions for violation of Section 6.6 of the Loan Agreement (providing that the violation of "any of the negative covenants set forth in Section 6 of" the Loan and Security Agreement is an Event of Default not subject to a notice-and-cure or grace period).

141.    Tessemae's was also required to advise Democracy of the Prohibited Pre-Maturity Loans pursuant to Section 5.8 of the Loan Agreement, which imposes an affirmative obligation on Tessemae's to notify Democracy of any events that may give rise to an Event of Default. *See id.*, §5.8. *Notice of Defaults and Litigation* ("Borrower shall notify Lender promptly upon acquiring knowledge of the occurrence of any Event of Default or of the occurrence of any event which, with the passage of time or the giving of notice or both, would constitute an Event of Default.").

142.    Tessemae's failed to provide notice of the Events of Default that the Prohibited Pre-Maturity Loans created which, is in and of itself, a separate Event of Default that is not subject to

any notice or cure provision. *See id.*, §7.1.c. <u>Breach of Affirmative Covenant</u> (expressly providing that a notice-and-cure period "shall not apply to the failure to give Lender any required notice...").

143.    As noted, Tessemae's refused to provide required financial material to Democracy and, in doing so, purposely concealed from Democracy the existence of the Prohibited Pre-Maturity Loans.

144.    Yet another default occurred pursuant to Section 5.20 of the Loan Agreement when Tessemae's failed to provide prompt notice to Democracy of the filing of the litigation concerning the Prohibited Pre-Maturity Loans, as well as the filing of the other litigation matters that are pending against Tessemae's including, but not limited to, lawsuits filed by landlords, vendors and other investors and/or members of Tessemae's.

145.    Democracy did not consent to Tessemae's incurring the Prohibited Pre-Maturity Loans, although its prior written consent was required pursuant to Section 6 of the Loan Agreement.

146.    Section 9.8 of the Loan Agreement prohibits oral modifications to the Loan Documents. There are no writings evidencing a modification of the requirement that Democracy provide its consent to the Prohibited Pre-Maturity Loans through any means other than expressly in writing.

147.    In any event, Tessemae's never informed Democracy of its intent to incur the Prohibited Pre-Maturity Loans, nor did Tessemae's ever seek Democracy's approval of the same, whether through written requests or informally through oral conversations.

148.    Additionally, the Prohibited Pre-Maturity Loans were required by Section 5.4 of the Loan Agreement to be based on terms acceptable to Democracy and to be subordinated to Democracy's debt. *See id.*, §5.4.

31

149.     The failure of Tessemae's to make the terms of the Prohibited Pre-Maturity Loans t subject to Democracy's approval, or to be subordinated to Democracy's debt constitutes another Event of Default under the Loan Agreement.

150.     As the facts alleged herein clearly demonstrate, Tessemae's and the Vetters are in breach of the Loan Documents for a number of reasons, and they have made no attempts to cure any of these breaches.

**COUNT I**
**Breach of Contract (Tessemae's)**

151.     The allegations in the preceding paragraphs are incorporated as if set forth fully herein.

152.     Democracy and Tessemae's were parties to the Loan Documents, which obligated Tessemae's to make certain Cash Interest Rate payments to Democracy on a monthly basis.

153.     Aside from the first Cash Interest Rate payment Tessemae's made on May 1, 2018, all other Cash Interest Rate payments made by Tessemae's every month thereafter and continuing through February 1, 2020 were deficient.

154.     Additionally, the Loan Documents obligated Tessemae's to satisfy certain Affirmative Covenants, including but not limited to, providing certain financial information, maintaining a certain debt-to-equity ratio and providing Democracy with observer rights at Tessemae's Board Meetings.

155.     Tessemae's failed to fulfill its obligations under the Loan Documents as it did not provide the required financial information, did not provide Democracy with observer rights at its Board Meetings, and did not maintain the required debt-to-equity ratio.

156.    Pursuant to the Loan Documents, Tessemae's also agreed that certain debt owed, including any and all debts it owed to the Abacos Group, was subordinate to the debt it owed Democracy.

157.    Despite its agreement to subordinate this debt, Tessemae's issued a settlement payment to the Abacos Group at a time when Tessemae's still owed substantial sums of money to Democracy, which was a direct violation of the terms of the Loan Agreement as well as the relevant subordination agreements.

158.    Pursuant to the Loan Documents, Tessemae's also agreed that it would not incur additional indebtedness without Democracy's express written consent.

159.    Despite its agreement to not incur additional indebtedness, Tessemae's incurred $13.5 million in additional debt prior to the Maturity Date, which debt was obtained without notice to or approval by Democracy.

160.    Pursuant to the Loan Documents, Tessemae's also agreed to notify Democracy of the occurrence of any Event of Default.

161.    Despite its agreement to notify Democracy of any Event of Default, Tessemae's failed to do so when it incurred $13.5 million in additional indebtedness prior to the Maturity Date, and when it failed to notify Democracy of any of the other Events of Default set forth herein.

162.    Pursuant to the Loan Documents, Tessemae's also agreed it would provide prompt notice to Democracy of any litigation instituted or threatened against it.

163.    Despite its agreement to notify Democracy of pending or threatened litigation, Tessemae's repeatedly failed to provide any such notice, including when a group of creditors sued to recover sums in connection with the Prohibited Pre-Maturity Loans, when multiple landlords

33

filed suit, or when various other members and/or investors as well as certain contractors, vendors and/or suppliers all filed suit against Tessemae's.

164.    Pursuant to the Loan Documents, Tessemae's was required to subordinate any new indebtedness to Democracy's debt and to make the terms of such debt subject to Democracy's approval.

165.    Tessemae's neither subordinated the Pre-Maturity Loans to Democracy's debt, nor was that debt based on terms subject to Democracy's approval.

166.    Each of these deficiencies is an Event of Default, as that term is defined by the Loan Agreement, which permitted Democracy the right to assess Default Interest as early as June 1, 2018.

167.    The Loan Documents also permitted Tessemae's to issue a Warrant **but only if issuance occurred prior to the occurrence of an Event of Default and prior to the Maturity Date**.

168.    Democracy sent its Notice of Default on February 21, 2020, which specifically stated that the Exit Fee was then due and owing. On March 2, 2020, Tessemae's provided Democracy with the Defective Instrument, although it was not permitted to do so because multiple Events of Default had occurred prior to that date.

169.    Alternatively, regardless of whether Tessemae's was in default on March 2, 2020, the Defective Instrument was not properly issued because Tessemae's Operating Agreement had not been amended to create a new class of ownership as required by the terms of the Note and neither the Defective Instrument nor the Operating Agreement amendment had been properly approved by Tessemae's members prior to its issuance.

34

170. Moreover, the terms of the Defective Instrument were not market, did not conform to the terms of the sample warrants that Tessemae's had previously provided and, in any event, did not conform to the criteria enumerated in Section 1.5 of the Note.

171. For these reasons, Democracy properly rejected the non-conforming Defective Instrument, exercising its discretion, in good faith.

172. Tessemae's made no attempt to correct any of the deficiencies identified by Democracy with respect to the Defective Instrument and, when the Maturity Date arrived, had still failed to issue a Warrant correcting any of these deficiencies, making the Exit Fee payable even if no other Events of Default had occurred.

173. To date, Tessemae's has failed to pay the full unpaid principal balance, plus interest thereon, pursuant to the terms of the Note and it has also failed to pay any portion of the Exit Fee, thus entitling Democracy to all additional fees and penalties set forth in the Loan Documents, including without limitation Default Interest.

174. Each of the terms concerning Tessemae's payment obligations, financial reporting requirements, observer rights, debt-to-equity ratio requirements and subordinate debt, as well as the terms regarding the Warrant and/or the Exit Fee, are material to the Loan Documents and Democracy would not have agreed to make the Loan in the absence of these terms.

175. Additionally, the Loan Documents contain an implied duty prohibiting Tessemae's from taking any actions that will destroy or injure Democracy's right to receive the full benefits of the Loan.

176. By refusing to comply with the financial reporting and observer rights covenants, Tessemae's has actively and/or intentionally interfered with, frustrated and otherwise prevented

Democracy's ability to monitor and service its Loan and/or its ownership in Tessemae's, and to assess the financial health of Tessemae's and the integrity of its Collateral.

177.    By refusing to satisfy their payment obligations in full, Tessemae's has actively and/or intentionally interfered with, frustrated and otherwise prevented Democracy's ability to receive the full benefits of the Loan.

178.    By failing to adhere to the debt-to-equity ratio covenants, Tessemae's has actively and/or intentionally interfered with, frustrated and otherwise prevented Democracy's ability to receive the full benefits of the Loan by not protecting and ensuring the integrity of the financial status of Tessemae's.

179.    By attempting to force a signed Defective Instrument onto Democracy, without negotiation, by including terms in the Defective Instrument that were wholly inconsistent with the requirements set forth inin Section 1.5 of the Note, and by attempting to issue the Defective Instrument without the requisite unanimous member approval, Tessemae's has actively and/or intentionally interfered with, frustrated and otherwise prevented Democracy's ability to receive the full benefits of the Loan,  having failed to pay the Exit Fee and/or provided the agreed upon equitable interest timely, instead allowing Tessemae's financial position to deteriorate.

180.    By incurring $13.5 million in additional indebtedness prior to the Maturity Date, and by failing to defend against lawsuits commenced by the creditors who extended that debt, Tessemae's has actively and/or intentionally interfered with, frustrated and otherwise prevented Democracy's ability to receive the full benefits of the Loan by causing irreparable damage to Democracy's security interest and collateral, which security interest and collateral are in peril.

181.    Democracy satisfied all conditions precedent necessary to declare an Event of Default and commence this instant litigation, either through strict or substantial compliance with any requirements in this regard that are or might be more fully set forth in the Loan Documents.

182.    Due to Tessemae's breach of the Loan Documents, Democracy has and continues to suffer at least $13,852,897.14,000 in damages.

**WHEREFORE**, Democracy Capital Corporation respectfully seeks the entry of a judgment in its favor and against Tessemae's LLC in the amount of $13,852,897.14, plus attorneys' fees, pre-judgment interest at a contractual rate of $6,533.35 per day, post-judgment interest at the legal rate, and such other relief that justice may require.

**COUNT II**
**Breach of Contract (The Vetters)**

183.    The allegations in the preceding paragraphs are incorporated as if set forth fully herein.

184.    Democracy and the Vetters were parties to the Guaranty Agreement, which obligated the Vetters to unconditionally and irrevocably guarantee to Democracy the full and punctual payment of all past, present and future indebtedness, liability, and obligations of Tessemae's to Democracy of any kind, nature and description whatsoever in connection with the Loan. *See* Exhibit 6, §2.1.

185.    The terms of the Guaranty Agreement also provide that the Vetters' obligations are joint and several, absolute and unconditional. *See id.*, §2.2.

186.    The Vetters agreed that the terms of the Guaranty Agreement may be enforced "from time to time, as often as occasion therefor may arise, and without any requirement that [Democracy] must first exercise any rights against [Tessemae's] or any other Person or exhaust any remedies available to it against [Tessemae's] under the Loan Documents or against any other

Person or resort to any collateral at any time held by it for performance of the Guaranteed Obligations or any other source or means of obtaining payment of any of the Guaranteed Obligations." *See id.*, §2.4.

187.   Democracy made a demand to the Vetters to pay all amounts that were due and owing as a result of Tessemae's numerous breaches of the Loan Documents, and the Vetters refused to fulfill and otherwise satisfy this demand.

188.   Additionally, the Guaranty Agreement obligated the Vetters to satisfy certain Affirmative Covenants, including but not limited to, providing certain financial information to Democracy at specific intervals. *See id.*, §4.1.

189.   To date, the Vetters have failed entirely to provide Democracy with any financial information whatsoever regarding either of the Vetters, and more specifically have not provided personal financial statements, federal or state income tax returns or any other financial information as required by the terms of the Guaranty Agreement.

190.   The Vetters' payment and financial reporting obligations are essential and material to the Guaranty Agreement, and Democracy would not have agreed to enter into the Loan in the absence of these terms.

191.   Additionally, the Guaranty Agreement contains an implied duty that prohibits the Vetters from taking actions that will destroy or injure Democracy's right to receive the full benefits of the Loan.

192.   By refusing to comply with the financial reporting covenants, the Vetters have actively and/or intentionally interfered with, frustrated and otherwise prevented Democracy's ability to monitor and service its Loan and assess the financial health of the Vetters to ensure they have the capacity to fulfill their contractual obligations.

38

193.    By refusing to satisfy their obligations under the Guaranty Agreement, the Vetters have also actively and/or intentionally interfered with, frustrated and otherwise prevented Democracy's ability to receive the full benefits of the Loan.

194.    The Vetters' failures to satisfy their payment obligations and financial reporting requirements are clear Events of Default, as that term is defined in the Guaranty Agreement. *See id.*, §5.1.

195.    Democracy satisfied all conditions precedent necessary to declare an Event of Default, either through strict or substantial compliance with any requirements in this regard that are or might be more fully set forth in the Guaranty Agreement and commence this instant litigation.

196.    Due to the Vetters' breach of the Guaranty Agreement, Democracy has and continues to suffer at least $11,500,000 in damages.

**WHEREFORE**, Democracy Capital Corporation respectfully seeks the entry of a judgment in its favor and against Gregory Vetter and Genevieve Vetter, jointly and severally, in the amount of $13,852,897.14, plus attorneys' fees, pre-judgment interest at a contractual rate of $6,533.35 per day, post-judgment interest at the legal rate, and such other relief that justice may require.

Date:    December 23, 2022          Respectfully submitted,

*/s/Mark J. Dimenna*
Mark J. Dimenna
CPF No. 1012140200
Joyce A. Kuhns
CPF No. 8406010206

OFFIT KURMAN, P.A.
300 E. Lombard Street
Suite 2010
Baltimore, Maryland 21202

39

Mark.Dimenna@offitkurman.com
Phone: (410) 209-6411
Fax:    (410) 209-6435
*Counsel for Democracy
Capital Corporation*

## NOTICE OF CLAIM FOR ATTORNEYS' FEES

Democracy Capital Corporation hereby gives notice that it will seek an award of reasonable attorneys' fees.

/s/Mark J. Dimenna
Mark J. Dimenna, CPF No. 1012140200

## RULE 20-201 CERTIFICATION

The undersigned hereby certifies that the foregoing pleading filed herewith does not contain any restricted information within the meaning of Rule 20-201(h).

/s/Mark J. Dimenna
Mark J. Dimenna, CPF No. 1012140200

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 23rd day of December 2022, a copy of the foregoing Democracy Capital Corporation's Second Amended Complaint was filed and served electronically upon counsel for all parties through the court's electronic filing and service system.

/s/Mark J. Dimenna
Mark J. Dimenna, CPF No. 1012140200