# Exhibit 10

E-FILED; Baltimore County Circuit Court
Docket: 12/23/2022 5:16 PM; Submission: 12/23/2022 5:16 PM

## IN THE CIRCUIT COURT FOR BALTIMORE COUNTY, MARYLAND

| | |
|---|---|
| **DEMOCRACY CAPITAL CORPORATION** } | |
| } | |
| Plaintiff, } | |
| } | |
| **v.** } | **Case No.** C-03-CV-20-004048 |
| } | |
| **TESSEMAE'S LLC,** *et al.* } | |
| } | |
| Defendants. } | |

### DEMOCRACY CAPITAL CORPORATION'S MOTION FOR SUMMARY JUDGMENT

Democracy Capital Corporation ("Democracy"), by its attorneys, Mark J. Dimenna, Joyce A. Kuhns and Offit Kurman, P.A., and pursuant to Rule 2-501, hereby moves this Honorable Court for summary judgment in the above-captioned matter, and in support thereof states:

### INTRODUCTION

1.      Tessemae's has repeatedly defaulted on its lenders and investors over an extended period of time, as confirmed by written admissions from Tessemae's and via litigation settlements and losses. True to form, Tessemae's also committed numerous defaults on its Loan from Democracy. Yet, if it concedes defaults occurred on Democracy's Loan, Tessemae's would be unable to argue that it could substitute a warrant for the Exit Fee; and Tessemae's desperately does not want to pay the Exit Fee to Democracy. On the other hand, if the warrant that Tessemae's provided to Democracy remotely complied with the terms of the Note, Democracy would not so vehemently object because a conforming warrant would be worth at least the same amount as the Exit Fee, if not more. Nevertheless, the instrument Tessemae's provided did not conform to the requirements of the Note and, in Democracy's judgment, is not worth $7,500,000 as required. In other words, Tessemae's is frantically trying to wrongly substitute a non-conforming and valueless warrant for the $7,500,000 in cash it would otherwise owe.

2.      Tessemae's has gone to great lengths not only to thwart, or at least delay, Democracy's efforts to recover its Exit Fee, but also to conceal any information regarding Tessemae's finances from Democracy. Initially, Tessemae's failed to deliver its financial information to Democracy in breach of the Loan Documents (as detailed in the Second Amended Complaint) and, when Tessemae's improperly delivered its purported warrant to Democracy, Tessemae's conspicuously omitted from that instrument any right for Democracy to receive financial information. Therefore, during the ensuing two and a half years, Tessemae's has refused to provide Democracy any meaningful insight into its business operations by claiming that Democracy has no right under the defective warrant to such information, which is precisely why Tessemae's excluded any information rights from the warrant over Democracy's objections.

3.      The purpose of Tessemae's obfuscation and delays are apparent: the more information Democracy obtains, the more malfeasance Democracy has and will continue to uncover. From its litigation searches, Democracy has now learned that Tessemae's incurred substantial indebtedness over three years ago, squarely during the term of the Loan, in direct violation of various provisions of the Loan Documents which expressly prohibit Tessemae's from obtaining additional indebtedness. Based on this fact alone, Tessemae's never had the right to issue a warrant in the first place or even to contest Democracy's confessed judgment action. The new litigation alone concerns over $20,000,000 of unpaid debt, which begs a number of questions concerning where the money went.

4.      Tessemae's has already succeeded in delaying Democracy sufficiently to give other creditors an advantage. It is time to put an end to Tessemae's charades in the hope that Democracy will still have time to protect its rights in the face of the numerous other claimants who are now surfacing.

2

## STATEMENT OF UNDISPUTED FACTS

5.    On or about April 10, 2018, Tessemae's, LLC ("Tessemae's") obtained from Democracy a $3,000,000 loan (the "Loan"), as evidenced by the Second Amended and Restated Loan and Security Agreement (the "Loan Agreement"), and the Consolidated, Amended and Restated Promissory Note (the "Note") from Tessemae's to the order of Democracy in the principal amount of $3,000,000. *See* Exhibit 1, Loan Agreement; *see also* Exhibit 2, Note.

6.    On or about April 10, 2018, Gregory and Genevieve Vetter (the "Vetters") entered into a Guaranty Agreement for the benefit of Democracy.  Pursuant to the Guaranty Agreement, the Vetters guaranteed all of Tessemae's obligations of payment and performance in connection with the Loan.  *See* Exhibit 3, Guaranty Agreement ("Guaranty").

7.    The Note details Tessemae's payment obligations under the Loan, including the requirement to pay an exit fee of $7,500,000 (the "Exit Fee") upon maturity of the Loan.  *See* Ex. 2, Note, §1.5.

8.    The Note also states, if certain conditions are satisfied and if no Event of Default has occurred, Tessemae's would be able to issue a warrant on certain terms (the "Warrant") in lieu of paying the Exit Fee. *See id.*

9.    Pursuant to the unambiguous terms of the Loan Agreement, Tessemae's had to abide by certain negative covenants, including a prohibition on incurring additional indebtedness.

10.    Specifically, Section 6.6 of the Loan Agreement provides:

No Additional Indebtedness. Borrower shall not incur or permit to exist any indebtedness or liability on account of deposits or advances or for borrowed money or for the deferred purchase price of any property or services, except: (a) the Loan; (b) current accounts payable arising in the ordinary course of business; (c) past due indebtedness outstanding on the date hereof to (i) Clearview Consulting, Inc. for accounting and financial services that is subordinated to the Loan …, (ii) Nemphos Braue LLC for legal services, and (iii) Brown Goldstein Levy for legal services; (d) past due accounts payable of Borrower arising in the ordinary course of business

3

...; (e) indebtedness of Borrower to Bibby pursuant to the Bibby Agreement ...; (f) purchase money indebtedness approved by Lender and incurred by Borrower in connection with the acquisition or lease by Borrower of equipment; and (g) the Subordinated Debt, including any Approved Modifications thereto....

*See id.*, §6.6.

11.    Despite these unambiguous terms, Tessemae's incurred at least **$13,520,000 in additional indebtedness** (the "Prohibited Pre-Maturity Loans") prior to the Loan's Maturity Date of **April 10, 2020**, including the following:

- On **August 21, 2019**, Tessemae's borrowed $500,000 from Benjamin H. Griswold, IV, *see* Exhibit 4, Complaint for Case No. C-03-CV-22-004605 with attachments;

- On **August 21, 2019**, Tessemae's borrowed $500,000 from Jupiter Fund LLC, *see* Exhibit 5, Complaint for Case No. C-03-CV-22-004601 with attachments;

- On **August 21, 2019**, Tessemae's borrowed $500,000 from K2 Trust, *see* Exhibit 6, Complaint for Case No. C-03-CV-004652 with attachments;

- On **November 27, 2019**, Tessemae's borrowed $1,500,000 from K2 Trust, *see id.*;

- On **November 27, 2019**, Tessemae's borrowed $1,500,000 from Jupiter Fund LLC, *see* Ex. 5;

- On **December 18, 2019**, Tessemae's borrowed $20,000 from Jupiter Fund LLC, *see id.*;

- On **January 14, 2020**, Tessemae's borrowed $3,000,000 from Jupiter Fund LLC, *see id.*;

- On **January 21, 2020**, Tessemae's borrowed $1,200,000 from Fleet Street Club III, LP, *see* Exhibit 7, Complaint for Case No. C-03-CV-00004600 with attachments;

- On **January 22, 2020**, Tessemae's borrowed $100,000 from Gabriel Poggi and Denise Poggi, *see* Exhibit 8, Complaint for Case No. C-03-CV-22-004607 with attachments;

4

- On **February 3, 2020**, Tessemae's borrowed $1,000,000 from K2 Trust, *see* Ex. 6;

- On **February 7, 2020**, Tessemae's borrowed $100,000 from Jonathan and McKensie Kish, *see* Exhibit 9, Complaint for Case No. C-03-CV-22-004602 with attachments;

- On **February 14, 2020**, Tessemae's borrowed $500,000 from M&C Irrevocable Trust, *see* Exhibit 10, Complaint for Case No. C-03-CV-22-004604 with attachments;

- On **February 14, 2020**, Tessemae's borrowed $500,000 from C&J Irrevocable Trust, *see* Exhibit 11, Complaint for Case No. C-03-CV-22-004603 with attachments;

- On **February 24, 2020**, Tessemae's borrowed $1,000,000 from GPS Family Trust, *see* Exhibit 12, Complaint for Case No. C-03-CV-004598;

- On **March 12, 2020**, Tessemae's borrowed $600,000 from Benjamin H. Griswold, IV, *see* Ex. 4;

- On **March 27, 2020**, Tessemae's borrowed $1,000,000 from Jupiter Fund LLC, *see* Ex. 5; and

- On **February 3, 2020**, Tessemae's borrowed $1,000,000 from K2 Trust, *see* Ex. 6.

12.    Tessemae's neither sought nor obtained Democracy's approval to incur the Prohibited Pre-Maturity Loans. *See* Exhibit 13, Aff. of J.R. Schuble. ¶¶*13-19*; *see also* Exhibit 14, Aff. of J. Plack. ¶¶*5-11*.

13.    The Prohibited Pre-Maturity Loans do not qualify for any of the exceptions enumerated in Section 6.6 of the Loan Agreement; and, as such, each of the Prohibited Pre-Maturity Loans constitutes a separate Event of Default.

14.    Democracy had no obligation to provide any notice to Tessemae's of the defaults caused by the various Prohibited Pre-Maturity Loans nor did the Loan Agreement afford Tessemae's any right to cure these defaults whatsoever. *See* Ex. 1, §7.1.d. Violation of Negative

5

Covenant (stating the violation of "any of the negative covenants set forth in Section 6 of" the Loan and Security Agreement is an Event of Default not subject to a notice-and-cure or grace period).

15.     Tessemae's was also obligated to notify Democracy of the occurrence of the Events of Default caused by the Prohibited Pre-Maturity Loans. *See id.*, §5.8. *Notice of Defaults and Litigation* ("Borrower shall notify Lender promptly upon acquiring knowledge of the occurrence of any Event of Default or of the occurrence of any event which, with the passage of time or the giving of notice or both, would constitute an Event of Default.").

16.     Tessemae's failed to provide notice of the Events of Default that occurred when Tessemae's obtained the Prohibited Pre-Maturity Loans, which is itself a separate Event of Default that is not subject to any notice or cure provision. *See id.*, §7.1.c. Breach of Affirmative Covenant (stating that a notice-and-cure period "shall not apply to the failure to give Lender any required notice").

17.     Indeed, Democracy only learned of the Prohibited Pre-Maturity Loans when, in the course of conducting research, Democracy discovered multiple lawsuits pending against Tessemae's, including the lawsuits involving the Prohibited Pre-Maturity Loans. *See* Ex. 13, Aff. of J.R. Schuble, ¶12.

18.     Tessemae's was obligated to notify Democracy of the lawsuits filed by the creditors who extended the Prohibited Pre-Maturity Loans. *See* Ex. 1, §5.20 *Notice of Litigation* ("Borrower shall notify Lender promptly of any material litigation instituted or threatened in writing against Borrower, of the entry of any judgment or Lien (other than Permitted Liens) against any of Borrower's assets or properties and of any prospective condemnation, change of zoning, or other action affecting in any material respect any of Borrower's properties.").

19.     Tessemae's failed to provide notice of the Prohibited Pre-Maturity Loans, which is also a separate Event of Default not subject to any notice or cure provision. *See id.*, §7.1.c. <u>Breach of Affirmative Covenant</u> (stating a notice-and-cure period "shall not apply to the failure to give Lender any required notice")

20.     Tessemae's is not defending against these lawsuits, and each of the Plaintiffs therein have moved for summary judgment, which motions are supported by affidavits testifying to the debt.

21.     Because the Prohibited Pre-Maturity Loans and failure to notify Democracy of the same constitute Events of Default, Tessemae's did not have the option of issuing a Warrant in lieu of paying the Exit Fee per the express terms of Section 1.5 of the Note. *See* Ex. 2, §1.5.

22.     Despite this, on or about March 2, 2020, Tessemae's attempted to issue an instrument it purports satisfies the Exit Fee. *See* Ex. 13, Aff. of J.R. Schuble, ¶24.

23.     Tessemae's has not paid the Exit Fee to date and the full amount remains due and owing, plus interest accruing at the rate of 15.00% *per annum*. *See* Ex. 2, §1.2 ("interest shall accrue on the unpaid principal balance of this Note at a rate of an aggregate of 15.00% *per annum*").

24.     As of December 21, 2022, $3,078,125 in interest has accrued, making for a total balance owed in the amount of $10,578,125, which continues to accrue daily interest in the amount of $3,125. *See* Ex. 13, Aff. of J.R. Schuble, ¶31.

25.     Despite their obligations under the Guaranty Agreement, the Vetters have not paid anything to Democracy, also placing them in breach of the Guaranty Agreement and the other Loan Documents.

<u>**STANDARD OF REVIEW**</u>

7

26.     Rule 2-501 provides that summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *Lightoilier v. Hoon*, 387 Md. 539, 551–52 (2005) (quoting Rule 2-501(f)).  To meet its burden, the movant must demonstrate the absence of a genuine issue of material fact. *Nerenberg v. RICA of S. Maryland*, 131 Md. App. 646, 660 (2000).  A fact is material only if it affects the outcome of the case. *Pence v. Norwest Bank Minnesota, N.A.*, 363 Md. 267, 279 (2001).  Once the movant satisfies its burden, the burden shifts to the opposing party to "identify with particularity each material fact as to which it is contended that there is a genuine dispute." *See* Rule 2-501(b); *see also Warsham v. James Muscatello, Inc.*, 189 Md. App. 620, 634 (2009) ("The party opposing a motion for summary judgment must show disputed material facts with precision in order to prevent the entry of summary judgment.").

27.     Summary judgment is not defeated by "general allegations which do not show facts in detail and with precision," nor will "bare allegations" or "a mere scintilla of evidence" suffice to support the non-movant's position. *Warsham*, 189 Md. App. at 634; *see also Beatty v. Trailmaster Products, Inc.*, 330 Md. 726, 738 (1993) ("[T]he party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts."). Likewise, "a person opposing summary judgment cannot merely allude to the existence [evidence] and thereby hope to raise the specter of dispute over a material fact which would defeat a motion for summary judgment." *Beatty*, 330 Md. at 738.  Rather, "there must be evidence upon which the jury could reasonably find for the moving party." *Nerenberg*, 131 Md. App. at 660.  Furthermore, in deciding a summary judgment motion, the court should resolve all inferences that can be drawn from the evidence and pleadings in the record in favor of the opposing party, but "those inferences must be <u>reasonable</u> ones." *Beatty*, 330 Md. at 739 (emphasis in original).

8

### DEMOCRACY IS ENTITLED TO JUDGMENT IN ITS FAVOR
### ON COUNTS I AND II OF THE SECOND AMENDED COMPLAINT

28.     The existence of the Prohibited Pre-Maturity Loans is undisputed, as evidenced by 1) the notes attached to the various complaints filed by the creditors who extended the loans, which Notes bear the signature of Tessemae's CEO, Gregory Vetter; and 2) the affidavits each of the creditors have offered in support of their motions for summary judgment in each of the litigation matters arising out of the Prohibited Pre-Maturity Loans. *See* Exs. 4-12.

29.     Each of the Prohibited Pre-Maturity Loans is a separate violation of Section 6.6 of the Loan Agreement, which expressly prohibits Tessemae's from incurring additional indebtedness absent prior ***express written approval*** from Democracy. *See* Ex. 1, §6 & 6.6.

30.     Furthermore, there is no requirement for Democracy to provide Tessemae's with written notice of a violation of Section 6.6 of the Loan Agreement, nor is there any cure period afforded to Tessemae's for a breach of any of the Negative Covenants in Section 6.6. *See id.*, §7.1.d. <u>Violation of Negative Covenant</u> (explaining that the violation of "any of the negative covenants set forth in Section 6 of" the Loan and Security Agreement is an Event of Default not subject to a notice-and-cure or grace period).

31.     Accordingly, it is undisputed that Events of Default occurred on:

- **August 21, 2019** (by virtue of the loans from Benjamin Griswold, IV, Jupiter Fund LLC, K2 Trust);

- **November 27, 2019** (by virtue of the loans from Jupiter Fund LLC and K2 Trust);

- **December 18, 2019** (by virtue of the loan from Jupiter Fund LLC);

- **January 14, 2020** (by virtue of the loan from Jupiter Fund LLC);

- **January 21, 2020** (by virtue of the loan from Fleet Street Club III, LP);

- **January 22, 2020** (by virtue of the loan from Gabriel and Denise Poggi);

- **February 3, 2020** (by virtue of the loan from K2 Trust);

- **February 7, 2020** (by virtue of the loan from Jonathan and McKensie Kish);

- **February 14, 2020** (by virtue of the loans from M&C Irrevocable Trust and C&J Irrevocable Trust);

- **February 24, 2020** (by virtue of loan from GPS Family Trust);

- **March 12, 2020** (by virtue of the loan from Benjamin Griswold, IV); and

- **March 27, 2020** (by virtue of the loan from Jupiter Fund LLC).

*See* Exs. 4-12.

32.    Tessemae's lost the right to issue a warrant in lieu of paying the Exit Fee when it obtained the very first Prohibited Pre-Maturity Loan without Democracy's express written consent, and there is no genuine dispute relative to these facts.  *See* Ex. 2, §1.5.

33.    Any contentions by Tessemae's that genuine disputes of material fact exist regarding whether Democracy provided its approval of the Prohibited Pre-Maturity Loans are flagrantly false.

34.    It is undisputed that Democracy did not provide written approval of the Prohibited Pre-Maturity Loans. *See* Ex. 13, Aff. of J.R. Schuble, ¶¶13-20.

35.    In fact, Tessemae's did not even attempt to obtain Democracy's approval of the Prohibited Pre-Maturity Loans. *See id.*

36.    There is only one instance in which Tessemae's sought Democracy's approval of additional indebtedness:  on or about August 5, 2019, Tessemae's sought Democracy's consent to

enter into a "short term bridge note" with "certain existing investors" in the amount of $220,000. *See* Ex. 13, Aff. of J.R. Schuble, ¶¶16-19.

37.    Democracy consented to this "short term bridge note." *See id.*

38.    Although Tessemae's did not identify the "certain existing investors" who were expected to extend this "short term bridge note," none of the lenders of the Prohibited Pre-Maturity Loans were existing investors when Democracy's Loan was made. *See* Ex. 13, Aff. of J.R. Schuble, ¶18.

39.    The only Prohibited Pre-Maturity Loans that Tessemae's incurred around the time of the August 21, 2019 email requesting approval of "short term bridge note" was $1.5 million in additional indebtedness from three Prohibited Pre-Maturity Loan creditors who were not previously disclosed to Democracy as being "existing investors." *See* Ex. 4 (noting $500,000 loan from Benjamin Griswold, IV on August 21, 2019); *see also* Ex. 5 (noting $500,000 loan from Jupiter Fund LLC on August 21, 2019); *see also* Ex. 6 (noting $500,000 loan from K2 Trust on August 21, 2019); *see also* Ex. 13, Aff. of J.R. Schuble, ¶18.

40.    As such, Democracy's approval of short-term financing to existing investors does not constitute an approval of term debt to new lenders.

41.    Nevertheless, even if the approved $220,000 "short term bridge note" was part of the Prohibited Pre-Maturity Loans, that still would leave $13,280,000 which Tessemae's did not disclose to Democracy, let alone obtain proper authorization ***prior*** to incurring the debt.

42.    Tessemae's may contend that it informed Democracy of the Prohibited Pre-Maturity Loans vis-à-vis informal oral conversations, but any such contention would be completely untrue and woefully inadequate to serve as evidence of a genuine dispute of material fact regarding whether Democracy approved of this additional indebtedness.

11

43.     First, Tessemae's simply never informed Democracy whatsoever of the Prohibited Pre-Maturity Loans, whether in writing or in the course of conversations. *See* Ex. 13, Aff. of J.R. Schuble, ¶¶13-14; *see also* Ex. 14, Aff. of J. Plack, ¶¶5-11.

44.     Second, any such requests for approval ***had to be in writing***. *See* Ex. 1, §6 ("Until the Liabilities are repaid in full, ***without the prior written consent of Lender***, which consent may be granted or withheld in Lender's sole discretion unless otherwise indicated herein: … 6.6. *No Additional Indebtedness*.") (emphasis added).

45.     Third, the requirement set forth in Section 6 of the Loan Agreement that Democracy's consent to additional indebtedness be in writing could itself only be modified in writing, which further renders as irrelevant any argument that Democracy orally approved of the Prohibited Pre-Maturity Loans. *See id.*, §9.8 ("*No Oral Modification*. Neither this Agreement nor any term, condition, representation, warranty, covenant, or agreement set forth in this Agreement may be changed, waived, discharged, or terminated orally but only by an instrument in writing by the party against whom such change, waiver, discharge, or termination is sought.").

46.     There is simply no evidence demonstrating that Tessemae's even notified Democracy of the Prohibited Pre-Maturity Loans, which in and of itself is also an Event of Default that is not subject to any notice or cure provision. *See id.*, §5.8; *see also* §7.1.c. Breach of Affirmative Covenant (explaining that a notice-and-cure period "shall not apply to the failure to give Lender any required notice").

47.     Additionally, Tessemae's was obligated to promptly inform Democracy of the litigation arising out of the Prohibited Pre-Maturity Loans, and the fact that each of those creditors has already moved for summary judgment demonstrates why that notice was required to be promptly delivered. *See id.*, §5.20. The failure to provide prompt notice of those lawsuits is also

an Event of Default that is not subject to any notice or cure provision. *See id.*, §5.8; *see also* §7.1.c. Breach of Affirmative Covenant (explaining that a notice-and-cure period "shall not apply to the failure to give Lender any required notice").

48.    Based upon the numerous Events of Default caused by incurring the Prohibited Pre-Maturity Loans without obtaining Democracy's prior written approval, Tessemae's forfeited its option to issue a Warrant in lieu of paying the Exit Fee, per the unambiguous terms of Section 1.5 of the Note. Ex. 2, §1.5.

49.    Accordingly, it is undisputed that Tessemae's was obligated to pay the Exit Fee at maturity.

50.    Tessemae's has not paid the Exit Fee to date, and the full amount remains due and owing, plus interest accruing at the rate of 15.00% *per annum*. *See* Ex. 2, §1.2 ("interest shall accrue on the unpaid principal balance of this Note at a rate of an aggregate of 15.00% *per annum*").

51.    As of **December 21, 2022**, $3,078,125 in interest has accrued, making for a total balance owed in the amount of $10,578,125, which continues to accrue **daily interest in the amount of $3,125**. *See* Ex. 13, Aff. of J.R. Schuble, ¶¶31-32.

52.    Despite their obligations under the Guaranty Agreement, the Vetters have not paid anything to Democracy, also placing them in breach of the Guaranty Agreement and the other Loan Documents.

53.    Based on all the foregoing, Democracy is entitled to judgment in its favor in the amount of $10,578,125, plus additional interest at the daily rate of $3,125 accrues between December 21, 2022 and the date of the Court's entry of judgment in favor of Democracy.

### DEMOCRACY IS ENTITLED TO SUMMARY JUDGMENT IN ITS FAVOR ON DEFENDANT'S COUNTERCLAIM

54.     Democracy is entitled to summary judgment in its favor because Defendants' counterclaim is grounded in false allegations that Tessemae's was not in default of the Loan Agreement when it is undisputed that it was in default as early as August 21, 2019.

55.     Additionally, relative to Counts III and IV of the Counterclaim, the express terms of the subordination agreements between Democracy and the recipients of the letters that Defendants complain of in their counterclaim obligate Democracy to provide the requisite notice it delivered in or around August 2022. Because those Subordination Agreements are stamped with "CONFIDENTIAL TESSEMAE'S", Democracy did not attach them to its Motion to Dismiss, but copies can be provided for the Court's inspection.

### RESERVATION OF RIGHTS

56.     The Note permits Democracy to assess Default Interest, which Democracy would unequivocally be permitted to assess as early as August 19, 2019, and a Late Charge due to Tessemae's failure to pay when due all the Liabilities. *See* Ex 2, §§1.3 & 2.2.b.

57.     The Note also permits Democracy to recover its attorneys' fees incurred in connection with the enforcement of its rights under the Loan Documents. *See id.*, §§2.2.c & 2.3.

58.     The Loan Agreement includes a non-merger clause permitting Democracy to exercise remedies cumulatively in the sole discretion of Democracy. *See* Ex. 1, §7.2.d.

59.     In reliance on the non-merger clause, Democracy is reserving all rights to pursue a recovery of any and all default interest, late fees, attorneys' fees incurred and any other such fees as permitted under the Loan Agreements at a later date and/or in another separate matter.

WHEREFORE, for all of the foregoing reasons, Democracy Capital Corporation respectfully requests:

14

A.      That summary judgment be entered in its favor and against Tessemae's on Count I of the Second Amended Complaint;

B.      That summary judgment be entered in its favor and against Gregory and Genevieve Vetter on Count II of the Amended Complaint;

C.      That Tessemae's, Gregory Vetter and Genevieve Vetter are held to be jointly and severally liable to Democracy Capital Corporation for said judgment in the amount of $10,578,125, plus daily interest for each day that runs between the date of this filing and the Court's entry of judgment in favor of Democracy Capital Corporation at the daily rate of $3,125; and

D.      Any other equitable relief that this Court deems is just and proper.

Date:  December 23, 2022          /s/Mark J. Dimenna
                                 Mark J. Dimenna
                                 CPF No. 1012140200
                                 Joyce A. Kuhns
                                 CPF No. 8406010206
                                 OFFIT KURMAN, P.A.
                                 300 E. Lombard Street
                                 Suite 2010
                                 Baltimore, Maryland 21202
                                 Mark.Dimenna@offitkurman.com
                                 Joyce.Kuhns@offitkurman.com
                                 Phone: (410) 209-6411
                                 Fax:    (410) 209-6435
                                 *Counsel for Democracy Capital Corporation*

### **RULE 20-201 CERTIFICATION**

The undersigned hereby certifies that the foregoing pleading does not contain any restricted information within the meaning of Md. Rule 20-201(h).

/s/Mark J. Dimenna

15

Mark J. Dimenna
CPF No. 1012140200

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 23rd day of December 2022, a copy of the foregoing *Democracy Capital Corporation's Motion for Summary Judgment*, Exhibits and Proposed Order attached thereto were filed and served electronically upon counsel for all parties through the Court's electronic filing and service system.

*/s/Mark J. Dimenna*
Mark J. Dimenna
CPF No. 1012140200

E-FILED; Baltimore County Circuit Court
Docket: 12/30/2022 7:25 PM; Submission: 12/30/2022 7:25 PM

| | | |
|---|---|---|
| DEMOCRACY CAPITAL<br>CORPORATION, | * | IN THE |
| | * | CIRCUIT COURT |
| Plaintiff/Counter-Defendant, | | |
| | * | FOR |
| v. | * | BALTIMORE COUNTY |
| TESSEMAE'S, LLC, *et al.*, | | |
| | * | Case No.: C-03-CV-20-004048 |
| Defendants/Counter-Plaintiffs. | | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### DEFENDANTS' OPPOSITION TO DEMOCRACY CAPITAL CORPORATION'S SECOND MOTION FOR SUMMARY JUDGMENT

Tessemae's, LLC ("Tessemae's"), and Greg Vetter and Genevieve Vetter (jointly, "the Vetters" and, together with Tessemae's, "Defendants") hereby oppose Democracy Capital Corporation's ("Democracy Capital's") Second Motion for Summary Judgment.

### INTRODUCTION

In 2019 and early 2020, Democracy Capital encouraged Tessemae's to borrow tens of millions of dollars of junior subordinated debt from third-party lenders. It did so partly because Democracy Capital had loaned Tessemae's $3 million, the maturity date for that two-year loan was April 2020, and Democracy Capital understood that it would be repaid from the new money that Tessemae's sought to borrow, which it was.

In its second pre-discovery motion for summary judgment, Democracy Capital now argues (for the first time in this two-year-old litigation) that Tessemae's breached its contractual obligations by borrowing money from August 2019 to March 2020 without notifying Democracy Capital or obtaining its approval to do so. Second Summ. J. Mot. ¶ 12.[1] According to Democracy

---

[1] Democracy Capital also makes a variety of other slanderous assertions that are incorrect and irrelevant to the present second summary-judgment motion. *See id.* ¶¶ 1–4.

Capital, there is "no evidence" that Tessemae's ever notified it of these loans, *id.* ¶¶ 42, 46, and any suggestion that Democracy Capital knew anything about these loans before December 2022 is "completely untrue." *See id.* ¶¶ 17, 42–43 & Ex. 13 (Schuble Decl.) ¶ 13 (stating Democracy Capital was unaware of these loans until December 2022).[2]

This is untrue as evidenced by contemporaneous correspondence between the parties. While there are many genuine disputes of material fact between the parties, this much cannot fairly be disputed: Democracy Capital not only knew about the loans, but it encouraged Tessemae's to borrow this money. Democracy Capital even offered to help Tessemae's secure from third-party lenders the millions of dollars it sought in 2019 and 2020. The notion that Democracy Capital knew nothing about these loans until December 2022 (let alone that Tessemae's concealed the loans from Democracy Capital) is patently false.

Between August 2019 and March 2020, Tessemae's borrowed money for two reasons: (1) to launch a new product, and (2) to pay back Democracy Capital. Before borrowing a single dime, Tessemae's explained to Democracy Capital why it needed to borrow money and how much money it sought to borrow. As negotiations with two potential major lenders progressed, Tessemae's provided real-time updates to Democracy Capital. When the loan negotiations concluded and Tessemae's selected a lender, Tessemae's informed Democracy Capital of that decision. When Tessemae's received money from that lender, it again notified Democracy Capital. At all times, Democracy Capital strongly supported Tessemae's efforts to borrow money

---

[2] In its frivolous Motion to Strike (filed Dec. 18, 2022), Democracy Capital further alleged that Tessemae's "actively concealed the existence of [these loans] to both Democracy and this Court" and thus "has not been candid with this tribunal," "misled this Court," made "materially false assertions" and "material misrepresentations" to the Court, made "deceptive" arguments in Court, and was "dishonest." Mot. to Strike ¶¶ 4, 5, 8, 16, 18, 25. Democracy Capital apparently has abandoned these assertions, and for good reason—not only are they false, but they are flatly contradicted by the contemporaneous correspondence between the parties.

and approved of the package of loans that Tessemae's negotiated. Democracy Capital never told Tessemae's it should not borrow this money and never told Tessemae's the loans it negotiated with third parties violated the terms of the Tessemae's–Democracy Capital loan.

After raising its new argument at the eleventh hour—despite knowing about these loans for years—Democracy Capital is attempting to engineer a crisis, claiming that it is running out of time "to protect its rights." Second Summ. J. Mot. ¶ 4. That too is false. If Tessemae's really did owe Democracy Capital more money—it does not—Democracy Capital would be Tessemae's senior secured lender and could assert its rights against any other borrowers seeking repayment from Tessemae's. But that has nothing to do with this case.

Further, any purported emergency is of Democracy Capital's making. Almost three years ago, Tessemae's paid off the Democracy Capital loan (including by sending Democracy Capital a $3.4 million check) and tendered a valid warrant to Democracy Capital worth an additional $7.5 million. That the current lawsuit continues today reflects only Democracy Capital's unreasonable and bad-faith effort to squeeze even more money out of Tessemae's.

Tessemae's has every reason to believe that discovery will further bolster its affirmative defenses, particularly once it has access to Democracy Capital's files, including its ESI. Not surprisingly, Democracy Capital is doing its utmost to avoid discovery. This Court already has vacated Democracy Capital's confessed judgment, denied its motion for reconsideration, and denied its first pre-discovery summary-judgment motion. This Court should deny this latest motion, which is built on a foundation of patent falsehoods, and, at long last, allow the parties to engage in discovery and litigate the merits of their dispute.

## BACKGROUND

### Tessemae's Informed Democracy Capital About Loan Negotiations.

In April 2018, Democracy Capital loaned Tessemae's $3 million, which Tessemae's was to pay back (with interest) by April 2020. This was a "bridge loan," meaning it was interim financing that helped Tessemae's fulfill short-term needs until it could find a more permanent funding source. Ex. 1 (Vetter Decl.) ¶¶ 3–4. Democracy Capital advertises itself as "a lender who specializes in . . . bridge loans," whose clients "are in need of transitional financing." *See* https://www.democracycapital.com/about (last visited December 30, 2022). Before Democracy Capital loaned Tessemae's money, both parties understood that $3 million was insufficient to satisfy Tessemae's capital needs and that Tessemae's would need to raise millions of additional dollars during the two-year loan period to meet its long-term goals. *Id.* ¶ 5. During negotiations with Tessemae's, Democracy Capital inquired how Tessemae's would pay off the loan, and Tessemae's responded that it intended to raise about $20 million from third-party investors and use part of that money to repay Democracy Capital. *Id.* ¶¶ 5–6; Ex. 2 (Costa Decl.) ¶¶ 5–6.

In accordance with the plan that Tessemae's and Democracy Capital had discussed, by the spring or summer of 2019, Tessemae's had entered into negotiations with two major potential lenders: Morgan Stanley and Jupiter Fund LLC ("Jupiter Fund"). Ex. 1, Vetter Decl. ¶ 6; Ex. 2, Costa Decl. ¶ 7. During this time, Tessemae's CEO Greg Vetter was in regular contact with Democracy Capital's Jim Plack concerning the state-of-play of these negotiations, how much money Tessemae's sought to borrow from these lenders, and how Tessemae's intended to use that money. Ex. 1, Vetter Decl. ¶ 6; Ex. 2, Costa Decl. ¶¶ 7–13. Tessemae's chief financial

officer also was in regular contact with Democracy Capital on these same issues. Ex. 1, Vetter Decl. ¶ 6.[3]

Democracy Capital not only approved of Tessemae's efforts to borrow money from Morgan Stanley or Jupiter Fund—it actively supported Tessemae's efforts, including by asking Tessemae's who it was talking to in order to see whether Democracy Capital knew the players and could facilitate the discussions. Ex. 1, Vetter Decl. ¶¶ 7–8; Ex. 2, Costa Decl. ¶¶ 9, 13. Democracy Capital also advised Tessemae's as to how it should use money obtained from Morgan Stanley or Jupiter Fund to grow Tessemae's business. Ex. 1, Vetter Decl. ¶ 7. Democracy Capital approved of, and encouraged, Tessemae's efforts to borrow money because it knew Tessemae's would use part of the money to pay off the Democracy Capital loan. *Id.* ¶¶ 5, 7–8, 20–21, 24–25; Ex. 2, Costa Decl. ¶¶ 5–6, 13, 19. Tessemae's, in turn, repeatedly reassured Democracy Capital that one priority use of the funds it sought would be to repay Democracy Capital. Ex. 1, Vetter Decl. ¶ 21.[4]

Around the time Tessemae's was negotiating with Morgan Stanley and Jupiter Fund, Tessemae's borrowed $220,000 from existing investors to meet an immediate financing need. Ex. 1, Vetter Decl. ¶ 10 & Ex. 1-A. On Aug. 5, 2019, Tessemae's informed Democracy Capital of this loan, and Democracy Capital approved the loan in writing the next day. *Id.*

In or around the fall of 2019, Tessemae's received loan offers from Morgan Stanley and Jupiter Fund. Ex. 1, Vetter Decl. ¶¶ 9–13; *see* Ex. 2, Costa Decl. ¶¶ 9–13. Tessemae's explained

---

[3] Tessemae's intended to use the money to launch a new product (a "shelf-stable" salad dressing that, unlike Tessemae's other products, did not require refrigeration) and pay back Democracy Capital. Ex. 1, Vetter Decl. ¶ 5; Ex. 2, Costa Decl. ¶ 6. Tessemae's also kept Democracy Capital informed regarding the launch of its new product. *See* Ex. 3 (Cooper Decl.) ¶ 3 & Ex. 3-A (April 26, 2019 email from L. Thomas to J. Plack).

[4] In April 2020, Tessemae's did, in fact, use money raised from Jupiter Fund and associated investors to pay off the debt to Democracy Capital. Ex. 2, Costa Decl. ¶¶ 19, 24.

to Democracy Capital the details of both offers. Ex. 1, Vetter Decl. ¶¶ 9, 11–13; Ex. 2, Costa

Decl. ¶¶ 8–13. For instance, on June 6, 2019, Tessemae's then-CFO emailed to Democracy

Capital the potential terms of a loan from Morgan Stanley. Ex. 3-B (June 6, 2019 Email from L.

Thomas to J. Plack). On July 10, 2019, Tessemae's again updated Democracy Capital on the

ongoing negotiations with Morgan Stanley. Ex. 3-C (July 10, 2019 Email from L. Thomas to J.

Plack). On September 4, 2019, in response to a prior request from Mr. Plack, Tessemae's

emailed to Democracy Capital a "term sheet" outlining the terms of the potential loan from

Jupiter Fund and associated investors. Ex. 1, Vetter Decl. ¶ 11 & Ex. 1-B. The next day, Mr.

Plack emailed Tessemae's asking for additional information about the potential loan from Jupiter

Fund and associated investors. Ex. 1, Vetter Decl. ¶¶ 12–13 & Ex. 1-C.

**Tessemae's Informed Democracy Capital About the Jupiter Fund Loan.**

In or around the fall of 2019, Tessemae's decided to accept the Jupiter Fund offer.

Tessemae's notified Democracy Capital when it accepted this offer. Ex. 1, Vetter Decl. ¶ 14; Ex.

2, Costa Decl. ¶ 14. Tessemae's and Democracy Capital were in frequent contact during this

time. On September 19, 2019, for instance, Mr. Plack texted Mr. Vetter and asked for another

update on the loan negotiations with Jupiter Fund. Ex. 1, Vetter Decl. ¶ 15 & Ex. 1-D. In

response, Mr. Vetter replied, "All things on track," because Jupiter Fund was moving forward

with loaning Tessemae's a large amount of money. *Id.*

Tessemae's also explained to Democracy Capital the terms on which it would borrow

money from Jupiter Fund, including the fact that Jupiter Fund debt would be junior

(subordinated) to Democracy Capital debt. Ex. 1, Vetter Decl. ¶ 20; Ex. 2, Costa Decl. ¶ 17.

Tessemae's also repeatedly assured Democracy Capital it would use money from Jupiter Fund to

pay off the Democracy Capital loan prior to the April 2020 maturity date. Ex. 2, Costa Decl. ¶ 19.

Jupiter Fund and Tessemae's targeted a total loan amount of approximately $20 million. Ex. 1, Vetter Decl. ¶¶ 9, 19; Ex. 2, Costa Decl. ¶ 10. However, Jupiter Fund did not agree to loan this entire amount as a lump sum. Instead, Jupiter Fund sent the money in tranches over a series of months. Ex. 1, Vetter Decl. ¶ 16; Costa Decl. ¶¶ 15–16. For instance, Jupiter Fund sent $1.5 million on August 21, 2019. It then sent $3 million on November 27, 2019, and another $3 million on January 14, 2020. Tessemae's informed Democracy Capital that money would arrive in tranches, and it also notified Democracy Capital when it actually received the money. Ex. 1, Vetter Decl. ¶ 17.

As a formal matter, not all of these tranches of money came from Jupiter Fund, because Jupiter Fund represented a group of investors who had decided to pool their resources in order to make a major investment in Tessemae's. Ex. 2, Costa Decl. ¶¶ 11–12; Ex. 1, Vetter Decl. ¶ 16.[5] Nonetheless, Jupiter Fund and Tessemae's negotiated a single loan package. Ex. 2, Costa Decl. ¶ 5. In negotiations with Tessemae's, a single Jupiter Fund employee represented Jupiter Fund and the group of associated investors. *Id.* ¶ 11. When Jupiter Fund and its associated investors sent Tessemae's additional money via a new tranche, Tessemae's and Jupiter Fund did not engage in a new round of negotiations—the new loan was made on the same terms as prior ones. Ex. 1, Vetter Decl. ¶ 16; *see* Second Summ. J. Mot. Ex. 6, Ex. 1 ¶ 1 (Aug. 21, 2019 promissory note between Tessemae's and a Jupiter Fund-associated investor) (stating the note "is one of a series" of notes "issued by [Tessemae's] to investors with identical terms and on the same form as set

---

[5] Gabriel and Denise Poggi, Benjamin H. Griswold, IV, M&C Irrevocable Trust, C&J Irrevocable Trust, Jonathan and McKensie Kish, Fleet Street Club III, LP, GPS Family Trust, and K2 Trust are all investors associated with Jupiter Fund. Ex. 2, Costa Decl. ¶ 12.

forth herein (except that the holder, principal amount and date of issuance may differ in each Note)." The maturity date for all the loans from Jupiter Fund and its associated investors is the same (regardless of when the tranche was extended), further underscoring that all of the money extended to Tessemae's was part of a single loan package. Ex. 2, Costa Decl. ¶ 16.

Tessemae's explained the details of this loan structure to Democracy Capital. Democracy Capital understood that, although Tessemae's was negotiating with Jupiter Fund, the money it received in tranches was coming from both Jupiter Fund and a series of investors associated with Jupiter Fund. Ex. 1, Vetter Decl. ¶¶ 16–17; Ex. 2, Costa Decl. ¶¶ 14, 18; *see* Ex. 1-B at 2 (term sheet for Jupiter Fund loan stating the money would come from Jupiter Fund "or any of [its] affiliates"). Tessemae's notified Democracy Capital when Jupiter Fund and associated investors sent a new tranche of money, continually updated Democracy Capital as to how much total money Tessemae's had received, and explained how Tessemae's intended to use the money. Ex. 1, Vetter Decl. ¶¶ 16–17, 21; Ex. 2, Costa Decl. ¶¶ 18–19.

Tessemae's also informed Democracy Capital in real time as to the increasing total amounts of money that Jupiter Fund and its associated investors agreed to lend and the amount of money Tessemae's had received. Ex. 1, Vetter Decl. ¶ 17; Ex. 2, Costa Decl. ¶ 18. On September 19, 2019, for instance, Democracy Capital's Jim Plack texted Mr. Vetter and asked when Jupiter Fund would commit to lending $20 million. Ex. 1, Vetter Decl. ¶¶ 18–19 & Ex. 1-D. Mr. Vetter replied that he expected such a commitment within 60 days. *Id.* On January 22, 2020, Mr. Plack texted Mr. Vetter and inquired whether Tessemae's already had raised $12 million from Jupiter Fund. Ex. 1, Vetter Decl. ¶¶ 22–23 & Ex. 1-E. In response, Mr. Vetter explained that Jupiter Fund and associated investors had committed to loaning $12 million. *Id.*

8

Democracy Capital approved of the Jupiter Fund loan and encouraged Tessemae's to borrow this money so Tessemae's could grow its business and repay Democracy Capital. Ex. 1, Vetter Decl. ¶¶ 5, 7–8, 20, 24–25; Ex. 2, Costa Decl. ¶¶ 5, 13. Democracy Capital never objected to Tessemae's efforts to raise money from Jupiter Fund and its associated investors and never stated or suggested that Tessemae's efforts to borrow this money violated the terms of the loan agreement between Tessemae's and Democracy Capital. Ex. 1, Vetter Decl. ¶ 25; Ex. 2, Costa Decl. ¶ 20. In fact, Democracy Capital encouraged Tessemae's to borrow millions of dollars from Jupiter Fund and approved of the Jupiter Fund loans. Ex. 1, Vetter Decl. ¶¶ 24–25; Ex. 2, Costa Decl. ¶¶ 5, 13.[6]

### The Parties Corresponded About the Jupiter Fund Loan in 2019–2020.

Although Democracy Capital alleges Tessemae's never notified it of the loan from Jupiter Fund and associated investors, Second Summ. J. Mot. ¶¶ 17, 42–43, 46, that allegation is belied by the parties' correspondence throughout the fall of 2019 and early 2020, which shows that they regularly discussed the Jupiter Fund loan. Although Tessemae's and Democracy Capital (especially Tessemae's CEO Greg Vetter and Democracy Capital's Jim Plack) frequently spoke on the phone or in person, Ex. 1, Vetter Decl. ¶ 29 & Ex. 1-F, the two parties also emailed and texted about the loan. In those emails and texts, Mr. Plack inquired about the Jupiter Fund

---

[6] That Democracy Capital enthusiastically supported Tessemae's efforts to borrow money in the fall of 2019 and early 2020 is further underscored by its response to Tessemae's efforts to secure a $220,000 loan from a non-Jupiter Fund source in the summer of 2019. When Tessemae's explained to Democracy Capital the need for this loan, Democracy Capital promptly and explicitly approved of it, without asking for any further details. Ex. 1, Vetter Decl. ¶ 10 & Ex. 1-A.

loan and received updates as to how much money Jupiter Fund was willing to loan to Tessemae's and how much it had loaned to date. For example:

- On September 4, 2019, Tessemae's then-CFO emailed the "term sheet" for the Jupiter Fund loan to Democracy Capital, in response to Mr. Plack's request. Ex. 1, Vetter Decl. ¶ 11 & Ex. 1-B.

- On September 5, 2019, Mr. Plack emailed Tessemae's then-CFO, because Mr. Plack was "looking for the $30m term sheet [Tessemae's] spoke about." Ex. 1-C (Sept. 5, 2019 email from J. Plack to L. Thomas). Mr. Vetter previously had informed Mr. Plack that Jupiter Fund had written a non-binding term sheet outlining a potential total loan amount of $30 million. Mr. Plack, who was fully aware of the negotiations with Jupiter Fund and the co-investors, wanted to review the non-binding term sheet to stay abreast of the ongoing negotiations. Ex. 1, Vetter Decl. ¶¶ 12–13.

- On September 19, 2019, Mr. Plack texted Mr. Vetter and asked, "What is going on with Poggi," to which Mr. Vetter replied, "All things on track." Ex. 1-D (text messages between G. Vetter and J. Plack). In his text message, Mr. Plack was referring to "Biff" Poggi, the leader of Jupiter Fund. By asking "[w]hat is going on with Poggi," Mr. Plack was asking Mr. Vetter for an update on the Jupiter Fund loan. Ex. 1, Vetter Decl. ¶ 15. Mr. Vetter replied, *inter alia*, "All things on track," because Jupiter Fund already had agreed to loan Tessemae's a large amount of money that would enable Tessemae's to repay Democracy Capital, which was Democracy Capital's principal concern. *Id.*

- On September 19, 2019, Mr. Plack texted Mr. Vetter and asked, "When do you expect closing in the larger 20m facility." Ex. 1-D (text messages between G. Vetter and J. Plack). That same day, Mr. Vetter responded, "Next 60 days." *Id.* In his text message,

10

Mr. Plack was inquiring as to when Jupiter Fund would formally commit to loaning $20 million, an amount that Mr. Plack knew the parties were discussing. At the time, Mr. Vetter expected to receive such a commitment within 60 days. Ex. 1, Vetter Decl. ¶¶ 18–19.

- On January 22, 2020, Mr. Plack texted Mr. Vetter and asked, "Were you able to complete your $12m raise?" Ex. 1-E (Jan. 22, 2020 text messages between G. Vetter and J. Plack). That same day, Mr. Vetter responded, "Yes." *Id.* Mr. Plack was inquiring as to the latest total money commitment from Jupiter Fund; as of January 2020, Jupiter Fund and its associated co-investors had committed to loaning $12 million to Tessemae's, which is what Mr. Vetter confirmed in his response. Ex. 1, Vetter Decl. ¶¶ 22–23.

### The Parties Corresponded About the Jupiter Fund Loan After 2020.

Democracy Capital and Tessemae's continued to correspond about the money Tessemae's had received from Jupiter Fund and its associated investors even after Tessemae's had paid off Democracy Capital in April 2020—further underscoring that Democracy Capital's assertion that it knew nothing about the Jupiter Fund loans until December 2022 is false. In January 2022, the parties discussed the Jupiter Fund loans in settlement negotiations after Democracy Capital demanded additional information about the loans. For example:

- On January 28, 2022, Mr. Vetter and Mr. Costa told Democracy Capital's Jim Plack to specify which financial information "he needs to think through a possible solution," and Tessemae's "will do our best to provide." Ex. 2, Costa Decl. ¶ 23 & Ex. 2-A at 2–3 (Jan. 28, 2022 emails between G. Vetter, D. Costa, and J. Plack). In response, Mr. Plack asked Tessemae's to detail, *inter alia*, the "[u]ses of the Jupiter money." *Id* at 2. Mr. Plack was

referring to the loans received from Jupiter Fund and associated investors. Ex. 2, Costa Decl. ¶ 23.

- On January 31, 2022, Mr. Costa responded to Mr. Plack's inquiry regarding uses of the Jupiter Fund loans. He again explained that "[t]he use of proceeds [from] Jupiter was a mix of opex and debt repayment." Ex. 2-B at 1 (Jan. 31, 2022 emails between D. Costa and J. Plack). The term "opex" refers to Tessemae's operating expenses, while "debt repayment" refers to Tessemae's repayment in April 2020 of the $3 million loan from Democracy Capital. Ex. 2, Costa Decl. ¶ 24.

- On January 31, 2022, Tessemae's sent Democracy Capital a schedule of all loans and the amounts due on those loans, including the 2019–2020 loans in question. Ex. 2, Costa Decl. ¶ 25 & Ex. 2-B. This again shows Democracy Capital knew about these loans.

**ARGUMENT**

I.    **Tessemae's Complied with Its Obligations Under Loan Agreement § 6.6.**

Tessemae's fully complied with its obligations under Loan Agreement § 6.6, which required Tessemae's to obtain approval from Democracy Capital before borrowing money during the April 2018–April 2020 loan period. At all relevant times, Democracy Capital not only approved of Tessemae's efforts to borrow money from Jupiter Fund but strongly supported Tessemae's efforts—including because it ensured Democracy Capital would get repaid—and even offered to help Tessemae's raise this money.

In August 2022, Democracy Capital immediately approved, in writing, Tessemae's request to take out a $220,000 loan from third-party investors. Ex. 1-A. Over the ensuing months, Democracy Capital repeatedly made clear—in writing—that it approved of the Jupiter Fund loans and was anxious for Tessemae's to borrow this money. On September 19, 2019, for

12

instance, Mr. Plack asked Mr. Vetter when he expected to receive a commitment from Jupiter Fund to loan Tessemae's $20 million. Ex. 1-D. On January 22, 2020, Mr. Plack asked if Tessemae's had successfully raised $12 million from Jupiter Fund. Ex. 1-E. And Democracy Capital never suggested Tessemae's should not (let alone could not) borrow this money.

Construing all inferences in Tessemae's favor—as this Court must do on summary judgment—Democracy Capital consented, in writing, to the loans in question. Democracy Capital explicitly approved, in writing, the first loan that Tessemae's negotiated during the time period in question—the $220,000 loan with third-party investors in early August 2019. In the following weeks and months, Democracy Capital encouraged Tessemae's, including in various writings, to borrow millions of dollars from the Jupiter Fund. This satisfies Loan Agreement § 6—or, at minimum, reveals that a genuine dispute exists as to whether Tessemae's satisfied Loan Agreement § 6. That is especially true when considering that contractual covenants like the one in Section 6 "ordinarily require[] only substantial compliance" rather than strict compliance. *See Gebhardt & Smith LLP v. Md. Port Admin.*, 188 Md. App. 532, 567 (2009).

## II.    Defendants' Affirmative Defenses of Bad Faith, Estoppel, Waiver, Unclean Hands, and Contract Modification Preclude Summary Judgment.

Even if this Court concludes Democracy Capital never approved of the loans in question in writing, summary judgment nonetheless is inappropriate, because Defendants are entitled to discovery regarding their affirmative defenses of bad faith, equitable estoppel, waiver, unclean hands, and contract modification. These defenses are fact-dependent, and their merits are rarely decided at the summary-judgment stage. *See Clancy v. King*, 405 Md. 541, 571 (2008) ("Good faith ordinarily is a question of fact."); *Travelers Indem. Co. v. Nationwide Const. Corp.*, 244 Md. 401, 414 (1966) ("[W]hether or not an estoppel exists is a question of fact to be determined in each case."); *Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Ctr. at Parole, LLC*, 421

13

Md. 94, 123–24 (2011) ("Given the highly factual nature of the waiver inquiry, it is an uncommon case in which the issue can be resolved by summary judgment."); *id.* at 122 ("whether subsequent conduct of the parties amounts to a modification . . . of their contract is generally a question of fact").

### A. Democracy Capital Acted in Bad Faith with Respect to Loan Approval.

In every contract "there exists an implied covenant that each of the parties thereto will act in good faith and deal fairly with the others." *Julian v. Christopher,* 320 Md. 1, 9 (1990). Here, Democracy Capital's duty to act in good faith applies to the "performance and enforcement" of the loan documents. *See Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362 (2012). Pursuant to this duty, Democracy Capital "must refrain from doing anything that will have the effect of injuring or frustrating the right of [Tessemae's] to receive the fruits of the contract[s]." *See Clancy*, 405 Md. at 571. Here, Democracy Capital has consistently acted in bad faith. It knew, even before it loaned money to Tessemae's in April 2018, that Tessemae's would need to raise about $20 million dollars in 2019–2020. It repeatedly encouraged Tessemae's to borrow this money from Jupiter Fund and associated investors, approved of these loans, and even offered to help Tessemae's secure this funding from Jupiter Fund. Democracy Capital never told Tessemae's that, by raising this money without reducing Democracy Capital's approval to writing, Tessemae's was violating § 6.6 of the Loan Agreement.

Now, more than three years after Tessemae's raised the Jupiter Fund money and more than two-and-a-half years after Tessemae's paid off the Democracy Capital loan, Democracy Capital argues—for the first time—that it knew nothing about the Jupiter Fund loans and that Tessemae's owes it $10.5 million due to Tessemae's purported failure to secure written (as opposed to oral) approval. Democracy Capital's conduct is a textbook example of bad faith,

14

because it has "frustrat[ed] the right of [Tessemae's] to receive the fruits of" its deal with Democracy Capital. *See Clancy*, 405 Md. at 571. The Loan Agreement allows Tessemae's to raise the funds it needs, and Democracy Capital told Tessemae's to raise this money—apparently while secretly believing that Tessemae's failure to comply with a technicality (written, as opposed to oral, approval for the loans) would enable it to argue Tessemae's owed it $10.5 million. At the very least, a genuine dispute exists as to whether Democracy Capital's bad-faith actions preclude summary judgment.

For similar reasons, the doctrine of "unclean hands" bars Democracy Capital's claims. That doctrine states that "courts of equity will not lend their aid to anyone seeking their active interposition, who has been guilty of fraudulent, illegal, or inequitable conduct in the matter with relation to which he seeks assistance." *Dickerson v. Longoria*, 414 Md. 419, 455 (2010). That is precisely the case here—Democracy Capital's bad faith and shameless gamesmanship should not be rewarded.

**B. Democracy Capital Is Estopped from Arguing Written Approval Was Required.**

Estoppel applies if one party's acts mislead the other party to its prejudice—even if "there is no intent to mislead." *Travelers Indem. Co.*, 244 Md. at 414. Estoppel "rests upon a detrimental change of position induced by the acts or conduct of the party estopped," *Lipitz v. Hurwitz*, 435 Md. 273, 292 (2013), and requires "only conduct that reasonably causes another to act in a certain way," *Scottsdale Ins. Co. v. Bounds*, No. TJS-11-2912, 2013 WL 937905, at *5 (D. Md. Mar. 8, 2013). In general, estoppel applies if a party's conduct—"including his spoken and written words, his positive acts and his silence or negative omission to do anything"—would

15

"render[] it inequitable and unconscionable to allow the rights or claims to be asserted or enforced." *Travelers Indem. Co.*, 244 Md. at 414. *Id.*[7]

Here, Democracy Capital is estopped from arguing Tessemae's breached Loan Agreement § 6, because Democracy Capital informally approved of the loans, championed Tessemae's efforts to borrow the money in question, and never breathed a word of Tessemae's purported failure to attain written approval for more than three years. *See Mohr v. Universal C.I.T. Credit Corp.*, 216 Md. 197, 207 (1958) (estoppel applies where one party, through words or actions, lulls the other into a false sense of security). Because Democracy Capital did, in fact, approve of the loans—and told Tessemae's the same—it cannot now argue Tessemae's owes it over $10 million for failing to attain formal approval. *See id.* at 209 (estoppel applies where one party induces the other to refrain from taking action that would save the other from loss); *see also Bean v. Steuart Petroleum Co.*, 244 Md. 459, 467 (1966). Estoppel precludes such a claim, and Tessemae's should have the opportunity to develop its defense through normal discovery.

**C. Democracy Capital Waived Its Right to Argue Written Approval Was Required.**

Democracy Capital has also waived its right to argue, as it now attempts to do, that Tessemae's owes it $10.5 million because, although Democracy Capital approved of the loans in question, it never formalized its approval in writing.

"Waiver is the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from circumstances." *Hovnanian*, 421 Md. at 122. Waiver "require[s] mutual knowledge and acceptance, whether implicit or explicit, of the non-conforming action." *Id.* at 120. Here,

---

[7] "It is well established that there may be an estoppel raised to prevent a [party] from relying upon a right of . . . contract or of remedy." *Kline v. Lightman*, 243 Md. 460, 474 (1966).

before borrowing a single dime, Tessemae's fully informed Democracy Capital of the loans in question. Because Democracy Capital approved of these loans, encouraged Tessemae's to borrow this money, and did not object to any aspect of the loans for years, Democracy Capital waived its right to argue that Tessemae's failed to obtain written approval. *See id.* at 123 (a party may waive a contract right "by agreeing, in advance, to a course of action which would not otherwise comply with a contractual requirement"); *Pumphrey v. Pelton*, 250 Md. 662, 670 (1968) (party waived the right to object to a breach by allowing the breaching activity to continue and not objecting); *see generally id.* at 667 (in general, "a party to an executory bilateral contract, who keeps the same in existence after a known breach by the other party and accepts further performance from the party who has committed the breach, waives the breach").

### D. The Parties Modified the Contract to Allow Non-Written Approval.

Summary judgment is also inappropriate because the parties modified the Loan Agreement to allow oral, rather than written, approval of the Jupiter Fund loans. "[P]arties to a contract may agree to vary its terms and enter into a new agreement embodying the changes agreed upon." *Fantle v. Fantle*, 140 Md. App. 678, 687–88 (2001). The new agreement need not "be in writing or expressly stated," and "[a]ssent to an offer to vary, modify or change a contract may be implied and found from circumstances and the conduct of the parties showing acquiescence or agreement." *Id.* Contractual limitations on future modifications—such as requiring that any contract modifications be in writing—do not prevent parties from entering new agreements orally or by performance. *Hovnanian*, 421 Md. at 118–23 ("a party can modify or waive contractual provisions despite a provision purporting to limit those abilities"); *Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 88 (4th Cir. 2016) (applying Maryland law)

("Parties may modify their original agreement by their conduct notwithstanding a written agreement that any change to a contract must be in writing").

At the least, the conduct of the parties, and the communications between them, make clear that they both agreed that non-written approval of the loans in question would suffice, thereby modifying the requirement that Tessemae's obtain written approval before taking on new loans. Although Democracy Capital argues the requirement that Democracy Capital approve new loans in writing "could itself only be modified in writing," Second Summ. J. Mot. ¶ 45 (citing Loan Agreement § 9.8), that argument ignores binding case law that states that such contractual limitations are ineffective. *See Hovnanian*, 421 Md. at 118–23; *Galloway*, 819 F.3d at 88. At minimum, a genuine dispute exists as to this issue too.

## III.    Democracy Capital's Additional Arguments All Fail for the Same Reasons.

Although Democracy Capital raises a host of additional issues, they all fail, because genuine disputes exist as to whether Democracy Capital approved the loans in question.

First, Democracy Capital argues it "had no obligation to provide any notice to Tessemae's of the defaults caused by the" loans. Second Summ. J. Mot. ¶ 14; *see id.* ¶ 30. But that is irrelevant with respect to affirmative defenses like bad faith, estoppel, waiver, and contract modification. The duty to act in good faith applies to every contract, regardless of its specific provisions. Similarly, a party may waive its rights, including through its conduct, irrespective of a contract's particular terms. Indeed, as the Court of Appeals recently confirmed, a party may waive its rights even if the contract in question purports to forbid waiver. *See Hovnanian*, 421 Md. at 123 (no-waiver clauses do not preclude waiver); *see id.* at 126 n.20.

Next, Democracy Capital argues that Tessemae's "was also obligated to notify" Democracy Capital of Events of Default purportedly caused by the loans in question. Second

18

Summ. J. Mot. ¶¶ 15–16, 19. But the loans did not cause an Event of Default, because Democracy Capital had approved them. In any event, Tessemae's fully informed Democracy Capital about these loans in real time—including while they were still being negotiated.

Democracy Capital also argues Tessemae's was "obligated to notify Democracy [Capital] of the lawsuits filed" against Tessemae's in late 2022. *Id.* ¶ 18. But this Court already has determined that genuine disputes exist as to whether Tessemae's fully complied with its loan obligations as of April 2020. If Tessemae's had fully complied as of April 2020, it would have no obligations vis-à-vis Democracy Capital with respect to lawsuits filed in late 2022.

## CONCLUSION

For Democracy Capital, this litigation is about squeezing more out of Tessemae's. Tessemae's has already paid Democracy Capital $4 million and offered Democracy Capital a $7.5 million warrant. But Democracy Capital wants more, and it is willing to mislead this Court in order to get it. The undisputed evidence—evidence that Tessemae's hastily assembled in less than two weeks over the winter holiday—shows that Democracy Capital's claims are false. Democracy Capital has known about the Jupiter Fund loans for years, and, especially when construing all evidence in Tessemae's favor, Democracy Capital approved of the loans in question. Tessemae's is entitled to discovery, because genuine disputes exist as to whether Democracy Capital approved of the loans and as to Tessemae's affirmative defenses. For Tessemae's, this is bet-the-company litigation involving over $10 million. On this record, and before the parties have even started discovery, summary judgment is inappropriate.

Dated:  December 30, 2022

Respectfully submitted,

*/s/ Andrew D. Levy*
Andrew D. Levy (CPF # 8205010187)
(adl@browngold.com)
Kevin D. Docherty (CPF # 1212110239)
(kdocherty@browngold.com)
James O. Strawbridge (CPF # 1612140265)
(jstrawbridge@browngold.com)
Lauren J. Kelleher (CPF # 2008030009)
(lkelleher@browngold.com)
BROWN GOLDSTEIN & LEVY LLP
120 East Baltimore Street, Suite 2500
Baltimore, Maryland 21202
T:  (410) 962-1030
F:  (410) 385-0869

*Attorneys for Defendants/Counter-Plaintiffs*

## RULE 20-201 CERTIFICATION

The undersigned hereby certifies that the foregoing pleading does not contain any

restricted information within the meaning of Md. Rule 20-201(h).

*/s/ Andrew D. Levy*
Andrew D. Levy (CPF # 8205010187)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this 30th day of December, 2022, a copy of the

foregoing Opposition was filed and served upon counsel for all parties through the court's

MDEC filing and service system.

*/s/ Andrew D. Levy*
Andrew D. Levy

20

DEMOCRACY CAPITAL
CORPORATION,

      Plaintiff/Counter-Defendant,

v.

TESSEMAE'S, LLC, *et al.*,

      Defendants/Counter-Plaintiffs.

    \*     IN THE

    \*     CIRCUIT COURT

    \*     FOR

    \*     BALTIMORE COUNTY

    \*     Case No.: C-03-CV-20-004048

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### DEFENDANTS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF THEIR OPPOSITION TO DEMOCRACY CAPITAL CORPORATION'S SECOND MOTION FOR SUMMARY JUDGMENT

Tessemae's, LLC ("Tessemae's"), and Greg Vetter and Genevieve Vetter (jointly, "the Vetters" and, together with Tessemae's, "Defendants") file this Supplemental Memorandum in support of their Opposition to Democracy Capital Corporation's ("Democracy Capital's") Second Motion for Summary Judgment.

    1.     During the January 4, 2023, hearing on Democracy Capital's Second Motion for Summary Judgment, Democracy Capital argued, for the first time, that Tessemae's breached § 5.4 of the Second Amended and Restated Loan and Security Agreement ("Loan Agreement") by failing to sign agreements with Jupiter Fund, LLC ("Jupiter Fund") and its affiliated lenders expressly stating that debt would be subordinated to Democracy Capital's debt.[1] Democracy Capital did not make this argument in its second motion for summary judgment.

_____

[1] By arguing that Tessemae's violated § 5.4 at the January 4, 2023, hearing, Democracy Capital ignored the Court's explicit instruction at the December 19, 2022, hearing that any new arguments that Democracy Capital wished to raise needed to be made in its Second Motion for Summary Judgment. Instead, Democracy Capital has again moved the goalposts, alleging a violation of § 5.4 only after being confronted with evidence that undercuts the central allegation in its Motion to Strike and Second Motion for Summary Judgment: that "Democracy only learned of the Prohibited Pre-Maturity Loans when, in the course of conducting research, Democracy discovered multiple lawsuits pending against Tessemae's." Second Mot. Summ. J. ¶ 17. Democracy Capital's pattern

2.     The attached affidavits from George Nemphos, Tessemae's corporate counsel, and Greg Vetter, Tessemae's CEO, address why Tessemae's did not enter into such subordination agreements with Jupiter Fund and the associated investors.

3.     As Mr. Nemphos explains, the funds Tessemae's borrowed from Jupiter Fund were used to pay off the Democracy Capital loan. Therefore, there was no need to clarify that the Jupiter Fund debt would be subordinate to the Democracy Capital debt because the Democracy Capital debt would no longer exist (its maturity date was April 2020) when the Jupiter Fund debt came due (in December 2021). Ex. 1, Nemphos Aff. ¶¶ 7–10. When new debt is used to pay off existing debt, as was the case here, subordination agreements are not typically needed, because the new money is used to pay off the old debt. *Id.*

4.     Despite knowing about the Jupiter Fund loans, Democracy Capital did not state that a subordination agreement was necessary and, in these circumstances, it would have been surprising if Democracy Capital had stated a subordination agreement was necessary. *Id.* ¶¶ 7, 10–13.

5.     Moreover, the loans from Jupiter Fund and associated investors were unsecured. The Democracy Capital loan, by contrast, was secured debt. That means that, by definition, the package of loans that Tessemae's received from Jupiter Fund and associated investors were subordinate to the Democracy Capital loan, even absent an express subordination agreement. Put differently, because it was senior secured debt, the Democracy Capital loan necessarily had priority of payment in terms of repayment over the Jupiter Fund loans. *Id.* ¶ 14.

---

of continuously changing its allegations is antithetical to the Maryland Rules and deeply prejudicial to Tessemae's and the Vetters' ability to defend themselves in this substantial litigation.

6.      For both reasons, negotiating and drafting subordination agreements here would have served no purpose and instead would have only driven up the transaction costs associated with the financing, such as attorneys' fees. *Id.* ¶¶ 7, 13.

7.      It is undisputed that Democracy Capital "encouraged" Tessemae's to pursue financing from Jupiter Fund. As Democracy Capital's counsel made clear at the hearing, lenders like Democracy Capital regularly keep an eye on "the exit" (*i.e.*, their own payoff) and encourage their borrowers to secure financing to "take them [*i.e.*, the lender] out."

8.      Through the fall of 2019, Mr. Vetter and Democracy Capital's Mr. Plack were in close contact about Tessemae's plans to raise money from Jupiter Fund in order to pay off Democracy Capital. Tessemae's "repeatedly assured Democracy Capital that one priority use of the Jupiter Fund money was to pay off the Democracy Capital loan before the April 10, 2020, maturity date." Vetter Aff. ¶ 21.

9.      Further, Tessemae's and Democracy Capital specifically discussed the fact that the Jupiter Fund loans were junior, *i.e.*, subordinated, to the Democracy Capital loan. Vetter Aff. ¶ 20 ("Tessemae's and Democracy Capital also discussed the terms on which Tessemae's was borrowing money from Jupiter Fund and the associated investors, including the fact that all of the debt from Jupiter Fund would be junior to the debt from Democracy Capital.").

10.     Democracy Capital never stated or suggested that Tessemae's should negotiate subordination agreements even though Mr. Vetter and Democracy Capital's Jim Plack routinely discussed the Jupiter Fund loans, including the fact that all debt from Jupiter Fund would be junior to the debt from Democracy Capital. Ex. 2, Second Vetter Affidavit ¶¶ 4–5. In fact, one reason Democracy Capital so enthusiastically encouraged Tessemae's to borrow money from

Jupiter Fund was because Democracy Capital knew the Jupiter Fund debt was unsecured, meaning it was subordinate to the Democracy Capital debt. *Id.* ¶ 6.

11.    Democracy Capital knew that Tessemae's was borrowing money from Jupiter Fund and associated lenders. It knew how much money Tessemae's was borrowing, and it knew the terms of the loan, including the fact that the Jupiter Fund debt would be junior to the Democracy Capital debt. Vetter Aff. ¶¶ 15–23, Ex. 1-D, 1-E. Nonetheless, Democracy Capital never stated or suggested that a subordination agreement with Jupiter Fund was necessary or was a condition of its consent. Ex. 2, Second Vetter Aff. ¶¶ 8–9.

12.    Instead, Democracy Capital enthusiastically encouraged Tessemae's to borrow money from Jupiter Fund. Vetter Aff. ¶¶ 7, 8, 25.

13.    At least two reasonable inferences stem from Democracy Capital's silence: (a) Democracy Capital (a sophisticated lender) knew that that the Jupiter Fund loans were subordinate by operation of law because they were unsecured, Ex. 1, Nemphos Aff. ¶ 14; Ex. B, Second Vetter Aff. ¶¶ 5–7, and/or (b) Democracy Capital understood that subordination agreements were unnecessary because the Jupiter Fund money was being used to pay off Democracy Capital, Ex. 1, Nemphos Aff. ¶¶ 7–13.

14.    Indeed, it was so clear to all involved that the money from Jupiter Fund would be used to pay off Democracy Capital that the parties' counsel spoke by telephone on January 8, 2020, to discuss modifications to the Loan Agreement. Modifying the Loan Agreement was necessary because the parties had agreed that Tessemae's could place $150,000 in escrow pending the resolution of a dispute with another (subordinated) creditor. *See* Vetter Aff., Ex. 1E (text message communications from Dec. 13, 2019: "Give me a call when you can today so we can talk about pay off." "Your structure is fine. Leave $150k outstanding").

4

15.     The parties agreed to modify the Loan Agreement to account for the reduced payoff amount and to make other changes as well, including but not limited to removing various covenants in the Loan Agreement. Ex. 1, Nemphos Affidavit ¶ 15 & Ex. A. Among other things, the parties agreed that all guarantors and obligors (which would include the Vetters) would be released from their obligations with respect to the Democracy Capital loan. *Id.* ¶ 16.

16.     After that January 8, 2020 call between counsel for both parties, Tessemae's corporate counsel sent Democracy Capital's counsel a redline showing changes to the Loan Agreement. Ex. A, Nemphos Affidavit ¶ 17 & Ex. A. Tessemae's counsel also confirmed that, "as we discussed during our call, it is our understanding that our clients have agreed that all guarantors and obligors will be released from their obligations in connection with the loan."[2] *Id.*

17.     Democracy Capital's counsel acknowledged receipt of the January 8, 2020 email from Nemphos Braue but then refused to respond in substance. *Id.* ¶¶ 18–20.

18.     Despite knowing about the Jupiter Fund loans and their specific terms, Democracy Capital did not mention the loans—or any purported shortcomings related to them—when it sent Tessemae's a Notice of Default on February 21, 2020.

19.     Democracy Capital's failure to raise any issue about the Jupiter Fund loans in its February 21, 2020 Notice of Default, or to otherwise complain about them before December 18, 2022 (notwithstanding its undisputed awareness of them) creates a genuine dispute of material fact regarding whether Tessemae's equitable defenses (waiver, equitable estoppel, bad faith, unclean hands, and contract modification) apply.

---

[2] The e-mail from Tessemae's counsel is additional evidence that (at minimum) reveals a genuine dispute of material fact regarding whether the Vetters are proper parties to this lawsuit as guarantors. If, as the January 8, 2020, e-mail reflects, the parties agreed to release the guarantors, then Democracy Capital's claims against the Vetters must be dismissed. Defendants should be permitted to explore this issue in discovery, including by deposing Mr. Rosenberg.

20.     The parties also expressly agreed in late 2019 and early 2020 that the Vetters would not be held liable for the Democracy Capital loan. Ex. A, Nemphos Affidavit ¶¶ 16–17.

21.     Among the gaping holes in this record are Democracy Capital's contemporaneous internal communications.  Discovery will permit an examination into what it knew, when it knew it, and what it expected of Tessemae's.

WHEREFORE, for the foregoing reasons, as well as all of those set forth in Tessemae's prior opposition to Democracy Capital's motion, Democracy Capital's Second Motion for Summary Judgment should be denied.

Respectfully submitted,

*/s/ Andrew D. Levy*
Andrew D. Levy (CPF # 8205010187)
(adl@browngold.com)
Kevin D. Docherty (CPF # 1212110239)
(kdocherty@browngold.com)
James O. Strawbridge (CPF # 1612140265)
(jstrawbridge@browngold.com)
Lauren J. Kelleher (CPF # 2008030009)
(lkelleher@browngold.com)
BROWN GOLDSTEIN & LEVY LLP
120 East Baltimore Street, Suite 2500
Baltimore, Maryland 21202
T:  (410) 962-1030
F:  (410) 385-0869

Dated:  January 6, 2023                *Attorneys for Defendants/Counter-Plaintiffs*

## RULE 20-201 CERTIFICATION

The undersigned hereby certifies that the foregoing pleading does not contain any restricted information within the meaning of Md. Rule 20-201(h).

*/s/ Andrew D. Levy*
Andrew D. Levy (CPF # 8205010187)

6

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this 6th day of January, 2023, a copy of the foregoing Supplemental Memorandum was filed and served upon counsel for all parties through the court's MDEC filing and service system.

*/s/ Andrew D. Levy*
Andrew D. Levy

## IN THE CIRCUIT COURT FOR BALTIMORE COUNTY, MARYLAND

| | | |
|---|---|---|
| **DEMOCRACY CAPITAL CORPORATION** | } | |
| | } | |
| Plaintiff, | } | |
| **v.** | } | **Case No.** C-03-CV-20-004048 |
| | } | |
| **TESSEMAE'S LLC, *et al.*** | } | |
| | } | |
| Defendants. | } | |

## MOTION TO STRIKE SUPPLEMENTAL OPPOSITION TO SECOND MOTION FOR SUMMARY JUDGMENT

Democracy Capital Corporation ("Democracy"), by its undersigned counsel, files this Motion to Strike Tessamae's LLC's Supplemental Opposition to Second Motion for Summary Judgment and, in support, states:

1.     At the conclusion of the December 20, 2023 hearing, the Court set a briefing and hearing schedule for Plaintiff's Second Motion for Summary Judgment on its Second Amended Complaint and specifically admonished counsel that no replies would be permitted. Nonetheless, expressly in violation of this Court's directive, after a full opportunity to be heard at the January 4, 2023 hearing on the Second Motion for Summary Judgment, after the conclusion of argument and after the Court taking the matter under advisement, Tessemae's LLC ("Tessemae's), without permission and in the face of a court directive to the contrary, has filed a "supplemental" Opposition (the "Supplement"). This pleading is improper under the Maryland Rules and is an impermissible attempt to circumvent a court directive and undermine Plaintiff's due process rights. It should be summarily stricken[1].

---

[1]     On January 10, 2023, in a further attempt to subvert Plaintiff's due process rights and prior to Plaintiff's filing this Motion to Strike the Supplement, Defendants filed what is styled as an "Objection to Further Pre-Discovery Summary Judgment Briefing" (the "Objection"). The arguments set forth in this Motion to Strike apply with equal force to the improper Objection.

2.       Tessamae's attempts to justify its Supplement by incorrectly claiming that Democracy first introduced at the January 4 hearing the fact that Section 5.4 of the Loan Agreement requires all indebtedness of Tessemae's to be subject to a written subordination agreement.  However, it was Tessamae's that raised this issue repeatedly in its Opposition, referring to the Jupiter Fund debt as "subordinate" or "junior" both in the very first sentence of the Introduction paragraph and again at page 6, and referring to Democracy as the "senior" lender on page 3 of its Opposition.  Gregory Vetter also specifically highlights subordination of the Jupiter Fund debt in Paragraph 20 of his Affidavit (*see* Exhibit 1 attached to the Opposition).  The only opportunity for Democracy to point out to the Court that the Loan Agreement requires subordination to be in writing, as it properly did, was at the January 4, 2023 hearing on the record.  Furthermore, there is nothing that would have precluded Tessamae's from seeking permission from the Court but instead it preemptively filed its Supplement, taking unfair advantage.

3.       Cutting through the noise, the Supplement in fact adds nothing relevant to this Court's consideration.  The Loan Agreement  requires Tessemae's to obtain "the prior written consent of Lender, which consent may be granted or withheld in Lender's sole discretion" prior to incurring any indebtedness (subject to certain exceptions that are not applicable). *See* Section 6 of the Loan Agreement. The Loan Agreement also requires that all of Tessemae's indebtedness to any person for other than non-purchase money obligations "shall be subordinated to repayment of the Loan pursuant to a subordination agreement in form and substance acceptable to [Democracy] in [Democracy's] sole discretion." *See* Section 5.4 of the Loan Agreement. And, the Loan Agreement does not permit waiver except in writing and specifically states that any "failure or delay" by Democracy shall not constitute a waiver nor "preclude [Democracy] from exercising any such right, power, or remedy at any later time or times." *See* Section 7.2.f of the Loan

2

Agreement. None of these provisions are ambiguous; and Tessemae's acknowledges that it did not obtain Democracy's written consent to the Jupiter Fund debt, that the Jupiter Fund debt is not subject to a written subordination, and that Democracy did not waive any of these requirements in writing. The Jupiter Fund $20 million indebtedness was obtained on August 21, 2019 in violation of the terms of the Loan.

      4.      The facts as presented by Tessemae's in its Opposition and the exhibits attached thereto further show that Tessemae's (1) routinely referred to the Jupiter Fund facility as a "potential offering," as "equity" or as a "capital raise" and did not advise Democracy that this facility would be new debt, (2) sent Democracy an irrelevant term sheet rather than the actual term sheet for the Jupiter Fund facility, failing to produce the correct term sheet even after specific request, (3) did not send any requests for approval to Democracy despite acknowledging previously through its then CFO that formal approval to incur additional indebtedness was required, (4) did not provide Democracy copies of any relevant documentation (in fact, Tessemae's sent the incorrect term sheet to Democracy even after it had signed the actual deal documents for the Jupiter Fund facility and has not provided a copy of the Convertible Note Purchase Agreement to this day), and (5) advised Democracy on several different occasions that Tessemae's had not closed on the Jupiter Fund facility when Tessemae's had in fact done so. Strikingly, on September 19, 2019, James Plack with Democracy directly asked Mr. Vetter, Tessemae's CEO, for a status report regarding the Jupiter Fund facility and Mr. Vetter replied, "All things on track" and that closing will occur within the "Next 60 days", even though Mr. Vetter, on behalf of Tessemae's, had actually closed the Jupiter Fund transaction a month earlier. It took five months and several additional requests by Mr. Plack for information before Mr. Vetter finally admitted that the Jupiter Fund facility had closed, after which Democracy promptly declared a default citing Tessemae's failure to provide required information as one of the enumerated breaches. These are the "facts"

presented by Tessemae's to support its position that it kept Democracy "fully informed" of the Jupiter Fund deal. Tessemae's has not produced a single communication with Democracy in which it provided Democracy with any accurate information regarding the terms of the Jupiter Fund debt.

5.      The only case that Tessemae's relies on for the contention that it need merely "substantially comply" with the Loan Documents is *Gebhardt & Smith LLP v. Md. Port Admin.*, 188 Md. App. 532, 567 (2009). However, the "substantial compliance" discussion in the *Gebhardt* case is factually inapposite because, in the *Gebhardt* case, the tenant argued that its obligation to perform and pay building operating expenses was excused due to the landlord's failure to use a certified public accountant to perform the audit of the operating expenses as required by the lease, which it maintained constituted a condition precedent requiring strict compliance. Here, it is the borrower, not the lender, that has the express and contractual duty to obtain lender's prior written consent. The only relevant holding from the *Gebhardt* case is that Maryland subscribes to the objective principle of contracts: "'[i]t is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'" *Gebhardt,* 188 Md. App. at 566 (internal citation omitted). Tessamae's cites no case law supporting its unfounded conclusion that "informal consent" can be substituted for written consent and a written subordination when the Loan Documents expressly require such documentation, as here. Even if the substantial compliance doctrine were relevant to this case (it is not), the case law is clear that this concept is applicable only to covenants rather than to conditions precedent and only where there has been an attempt to fully comply, which did not occur here. A plain reading of the operative terms of the Loan Agreement reveals that prior written consent to new indebtedness and entry into a written subordination agreement are, in fact, conditions precedent to the lender's approval of such additional indebtedness. And, even if Tessemae's was correct that the "substantial compliance"

4

concept is applicable to these facts, the undisputed facts of record show that Tessemae's, instead of informing Democracy of the true status of the Jupiter Fund facility and obtaining written consent to issuance of that debt, repeatedly failed to disclose the Jupiter Fund facility had already closed, thus falling woefully short of even "substantial compliance." Finally, as even Tessemae's itself notes at page 16 of its Opposition, for Democracy to have waived any of its rights, the law requires such waiver to be based on "mutual knowledge and acceptance" which simply did not exist here. *Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Ctr. at Parole, LLC*, 421 Md. 94, 120 (2011).

6.      In both its Opposition and the new Supplement, Tessemae's makes a number of tangential arguments, all of which are red herrings.  For example:

A.      While Tessemae's apparently sought to modify the terms of the Democracy loan in January 2020,  Democracy never approved any of the requested changes.  In its Supplement, Tessemae's attempts to create an issue of "fact" by introducing for the first time an unsigned mark-up of the Loan Agreement that Tessemae's forwarded to Democracy's for its consideration.  This mark-up, which is characterized as a "proposal", is a far cry from a formal written amendment and certainly does not reflect a "meeting of the minds," as required for contract formation.

B.      Tessemae's  argument  that  lenders  "typically"  do  not  require  written subordination agreements from unsecured creditors is irrelevant.  This Loan Agreement expressly requires that Tessemae's must provide written subordination agreements from all lenders (not just secured creditors).  Mr. Nemphos's experience that written subordination agreements are not ordinarily required for unsecured debt is immaterial in light of the unambiguous requirement contained in this Loan Agreement.  Further, Mr. Nemphos ignores his own experience in previously negotiating over 20 written subordination agreements with unsecured creditors in this very transaction.

5

C.        Tessemae's argues that summary judgment would deprive it of the right to obtain valuable discovery.  However, as the Court itself has noted, all relevant information is already in Tessemae's possession. In addition, Tessemae's and Democracy specifically bargained for confession of judgment provisions in these Loan Documents.  This expedited remedy shifts the burden of proof, such that a defendant is responsible for producing evidence sufficient show a "meritorious defense."  In other words, Tessemae's knowingly and voluntarily entered into contracts that permit Democracy to pursue expedited remedies without the need for a formal discovery process.  The reason that Democracy bargained for this expedited relief has become abundantly clear given the volume of other claimants now breathing down Tessemae's neck and seeking imminent judgments to position themselves for post-judgment execution against Tessemae's assets. Democracy is asking the Court, after two and a half years of delays by Tessemae's, to permit Democracy the ability to pursue the remedies that it negotiated for in these Loan Documents now, to avoid any further deterioration in its position *vis a vis* other creditors.

WHEREFORE, Democracy Capital Corporation requests that the Court grant its Motion to Strike the Supplemental Opposition and grant such other relief as may be just.

Date:   January 12, 2023                    Respectfully submitted,

*/s/Mark J. Dimenna*
Mark J. Dimenna (CPF No. 1012140200)
Joyce A. Kuhns (CPF No. 8406010206)
OFFIT KURMAN, P.A.
300 E. Lombard Street, Suite 2010
Baltimore, Maryland 21202
Mark.Dimenna@offitkurman.com
jkuhns@offitkurman.com
Phone: (410) 209-6411

*Counsel for Democracy Capital Corporation*

6

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this January 12, 2023, a copy of the foregoing Motion to Strike Supplemental Opposition to Second Motion for Summary Judgment was filed and served electronically upon counsel for all parties through the court's electronic filing and service system.

/s/Joyce A. Kuhns
Joyce A. Kuhns (CPF No. 8406010206)

| DEMOCRACY CAPITAL | * | IN THE |
| CORPORATION, | | |
| | * | CIRCUIT COURT |
| Plaintiff/Counter-Defendant, | | |
| | * | FOR |
| v. | | |
| | * | BALTIMORE COUNTY |
| TESSEMAE'S, LLC, *et al.*, | | |
| | * | Case No.: C-03-CV-20-004048 |
| Defendants/Counter-Plaintiffs. | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

### TESSEMAE'S AND THE VETTERS' OPPOSITION TO
### DEMOCRACY CAPITAL'S SECOND MOTION TO STRIKE

Defendants and Counter-Plaintiffs, Tessemae's, LLC ("Tessemae's") and Gregory and Genevieve Vetter ("the Vetters"), respectfully submit this Opposition to Democracy Capital Corporation's ("Democracy Capital's") Motion to Strike Supplemental Opposition to Second Motion for Summary Judgment ("Second Motion to Strike").

Democracy Capital's motion borders on frivolous. Tessemae's and the Vetters' January 6, 2023 supplemental opposition, which Democracy Capital asks the Court to strike, responded to an argument that Democracy Capital raised for the first time at a January 4, 2023 summary-judgment hearing—that Defendants purportedly breached Section 5.4 of the Loan Agreement by failing to secure certain subordination agreements in writing.

Democracy Capital did not raise this argument in its second motion for summary judgment filed on December 23, 2022, its first motion to strike filed on December 18, 2022 (which, despite its title, raised a purported new basis for summary judgment), or in its first motion for summary judgment filed in September 2022. Because Democracy Capital did not discuss Section 5.4 in any of these prior filings, Tessemae's and the Vetters were understandably surprised when Democracy Capital raised it for the first time at the January 4, 2023 hearing. To

ensure the Court understood the relevant facts and law, Tessemae's promptly and properly filed its short supplement two days later.

Democracy Capital now urges this Court to strike Defendants' supplemental memo opposing summary judgment—even though, ironically, Democracy Capital filed a supplemental memo in support of its summary judgment motion roughly six weeks ago. Supp. Mem. In Support of Mot. for Summ. J. (filed Dec. 13, 2022). Democracy Capital offers two arguments in support of its proposed motion to strike, both of which fail. First, it argues that Tessemae's "circumvented" the briefing schedule governing Democracy Capital's second summary-judgment motion, pursuant to which "no replies would be permitted." Second. Mot. to Strike ¶ 1. But if, as Democracy Capital argues, this Court barred reply briefs, that directive would affect only Democracy Capital as the moving party, not Tessemae's. Moreover, this Court's mid-December briefing schedule did not (indeed, could not) anticipate that Democracy Capital would offer a brand-new purported basis for summary judgment at the January 4, 2023 hearing and does not preclude Defendants from responding to that new argument in writing.

Second, Democracy Capital urges the Court to strike Defendants' memo because, although a new argument raised at a hearing may justify a supplemental filing, Democracy Capital did not, in fact, make a new argument at the January 4, 2023 hearing. Second Mot. to Strike ¶ 2. But it is undisputed that Democracy Capital did not argue that it was entitled to summary-judgment based on a purported breach of Section 5.4 before the January 4, 2023 hearing. Although Defendants had noted, in their summary-judgment opposition, that the Jupiter Fund loans were subordinate to the Democracy Capital loan (before it was paid off), that statement of fact (which Democracy Capital does not contest) is distinct from Democracy

Capital's new legal argument—*i.e.*, that Defendants breached Section 5.4 by not securing written subordination agreements. *See* Second Mot. to Strike ¶ 2.

Because Democracy Capital's two arguments offered to support its motion to strike readily fail, this Court should deny the motion.

The remainder of Democracy Capital's motion—the vast bulk of its filing—does not concern its request to strike at all but instead consists of Democracy Capital's extended response to the substance of Defendants' supplemental memo, *see* Second Mot. to Strike ¶¶ 3–6, which is entirely inconsistent with the notion that Defendants' memo prejudiced Democracy Capital by "undermin[ing]" its "due process rights." *Id.* ¶ 1; *see generally Garrett v. State*, 124 Md. App. 23, 30–31 & n.2 (1998) (the party moving to strike a filing "has the burden of proving that it has been prejudiced" by that filing).[1]

To the extent the Court is inclined to consider anything beyond the first two paragraphs of Democracy Capital's motion, Defendants respond to those arguments as follows:

Democracy Capital now concedes that Tessemae's and Democracy Capital discussed the Jupiter Fund loans, and exchanged documents concerning those loans, in fall 2019 and early 2020. Second Mot. to Strike ¶ 4. Democracy Capital thus abandons the argument at the center of its December 23, 2022 summary-judgment motion—*i.e.*, that it is entitled to summary judgment because "[t]here is simply no evidence demonstrating that Tessemae's even notified Democracy of the [Jupiter Fund] Loans." Second Summ. J. Mot. ¶ 46; *see also* Second Summ. J. Mot. Ex. 13

---

[1] Defendants pause briefly to note the irony of Democracy Capital's motion and its due-process argument. After filing its own supplement—a "Supplement to Memorandum in Support of Motion for Summary Judgment"—on December 13, 2022, Democracy Capital filed another brief (its first motion to strike), in which Democracy Capital added a brand-new argument to support its summary-judgment motion, on December, 18, 2022, which was one day before a previously scheduled hearing on Democracy Capital's summary-judgment motion.

¶ 12, Ex. 14 ¶ 8 (affidavits from James Plack and J.R. Schuble swearing that Democracy Capital was completely unaware of the Jupiter Fund loans until late 2022).

Although Tessemae's and Democracy Capital corresponded about the Jupiter Fund loans in 2019 and 2020, Democracy Capital now argues it is entitled to summary judgment because the information Tessemae's provided about those loans was somehow inaccurate. Second Mot. to Strike ¶ 4. This issue is not properly before the Court. Democracy Capital did not allege it was misled in its Second Amended Complaint. Democracy Capital also did not argue it was misled in its second summary-judgment motion. Indeed, this new argument contradicts the sworn statements of Mr. Plack and Mr. Schuble (which Democracy Capital submitted as exhibits to that second summary-judgment motion), who claim not that they were misled in 2019 and 2020 but that they were unaware of the Jupiter Fund loans until late 2022. [2] To the extent any issues regarding the Jupiter Fund loans are properly before the Court at all, Democracy Capital's shifting positions reveal (at most) a factual dispute that cries out for discovery. [3]

---

[2] Moreover, Democracy Capital's allegation that it was misled is completely baseless. For instance, Democracy Capital alleges that, when Mr. Plack inquired (in mid-September 2019) when Tessemae's would "close" on a "larger 20m facility," Tessemae's response—"Next 60 days"— was misleading, because Tessemae's allegedly already had closed. Second Mot. to Strike ¶ 4; *see also id.* ¶ 3 (alleging Tessemae's obtained a $20 million loan from Jupiter Fund on August 21, 2019). That is incorrect. Although, by mid-September 2019, Jupiter Fund had loaned Tessemae's an initial tranche of money, the total amount Jupiter Fund would loan (over a series of subsequent tranches) was undecided. Opp'n to Second Mot. for Summ. J. Ex. 1 ¶¶ 18–19. Mr. Plack knew that and was inquiring, in his mid-September text message, as to when Jupiter Fund would commit to loaning a total of $20 million, which was a figure Mr. Plack knew Tessemae's and Jupiter Fund had discussed but not yet agreed upon. In his response, Mr. Vetter explained that he expected to receive such a commitment from Jupiter Fund within 60 days. *Id.*

[3] Democracy Capital's second motion to strike not only mischaracterizes the record—it mischaracterizes Defendants' arguments. In its mistaken view, for instance, "Tessemae's acknowledges that it did not obtain Democracy's written consent to the Jupiter Fund debt." Second Mot. to Strike ¶ 3. Not so. Defendants argue that "Democracy Capital consented, in writing, to the loans in question." Defs. Opp'n to Democracy Capital's Second Mot. for Summ. J. at 13.

4

With respect to waiver, Democracy Capital waived the right to argue that Tessemae's needed written approval of the Jupiter Fund loans, or a written subordination agreement, because Democracy Capital was fully informed as to the Jupiter Fund loans, encouraged Tessemae's to borrow millions of dollars from Jupiter Fund and offered its assistance in that regard, and did not object to any aspect of the loans for years—until it suited its purposes to do so. Opp'n to Second Mot. for Summ. J. at 16–17; Defendants' Supp. Mem. In Support of Opp'n to Second Mot. for Summ. J. ¶ 19. In response, Democracy Capital now notes, in its Second Motion to Strike, that waiver requires "mutual knowledge and acceptance" and states—without more—that such knowledge and acceptance "did not exist here." Second Mot. to Strike ¶ 5. Democracy Capital's argument raises more questions than it answers (including whether there was mutual knowledge and acceptance) and is not enough to support summary judgment on the issue of waiver.[4]

Democracy Capital's argument that the concept of "substantial compliance" does not apply to the Loan Agreement fares no better. With respect to contractual provisions, Maryland distinguishes between affirmative covenants and conditions precedent; the former requires only substantial compliance whereas the latter requires strict compliance. *Gebhardt & Smith LLP v. Maryland Port Admin.*, 188 Md. App. 532, 567 (2009). Loan Agreement § 5.4 is an affirmative covenant. The contract expressly states that § 5.4 is an affirmative covenant. Loan Agreement § 5 (titled "Affirmative Covenants"); *accord* Loan Agreement § 7.1(c) (referring to the "affirmative covenants" set forth in Section 5). The provisions of § 5.4 also bear no resemblance to a condition precedent. A condition precedent states "a fact . . . which, unless excused, must exist or occur before a duty of immediate performance of a promise arises." *Gebhardt & Smith*

---

[4] Tessemae's waiver argument is further supported by the fact (which Democracy Capital does not dispute, *see* Second Mot. to Strike ¶ 6(B)) that written subordination agreements typically are not required from unsecured creditors. Defendants' Supp. Memo In Support of Opp'n ¶¶ 3–6.

*LLP*, 188 Md. App. at 567. "[W]hen a condition precedent is unsatisfied, the corresponding duty of the party whose performance was conditioned on it does not arise." *Id.* Here, Section 5.4 imposes certain duties on Tessemae's but does not condition the performance of those duties on the prior existence or occurrence of any facts. Underscoring the point, Section 5.4 does not contain any of the words or phrases signaling the existence of a condition precedent ("if," "provided that," "when," "after," "as soon as," "subject to"). *See id.* at 567, 570. And if any doubt remains, courts construe ambiguous provisions as covenants, not conditions precedent. *Beckenheimer's Inc. v. Alameda Assocs. Ltd. P'ship*, 327 Md. 536, 554 (1992).

Democracy Capital argues that, even if Tessemae's need only "substantially comply" with its obligations under Section 5.4, Tessemae's necessarily failed to do so, entitling Democracy Capital to summary judgment. Not so. Substantial compliance is a fact-laden question that this Court should not decide on a pre-discovery summary judgment motion (let alone Democracy Capital's supposed "motion to strike"). *See Rhoads v. Nasco*, 242 Md. 723, 724 (1966) ("Whether there has been substantial compliance with the terms of the [] contract is ordinarily a question for the trier of the facts."). And courts routinely find substantial compliance in situations like the one here. *See, e.g.*, *Beckenheimer's Inc.*, 327 Md. at 555 (failure to provide a financial statement pursuant to a written notice requirement breached a covenant only and was not a material contractual breach); *Hartford Fire Ins. Co. v. Himelfarb*, 355 Md. 671, 691–92 (1999) (failure to timely submit a complete proof-of-loss statement pursuant to an affirmative covenant breached a covenant only and was not a contractual breach).[5]

---

[5] Even with respect to conditions precedent, where a more demanding standard applies, courts routinely refuse to impose draconian penalties (like the $10.5 million Democracy Capital seeks) for minor breaches (such as obtaining oral rather than written consent or not negotiating a written subordination agreement for loans that are, by definition, subordinate). *See, e.g.*, *B & P Enterprises v. Overland Equip. Co.*, 133 Md. App. 583, 612 (2000) (rejecting argument that plaintiffs' failure

Next, Democracy Capital argues the parties never agreed to modify the Loan Agreement because there was no finalized, written amendment and thus no "meeting of the minds." Mot. to Strike ¶ 6A. Although lawyers for Tessemae's and Democracy Capital never finalized a written amendment, such a writing is not required. *See Freeman v. Stanbern Constr. Co.*, 205 Md. 71, 78 (1954) (parties may modify a contract "by a subsequent oral agreement" even if the contract "stipulates that it may not be varied except by an agreement in writing"). Here, a genuine dispute exists as to whether the parties agreed to modify the Loan Agreement and release the Vetters from their obligations as guarantors. Defendants' Supp. Mem. in Support of Opp'n to Mot. for Summ. J. ¶ 15; *id.* Ex. 1-A (email from Tessemae's to Democracy Capital stating, "as we discussed during our call, it is our understanding that our clients have agreed that all guarantors and obligors will be released from their obligations in connection with the loan").

Finally, this Court should reject Democracy Capital's argument that discovery in this case would be irrelevant. Although Democracy Capital states (without more) that "all relevant information is already in Tessemae's possession," that is incorrect. For example, whether Democracy Capital consented to the Jupiter Fund loan and whether it waived its right to insist on a written subordination agreement depends in part on the substance of phone calls and in-person meetings between the parties. Defendants have the right to depose Democracy Capital representatives about those phone calls and meetings. Similarly, whether Democracy Capital acted in bad faith depends in part on internal communications between Democracy Capital's representatives, including Mr. Plack and Mr. Schuble.

---

to comply with a written notice requirement barred recovery where the defendant had "actual, ongoing knowledge" of the subject of the notice such that written notice would have been "duplicative"); *Speed v. Bailey*, 153 Md. 655, 660 (1927) ("When a covenant goes only to a part of the consideration of a contract, is incidental and subordinate to its main purpose, and its breach may be compensated in damages, such a breach does not warrant a rescission of the contract.").

This Court also should reject Democracy Capital's bizarre argument that, because it negotiated for confessed-judgment provisions in the Loan Documents, Tessemae's has no right to discovery now. Democracy Capital opted to file a confessed-judgment complaint, which this Court correctly vacated in May 2022. The parties are now engaged in regular litigation, and Tessemae's is entitled to discovery to support its claims and affirmative defenses.

Respectfully submitted,

   /s/ Andrew D. Levy
Andrew D. Levy (CPF # 8205010187)
(adl@browngold.com)
Kevin D. Docherty (CPF # 1212110239)
(kdocherty@browngold.com)
James O. Strawbridge (CPF # 1612140265)
(jstrawbridge@browngold.com)
Lauren J. Kelleher (CPF # 2008030009)
(lkelleher@browngold.com)
BROWN GOLDSTEIN & LEVY LLP
120 East Baltimore Street, Suite 2500
Baltimore, Maryland 21202
T:  (410) 962-1030
F:  (410) 385-0869

Dated:  January 27, 2023                    *Attorneys for Defendants/Counter-Plaintiffs*

## RULE 20-201 CERTIFICATION

The undersigned hereby certifies that the foregoing pleading does not contain any

restricted information within the meaning of Md. Rule 20-201(h).


          */s/ Andrew D. Levy*
          Andrew D. Levy

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this 27th day of January, 2023, a copy of the

foregoing Opposition was filed and served by the MDEC system on:

    Mark J. Dimenna, Esquire
    Joyce A. Kuhns, Esquire
    Offit Kurman, P.A.
    300 E. Lombard Street, Suite 2010
    Baltimore, Maryland 21202
    mark.dimenna@offitkurman.com
    joyce.kuhns@offitkurman.com

    *Attorney for Plaintiff/Counter-Defendant*


          */s/ Andrew D. Levy*
          Andrew D. Levy

9