Entered: February 6th, 2023
Signed: February 6th, 2023

**SO ORDERED**



**NANCY V. ALQUIST**
**U. S. BANKRUPTCY JUDGE**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | |
|---|---|
| In re: | (Chapter 11) |
| Tessemae's LLC,[1] | Case No. 23-10675 (NVA) |
| Debtor. | |

---

[1]  The Debtor in this Chapter 11 case and the last four digits of its federal tax identification are Tessemae's LLC (2871).  The Debtor's principal address is 714 South Wolfe Street, P.O. Box No. 38438, Baltimore, Maryland 21231.

**INTERIM ORDER (I) AUTHORIZING AND APPROVING POSTPETITION SECURED FINANCING, (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTSRATIVE EXSPENSE STATUS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) SCHEDULING FINAL HEARINGS**

Upon the motion (the "Motion"), dated February 1, 2023, of Tessemae's LLC ("Borrower" or "Debtor"), as a Debtor and Debtor-in-Possession in the above-captioned Chapter 11 case (the "Case"), pursuant to Sections 105, 361, 362, 364(c)(1), 364(c)(2) and 364(c)(3) of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") and Rules 2002, 4001(c), and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking, among other things:

(a)      authorization for Debtor to obtain post-petition loans, advances and other financial accommodations on an interim basis for a period through and including the date of the Final Hearing (as defined below) from TESSE FUND I, LLC, ("Tesse Fund")  in accordance with the DIP Credit Agreement and this "Interim Order", secured by security interests in and liens upon all of the Collateral (as defined below) pursuant to Sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, priming only MCDJR, PMCD, CE CID and LEC;

(b)      authorization for Debtor to enter into the DIP Credit Agreement, dated of even date herewith, by and among Debtor and Tesse Fund (a copy of which is annexed hereto as Exhibit A and is incorporated herein),

(c)      the grant to Tesse Fund of a superpriority administrative claim status pursuant to Section 364(c)(1) of the Bankruptcy Code in respect of all Obligations of the Borrower (as defined in the DIP Credit Agreement); and

(d)      the setting of a final hearing on the Motion.

The initial hearing on the Motion having been held by this Court on February 3, 2023 (the "Interim Hearing").

It appearing that due and appropriate notice of the Motion, the relief requested therein, and the Interim Hearing (the "Notice") having been served by the Debtor in accordance with Rule 4001(c) on (i) Tesse Fund and prepetition secured lenders, (iii) the United States Trustee for the District of Maryland (the "U.S. Trustee"), (iv) the holders of the twenty (20) largest unsecured claims against the Debtor's estate (the "20 Largest Unsecured Creditors"), (collectively, the "Noticed Parties").

BACKGROUND

A.    Petition.  On February 1, 2023 (the "Petition Date"), Debtor filed a voluntary petition (the "Petition") under Chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its businesses and manage its properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

B.    Jurisdiction and Venue.  The Court has jurisdiction of this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  The Motion is a "core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A), (D) and (M).  Venue of the Case and the Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    Notice.  Under the circumstances, the Notice given by the Debtor of the Motion, the Interim Hearing and the relief granted under this Interim Order constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001(c).

D.    Debtor's Acknowledgments and Agreements.  The Debtor admits, stipulates, acknowledges and agree that:

(i)    *Pre-Petition Financing Agreements*.  Prior to the commencement of the Case, Lender Group made loans, advances and provided other financial accommodations to Debtor pursuant to the terms and conditions set forth in the "Financing Documents".

(ii)    *Pre-Petition Obligations Amount*.  As of the Petition Date, the aggregate principal amount of all Loans,[1] and other Obligations of the Borrower by Debtor to the Lender Group was not less than $3,878,995.00 plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (the "Pre-Petition Obligations"). The Pre-Petition Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of Debtor, and are not subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, and Debtor does not possess and shall not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Obligations.

(iii)    *Pre-Petition Collateral*.  As of the Petition Date, the Pre-Petition Obligations were fully secured pursuant to the Financing Documents by valid, perfected, enforceable and non-avoidable first priority security interests and liens granted by Debtor to the Lender Group, upon all of the Pre-Petition Collateral, *pari passu* with the liens under the Senior Secured Term Loan Facility, and the lien of Democracy Capital Corporation ("Democracy") to the extent a court enters a final order finding such liens to be valid and enforceable as of the Petition Date (the "Permitted Encumbrances").  The Debtor does not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of Lender Group's liens, claims or security interests in the Pre-Petition Collateral.

Upon the record made by the Debtor at the Interim Hearing, including the Motion, and the filings and pleadings in the Case, and good and sufficient cause appearing therefor;

---

[1]  Capitalized terms used but not otherwise defined in this Interim Order shall have the respective meanings ascribed thereto in the DIP Credit Agreement.

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

  A. <u>Findings Regarding the Postpetition Financing</u>.

   (i) *Postpetition Financing*.  The Debtor has requested from Tesse Fund, and Tesse Fund is willing to extend, certain loans, advances and other financial accommodations on the terms and conditions set forth, in this Interim Order and the DIP Loan Agreement.

   (ii) *Need for Post-Petition Financing*.  The Debtor does not have sufficient available sources of working capital, including cash collateral, to operate its business in the ordinary course of its business without the financing requested under the Motion.  The Debtor's ability to maintain business relationships with its vendors, suppliers and customers, to pay its employees, and to otherwise fund its operations is essential to the Debtor's continued viability as the Debtor seeks to maximize the value of the assets of the estate for the benefit of all creditors of the Debtor.  The ability of the Debtor to obtain sufficient working capital and liquidity through the proposed post-petition financing arrangement with Tesse Fund as set forth in this Interim Order and the DIP Credit Agreement is vital to the preservation and maintenance of the going concern values of the Debtor.  Accordingly, the Debtor has an immediate need to obtain the post-petition financing in order to, among other things, permit the orderly continuation of the operation of its businesses, minimize the disruption of its business operations, and preserve and maximize the value of the assets of the Debtor's bankruptcy estate (as defined under Section 541 of the Bankruptcy Code, the "<u>Estate</u>") in order to maximize the recovery to all creditors of the Estate.

   (iii) *No Credit Available on More Favorable Terms*.  The Debtor is unable to procure financing in the form of unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code, as an administrative expense under Section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to Section 364(c)(1) of the Bankruptcy Code, without the grant of liens on assets.  The Debtor has

been unable to procure the necessary financing on terms more favorable than the financing offered by Tesse Fund pursuant to the DIP Credit Agreement.

        (iv)    *Budget*.  The Debtor has prepared and delivered to Tesse Fund Group an initial Budget.  Such Budget has been thoroughly reviewed by the Debtor and its management and sets forth, among other things, the projected information for the periods covered thereby.  The Debtor represents that the Budget is achievable in accordance with the terms of the DIP Credit Agreement and this Interim Order and will allow the Debtor to operate at all times during this case without the accrual of unpaid administrative expenses.  The Tesse Fund is relying upon the Debtor's compliance with the Budget in determining to enter into the post-petition financing arrangements provided for herein.

        (v)    *Business Judgment*.  The terms of the DIP Credit Agreement and this Interim Order are fair, just and reasonable under the circumstances, are ordinary and appropriate for secured financing to debtors-in-possession, reflect the Debtor's exercise of its prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

        (vi)    *Good Cause*.  The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtor, its creditors and its Estate, as its implementation will, among other things, provide the Debtor with the necessary liquidity to (a) minimize disruption to the Debtor's businesses and on-going operations, (b) preserve and maximize the value of the Debtor's Estate for the benefit of all the Debtor's creditors, and (c) avoid immediate and irreparable harm to the Debtor, its creditors, its businesses, its employees, and its assets.

        (vii)    *Immediate Entry*.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(c)(2).

Based upon the foregoing, and after due consideration and good cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

**Section 1.**     **Authorization and Conditions to Financing.**

1.1     <u>Motion Granted</u>.  The Motion is granted in accordance with Bankruptcy Rule 4001(c)(2) to the extent provided in this Order.

1.2     <u>Authorization to Borrow and Use Loan Proceeds</u>.  Debtor is hereby authorized and empowered to immediately borrow and obtain loans and to incur indebtedness and obligations owing to the Tesse Fund pursuant to the terms and conditions of this Interim Order, and the DIP Credit Agreement during the period commencing on the date of this Interim Order through and including the date of the Final Hearing as set forth in this Interim Order (the "<u>Interim Financing Period</u>"), in such amounts as may be made available to Debtor by Tesse Fund in accordance with the DIP Credit Agreement, Budget and this Interim Order.

1.3     <u>Financing Agreements</u>

1.3.1    Authorization.  Debtor is hereby authorized and directed to enter into, execute, deliver, perform, and comply with all of the terms, conditions and covenants of the DIP Credit Agreement and this Interim Order.

1.4     <u>Payments and Application of Payments</u>.  The Debtor is authorized and directed to make all payments and transfers of Estate property to Tesse Fund as provided, permitted and/or required under the DIP Credit Agreement and this Interim Order, which payments and transfers, subject to the terms herein, shall not be avoidable or recoverable from Tesse Fund under Section 547, 548, 550, 553 or any other Section of the Bankruptcy Code, or any other claim, charge, assessment, or other liability, whether by application of the Bankruptcy Code, other law or otherwise.  Without limiting the generality of the foregoing, the Debtor is authorized and directed, without further order of this Court, to pay or reimburse Tesse Fund for all present and future costs and expenses, including, without limitation, all reasonable professional fees, and legal fees and expenses paid or incurred by Tesse Fund in connection with

6

the financing transactions as provided in this Interim Order and the DIP Credit Agreement, all of which shall be and are included as part of the principal amount of the Obligations of Borrower and secured by the Collateral.

Section 2.     **Postpetition Lien; Superpriority Administrative Claim Status**.

2.1     Post-Petition Lien.

2.1.1   Post-Petition Lien Granting.  To secure the prompt payment and performance of any and all Post-Petition Obligations (and upon entry of the Final Order, any and all Obligations of Borrower to Tesse Fund of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, Tesse Fund shall have and is hereby granted, effective as of the Petition Date, valid and perfected, priming first priority security interests and liens, superior to all other liens, claims or security interests that any creditor of the Debtor's Estate may have (but subject to certain claims entitled to priority, including the Permitted Liens and Claims (defined below) as and to the extent expressly provided in Section 2.1.2 below), in and upon the Post-Petition Collateral.  The Post-Petition Collateral are collectively referred to herein as the "Collateral."  Notwithstanding the foregoing or anything to the contrary contained in the DIP Credit Agreement, the Collateral shall not include avoidance actions brought under Sections 542, 544, 545, 547, 548, 549 or 550 of the Bankruptcy Code.  In accordance with Sections 552(b) and 361 of the Bankruptcy Code, the value, if any, in any of the Collateral, in excess of the amount of Obligations of the Borrower secured by such Collateral after satisfaction of the Post-Petition Obligations of Debtor to Tesse Fund, shall constitute adequate protection for the use by Debtor, and the diminution in the value, of the Collateral existing on the Petition Date. For the avoidance of doubt, this Interim Order does not seek to prime Democracy and only CE CID, LEC, PMCD and MCDJR are being primed.

2.1.2   Lien Priority.  The post-petition liens and security interests of Tesse Fund granted under the DIP Credit Agreement and this Interim Order in the Collateral shall be and shall continue to be priming first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court or

otherwise, in conjunction with Section 363, 364 or any other Section of the Bankruptcy Code or other applicable law; provided, however, that Tesse Fund's liens on and security interests in the Collateral shall be subject only to (i) a lien of Democracy in the event a Court of competent jurisdiction determines by final order that it has valid, enforceable liens, and (ii) the Carve Out Expenses (as defined below) solely to the extent provided for in Sections 2.3, 2.4 and 2.5 of this Interim Order (the foregoing clauses (i) and (ii) are collectively referred to herein as the "Permitted Liens and Claims").

        2.1.3   Post-Petition Lien Perfection.  This Interim Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the post-petition liens and security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state or local requirements or law requiring notice, filing, registration, recording or possession of the Collateral, or other act to validate or perfect such security interest or lien (a "Perfection Act").  Notwithstanding the foregoing, if Tesse Fund shall, in its sole discretion, elect for any reason to file, record or otherwise effectuate any Perfection Act, Agent is authorized to perform such act, and the Debtor is authorized and directed to perform such act to the extent necessary or required by Tesse Fund, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Order notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law.  Tesse Fund may choose to file, record or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file or record such certified copy of this Interim Order in accordance with applicable law. Should Tesse Fund so choose and attempt to file, record or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the post-petition liens and security interests granted herein by virtue of the entry of this Interim Order.

2.2    <u>Superpriority Administrative Expense</u>.  For all Post-Petition Obligations and, upon entry of a Final Order, for all Obligations of Borrower, now existing or hereafter arising pursuant to this Interim Order and the DIP Credit Agreement, Tesse Fund is granted an allowed superpriority administrative claim pursuant to Section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of Debtor, whether now in existence or hereafter incurred by Debtor, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1), 546(c), 726 or 1114 of the Bankruptcy Code (the "<u>Superpriority Claim</u>"), <u>provided</u>, <u>however</u>, the Superpriority Claim shall be subject to the Permitted Liens and Claims as and to the extent expressly set forth in this Interim Order.  Again, for the avoidance of doubt, this Interim Order does not seek to prime Democracy.

2.3 <u>Carve Out Expenses</u>.

2.3.1 Carve Out Expenses. Upon the declaration by Tesse Fund of the occurrence of an Event of Default, Tesse Fund's claims and security interests in the Collateral and their Superpriority Claim shall be subject only to the right of payment of the following expenses (the "<u>Carve Out Expenses</u>"):

   a. statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6);

   b. fees payable to the Clerk of this Court; and

   c. subject to the terms and conditions of this Interim Order, the unpaid and outstanding reasonable fees and expenses actually incurred on or after the Petition Date, and approved by a final order of the Court pursuant to Sections 326, 328, 330, or 331 of the Bankruptcy Code (collectively, the "<u>Allowed Professional Fees</u>"), by attorneys, accountants and other professionals retained by the Debtor and any Committee(s) under Section 327 or 1103(a) of the Bankruptcy Code (collectively, the "<u>Professionals</u>"), in a cumulative, aggregate sum not to exceed $100,000 (the "<u>Professional Fee Carve Out</u>").

2.3.2 Excluded Professional Fees. Notwithstanding anything to the contrary in this Interim Order, neither the Professional Fee Carve Out nor the proceeds of any loans or Collateral shall be used to pay any Allowed Professional Fees or any other fees or expenses incurred by any Professional in connection with any of the following: (a) an assertion or joinder in (but excluding any investigation into) any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief: (i) challenging the legality, validity, priority, perfection, or enforceability of the Obligations of Borrower or Tesse Fund's liens on and security interests in the Collateral, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Obligations of Borrower or Tesse Fund's liens on and security interests in the Collateral, or (iii) preventing, hindering or delaying Tesse Fund's assertion or enforcement of any lien, claim, right

or security interest or realization upon any Collateral in accordance with the terms and conditions of this Interim Order, (b) a request to use the Cash Collateral (as such term is defined in Section 363 of the Bankruptcy Code) without the prior written consent of Tesse Fund in accordance with the terms and conditions of this Interim Order, (c) a request for authorization to obtain Debtor-in-Possession financing or other financial accommodations pursuant to Section 364(c) or Section 364(d) of the Bankruptcy Code, other than from Tesse Fund without the prior written consent of Tesse Fund, (d) the commencement or prosecution of any action or proceeding of any claims, causes of action or defenses against Tesse Fund or their respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from Tesse Fund under Chapter 5 of the Bankruptcy Code, or (e) any act which has or could have the effect of materially and adversely modifying or compromising the rights and remedies of Tesse Fund, or which is contrary, in a manner that is material and adverse to Tesse Fund, to any term or condition set forth in or acknowledged by the DIP Credit Agreement or this Interim Order and which results in the occurrence of an Event of Default under the DIP Credit Agreement or this Interim Order.

        2.4       <u>Payment of Carve Out Expenses</u>.

        2.4.1   Prior to the occurrence of an Event of Default, Debtor shall be permitted to pay Allowed Professional Fees of the Professionals in accordance with the Budget and any such amounts paid prior to the occurrence of an Event of Default shall not reduce the Professional Fee Carve-Out.

        2.4.2   Any payment or reimbursement made either directly by Tesse Fund at any time, or by or on behalf of the Debtor on or after the occurrence of an Event of Default, in respect of any Allowed Professional Fees or any other Carve Out Expenses (exclusive of the application of any retainers by any of the Professionals) shall, in either case, permanently reduce the Professional Fee Carve Out on a dollar-for-dollar basis.  Tesse Fund's obligation to fund or otherwise pay the Professional Fee Carve Out and the other Carve Out Expenses shall be added to and made a part of the Obligations of Borrower, secured by the Collateral, and entitle

Tesse Fund to all of the rights, claims, liens, priorities and protections under this Interim Order, the DIP Credit Agreement, the Bankruptcy Code or applicable law.  Payment of any Carve Out Expenses, whether by or on behalf of Tesse Fund, shall not and shall not be deemed to reduce the Obligations of Borrower, and shall not be deemed to subordinate any of Tesse Fund's liens and security interests in the Collateral or their Superpriority Claim to any junior pre- or post-petition lien, interest or claim in favor of any other party.  Except as otherwise provided herein with respect to the Professional Fee Carve and the other Carve Out Expenses, Tesse Fund shall not, under any circumstance, be responsible for the direct payment or reimbursement of any fees or disbursements of any Professionals incurred in connection with the case under any chapter of the Bankruptcy Code, and nothing in Section 2 of this Interim Order shall be construed to obligate Tesse Fund in any way to pay compensation to or to reimburse expenses of any Professional, or to ensure that the Debtor has sufficient funds to pay such compensation or reimbursement.

2.5    Use of Cash Collateral; Adequate Protection.

2.5.1   Authorization to Use Cash Collateral.  Subject to the terms and conditions of this Interim Order, the DIP Credit Agreement, and in accordance with the Budget, Debtor shall be and are hereby authorized to use, until the expiration of Tesse Fund's commitment to lend under the DIP Credit Agreement, the Cash Collateral (as defined in Section 363 of the Bankruptcy Code) subject to the pre-petition liens and security interests granted to the Tesse Fund.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtor or its Estate outside the ordinary course of business, or any Debtor's use of Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order, the DIP Credit Agreement, and in accordance with the Budget.

2.5.2   Replacement Liens.  As adequate protection for the diminution in value of their interests in the Pre-Petition Collateral, including Cash Collateral (the "Diminution Amount"), on account of the Debtor's use of such Pre-Petition Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve Out-Expenses, the Tesse Fund is hereby granted pursuant to Sections 361 and 363 of the Bankruptcy

12

Code, valid, binding, enforceable and perfected replacement liens upon and security interests in all Collateral to the extent of the Diminution Amount (the "<u>Replacement Lien</u>").    The Replacement Lien shall (i) be junior and subordinate only to the Carve-Out Expenses, the other Permitted Liens and Claims, and the liens and security interests granted to Tesse Fund in the Collateral securing the Post-Petition Obligations and (ii) otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral. For the avoidance of doubt, this Interim Order does not seek to prime Democracy.

2.5.3    Section 507(b) Priority Claim.    As adequate protection for the diminution in value of their interests in the Pre-Petition Collateral (including Cash Collateral) on account of the Debtor's use of such Pre-Petition Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve-Out-Expenses, the Tesse Fund is hereby granted as and to the extent provided by Section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in the case and any Successor Case (the "<u>Adequate Protection Superpriority Claim</u>").    The Adequate Protection Superpriority Claim shall be junior only to the Carve-Out Expenses and shall otherwise have priority over all administrative expense claims and unsecured claims against Debtor and its Estate now existing or hereafter arising, of any kind or nature whatsoever.

2.5.4    Other Adequate Protection.  As further adequate protection, Debtor is hereby authorized to provide adequate protection to Tesse Fund in the form of payment of interest, fees and other amounts due under the DIP Credit Agreement, at the times specified therein, to Tesse Fund, but not during the Interim Financing Period.

**Section 3.        <u>Default; Rights and Remedies; Relief from Stay</u>.**

3.1    <u>Events of Default</u>.  The occurrence of any of the following events shall constitute an "<u>Event of Default</u>" under this Interim Order:

a.        Debtor's failure to perform, in any respect, any of the terms, conditions or covenants, or its obligations, under this Interim Order; or

b.        An "Event of Default" under the DIP Credit Agreement.

3.2    <u>Rights and Remedies Upon Event of Default</u>.  Upon the occurrence of and during the continuance of an Event of Default, (i) the Debtor shall be bound by all restrictions, prohibitions and other terms as provided in this Interim Order and the DIP Credit Agreement, and (ii) Tesse Fund shall be entitled to take any act or exercise any right or remedy as provided in this Interim Order including, without limitation, declaring all Obligations of Borrower immediately due and payable, accelerating the Obligations of Borrower, ceasing to extend loans, setting off any Obligations of Borrower with Collateral or proceeds in Tesse Fund's possession, and enforcing any and all rights with respect to the Collateral.  Tesse Fund shall have no obligation to lend or advance any additional funds to or on behalf of Debtor, or provide any other financial accommodations to Debtor, immediately upon or after the occurrence of an Event of Default or upon the occurrence of any act, event, or condition that, with the giving of notice or the passage of time, or both, would constitute an Event of Default.

3.3    <u>Expiration of Commitment</u>.  Upon the expiration of Debtor's authority to borrow and obtain other credit accommodations from Tesse Fund pursuant to the terms of this Interim Order and the DIP Credit Agreement (except if such authority shall be extended with the prior written consent of Tesse Fund, which consent shall not be implied or construed from any action, inaction or acquiescence by Tesse Fund), unless an Event of Default set forth in Section 3.1 above occurs sooner and the automatic stay has been lifted or modified pursuant to this Interim Order, all of the Obligations of Borrower shall immediately become due and payable.

**Section 4.**    <u>**Representations; Covenants; and Waivers**</u>.

4.1    <u>Objections to Pre-Petition Obligations</u>.  Any action, claim or defense (hereinafter, an "<u>Objection</u>") that seeks to object to, challenge, contest or otherwise invalidate or reduce, whether by setoff, recoupment, counterclaim, deduction, disgorgement or claim of any kind: (a) the existence, validity or amount of the Pre-Petition Obligations, or (b) the extent, legality, validity, perfection or enforceability of MCDJR and PMCD's ("<u>Lender Group</u>") pre-petition liens and security interests in the Pre-Petition Collateral, shall be filed with the Court (x) by any Committee, and no other party, within thirty (30) calendar days from the date of

14

appointment of the Committee by the U.S. Trustee, or (y) in the event no Committee is appointed within the thirty (30) days following the Petition Date, by any party in interest within sixty (60) calendar days from the date of entry of this Interim Order.  If any such Objection is timely filed and successfully pursued, nothing in this Interim Order shall prevent the Court from granting appropriate relief with respect to the Pre-Petition Obligations or Lender Group's liens on the Pre-Petition Collateral.  If no Objection is timely filed, or if an Objection is timely filed but denied, (a) the Pre-Petition Obligations shall be deemed allowed in full, shall not be subject to any setoff, recoupment, counterclaim, deduction or claim of any kind, and shall not be subject to any further objection or challenge by any party at any time, and Lender Group's pre-petition liens on and security interest in the Pre-Petition Collateral shall be deemed legal, valid, perfected, enforceable, and non-avoidable for all purposes and of first and senior priority, subject to only the Permitted Liens and Claims, and (b) Lender Group  and each of their respective participants, agents, officers, directors, employees, attorneys, professionals, successors, and assigns shall be deemed released and discharged from any and all claims and causes of action related to or arising out of the Pre-Petition Financing Agreements and shall not be subject to any further objection or challenge by any party at any time.

        4.2   <u>Debtor's Waivers</u>.  At all times during the case, and whether or not an Event of Default has occurred, the Debtor irrevocably waives any right that it may have to seek authority (i) to use Cash Collateral of Tesse Fund under Section 363 of the Bankruptcy Code, (ii) to obtain post-petition loans or other financial accommodations pursuant to Section 364(c) or 364(d) of the Bankruptcy Code, other than from Tesse Fund or as may be otherwise expressly permitted pursuant to the DIP Credit Agreement, (iii) to challenge the application of any payments authorized by this Interim Order as pursuant to Section 506(b) of the Bankruptcy Code, or to assert that the value of the Pre-Petition Collateral is less than the Pre-Petition Obligations, (iv) to propose, support or have a plan of reorganization or liquidation that does not provide for the indefeasible payment in cash in full and satisfaction of all Obligations of Borrower on the effective date of such plan in accordance with the terms and conditions set forth

in the DIP Credit Agreement, or (v) to seek relief under the Bankruptcy Code, including without limitation, under Section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of Tesse Fund as provided in this Interim Order and the DIP Credit Agreement or Tesse Fund's exercise of such rights or remedies; provided, however, that Tesse Fund may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or acquiescence by Tesse Fund.

        4.3     Section 506(c) Claims.  No costs or expenses of administration which have or may be incurred in the case at any time during the period covered by this Interim Order (and subject to the entry of a Final Order, any time after the expiration of the Interim Financing Period) shall be charged against Tesse Fund, their respective claims or the Collateral pursuant to Section 506(c) of the Bankruptcy Code without the prior written consent of Tesse Fund, and no such consent shall be implied from any other action, inaction or acquiescence by Tesse Fund.

        4.4     Collateral Rights.  Until all of the Obligations shall have been indefeasibly paid and satisfied in full:

        4.4.1   no other party shall foreclose or otherwise seek to enforce any junior lien or junior claim in any Collateral; and

       **Section 5.**     **Other Rights and Obligations.**

        5.1     No Modification or Stay of This Interim Order.  Notwithstanding (i) any stay, modification, amendment, supplement, vacating, revocation or reversal of this Interim Order, the DIP Credit Agreement or any term hereunder or thereunder, (ii) the failure to obtain a Final Order pursuant to Bankruptcy Rule 4001(c)(2), (iii) the dismissal or conversion of the case, or (iv) any order entered at any time in the Debtor's bankruptcy case containing terms inconsistent with the terms and conditions contained in this Interim Order (each, a "Subject Event"), (x) the acts taken by Tesse Fund in accordance with this Interim Order, and (y) the Post-Petition Obligations incurred or arising prior to Tesse Fund actual receipt of written notice from Debtor expressly describing the occurrence of such Subject Event shall, in each instance, be governed in all respects by the original provisions of this Interim Order, and the acts taken by

Tesse Fund in accordance with this Interim Order, and the liens granted to Tesse Fund in the Collateral, and all other rights, remedies, privileges, and benefits in favor of Tesse Fund pursuant to this Interim Order.

        5.2    <u>Power to Waive Rights; Duties to Third Parties</u>.  Tesse Fund shall have the right to waive any of the terms, rights and remedies provided or acknowledged in this Interim Order in respect of Tesse Fund (the "<u>Lender Rights</u>"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any Lender Right(s).  Any waiver by Tesse Fund of any Lender Rights shall not be or constitute a continuing waiver.  Any delay in or failure to exercise or enforce any Lender Right shall neither constitute a waiver of such Lender Right, subject Tesse Fund to any liability to any other party, nor cause or enable any other party to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtor to Tesse Fund.

        5.3    <u>Disposition of Collateral</u>.  Debtor shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral without the prior written consent of Tesse Fund (and no such consent shall be implied, from any other action, inaction or acquiescence by Tesse Fund) and an order of this Court, except for sales of Debtor's Inventory in the ordinary course of its business.

        5.4    <u>Inventory</u>.  Debtor shall not, without the consent of Tesse Fund, (a) enter into any agreement to return any inventory to any of its creditors for application against any pre-petition indebtedness under any applicable provision of Section 546 of the Bankruptcy Code, or (b) consent to any creditor taking any setoff against any of its pre-petition indebtedness based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise.

        5.5    <u>Reservation of Rights</u>.  The terms, conditions and provisions of this Interim Order are in addition to and without prejudice to the rights of Tesse Fund to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Credit Agreement or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek

17

an injunction, to oppose any request for use of cash collateral or granting of any interest in the Collateral or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of Professionals or other parties seeking compensation or reimbursement from the Estate.

      5.6   <u>Binding Effect</u>.

      5.6.1   The provisions of this Interim Order and the DIP Credit Agreement, the Post-Petition Obligations, the Superpriority Claim and any and all rights, remedies, privileges and benefits in favor of Tesse Fund provided or acknowledged in this Interim Order, and any actions taken pursuant thereto, shall be effective immediately upon entry of this Interim Order pursuant to Bankruptcy Rules 6004(g) and 7062, shall continue in full force and effect, and shall survive entry of any such other order, subject to entry of a Final Order approving the DIP Credit Agreement, including without limitation any order which may be entered confirming any plan of reorganization, converting one or more of the case to any other chapter under the Bankruptcy Code, or dismissing the case.

      5.6.2   Any order dismissing the case under Section 1112 or otherwise shall be deemed to provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (a) the Superpriority Claim and Tesse Fund's liens on and security interests in the Collateral shall continue in full force and effect notwithstanding such dismissal until the Obligations of Borrower are indefeasibly paid and satisfied in full, and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claim and liens in the Collateral.

      5.6.3   In the event this Court modifies any of the provisions of this Interim Order or the DIP Credit Agreement following a Final Hearing, (a) such modifications shall not affect the rights or priorities of Tesse Fund pursuant to this Interim Order with respect to the Collateral or any portion of the Obligations of Borrower which arises or is incurred or is advanced prior to such modifications, and (b) this Interim Order shall remain in full force and effect except as specifically amended or modified at such Final Hearing.

5.6.4   This Interim Order shall be binding upon Debtor, all parties in interest in the case and their respective successors and assigns, including any trustee or other fiduciary appointed in the case or any subsequently converted bankruptcy case(s) of Debtor. This Interim Order shall also inure to the benefit of Tesse Fund, Debtor and their respective successors and assigns.

5.7    <u>Restrictions on Cash Collateral Use, Additional Financing, Plan Treatment</u>.  All post-petition advances and other financial accommodations under the DIP Credit Agreement are made in reliance on this Interim Order and there shall not at any time be entered in the case, or in any subsequently converted case under Chapter 7 of the Bankruptcy Code, any order (other than the Final Order) which (a) authorizes the use of cash collateral of Debtor in which Tesse Fund has an interest, or the sale, lease, or other disposition of property of any Debtor's Estate in which Tesse Fund has a lien or security interest, except as expressly permitted hereunder or in the DIP Credit Agreement, or (b) authorizes under Section 364 of the Bankruptcy Code the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a lien or security interest in property in which Tesse Fund holds a lien or security interest, or which is entitled to priority administrative claim status which is equal or superior to that granted to Tesse Fund herein; unless, in each instance (i) Tesse Fund shall have given its express prior written consent with respect thereto, no such consent being implied from any other action, inaction or acquiescence by Tesse Fund, or (ii) such other order requires that all Obligations of Borrower shall first be indefeasibly paid and satisfied in full in accordance with the terms of the DIP Credit Agreement, including, without limitation, all debts and obligations of Debtor to Tesse Fund which arise or result from the obligations, loans, security interests and liens authorized herein, on terms and conditions acceptable to Tesse Fund.  The security interests and liens granted to or for the benefit of Tesse Fund hereunder and the rights of Tesse Fund pursuant to this Interim Order and the DIP Credit Agreement with respect to the Obligations of Borrower and the Collateral are cumulative and shall not be altered, modified, extended, impaired, or affected by any plan of reorganization or liquidation of Debtor and, if Tesse Fund

19

shall expressly consent in writing that the Obligations of Borrower shall not be repaid in full upon confirmation thereof, shall continue after confirmation and consummation of any such plan.

5.8    Marshalling.   In no event shall Tesse Fund be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the Collateral.  The Tesse Fund shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to Tesse Fund with respect to proceeds, products, offspring or profits of any of the Collateral.

5.9    Term; Termination.   Notwithstanding any provision of this Interim Order to the contrary, the term of the financing arrangements among Debtor and Tesse Fund authorized by this Interim Order may be terminated by Tesse Fund upon the occurrence of an Event of Default.

5.10    Limited Effect.   Unless the Interim Order specifically provides otherwise, in the event of a conflict between the terms and provisions of the DIP Credit Agreement and this Interim Order, the terms and provisions of this Interim Order shall govern, interpreted as most consistent with the terms and provisions of the DIP Credit Agreement.

**Section 6.**    Final Hearing and Response Dates.  The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) is scheduled for February 16, 2023, at 10:30 a.m. before this Court (the "Final Hearing").

The Debtor shall promptly mail copies of this Interim Order to the Noticed Parties, and to any other party that has filed a request for notices with this Court and to any Creditors' Committee after same has been appointed, or Creditors' Committee counsel, if same shall have filed a request for notice.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (a) counsel for the Debtor, Cole Schotz P.C., 300 East Lombard Street, Suite 1111, Baltimore, MD  21202; Attn: Gary Leibowitz, Esq., Fax: (410) 528-9401; (b) counsel to any Committee, if any; and (c) the U.S. Trustee; and shall be filed with the Clerk of the United States Bankruptcy Court for the

District of Maryland, in each case, to allow actual receipt of the foregoing no later than February 14, 2023 at 4:00 p.m. prevailing Eastern time.

cc:    Gary H. Leibowitz
Irving E. Walker
H.C. Jones III
Cole Schotz P.C.
300 East Lombard Street, Suite 1111
Baltimore, MD 21202

Gerard R. Vetter, Assistant United States Trustee
Office of the United States Trustee
101 West Lombard Street, Suite 2625
Baltimore, MD 21201

MCDJR-TESSE, LLC
c/o Richard L. Costella, Esq.
Tydings & Rosenberg LLP
One East Pratt Street, Suite 901
Baltimore, MD 21202

PMCDTESSE, LLC
c/o Richard L. Costella, Esq.
Tydings & Rosenberg LLP
One East Pratt Street, Suite 901
Baltimore, MD 21202

TESSE FUND I, LLC
c/o Richard L. Costella, Esq.
Tydings & Rosenberg LLP
One East Pratt Street, Suite 901
Baltimore, MD 21202

**END OF ORDER**

**EXHIBIT A**

Execution Version

## AGREEMENT FOR POST-PETITION FINANCING

THIS AGREEMENT FOR POST-PETITION FINANCING (this "<u>Agreement</u>") is made as of January 31, 2023, by and between MCDJR–TESSE, LLC, a Maryland limited liability company ("<u>MCDJR</u>"); PMCDTESSE, LLC, a Maryland limited liability company ("<u>PMCD</u>" and collectively with MCDJR, the "<u>Lender Group</u>"), and TESSEMAE'S LLC, a Maryland limited liability company (referred to as the "<u>Borrower</u>", as that term is defined in the Loan Agreement described below and the "<u>Debtor</u>" in this Agreement).

## RECITALS

A.      The Debtor is a debtor-in-possession under Chapter 11 of the Bankruptcy Code in a case (the "<u>Chapter 11 Case</u>") pending in the United States Bankruptcy Court for the District of Maryland (together with any other court having jurisdiction over the Chapter 11 Case or any proceedings therein from time to time, the "<u>Court</u>") as Case No. _____.   The Debtor has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its business as debtor-in-possession.

B.      Prior to the commencement of the Chapter 11 Case, the Lender Group made loans and advances (the "<u>Loan</u>") to the Debtor secured by certain assets and properties of the Debtor as set forth in the Financing Documents (as hereinafter defined).

C.      The Debtor has requested that the Lender Group make a post-petition loan and advances to the Debtor (the "<u>DIP Facility</u>"), notwithstanding the filing of the Chapter 11 Case. The Lender Group is willing to provide such financing on the terms and conditions set forth in this Agreement, including, a condition that the Court approve this Agreement on an interim basis by entering the "Interim Financing Order" (as hereinafter defined).

D.      In order to induce the Lender Group to make the DIP Facility available to the Debtor, the Debtor agrees to the form of adequate protection set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Debtor and the Lender Group mutually covenant, warrant and agree as follows:

ARTICLE I
DEFINITIONS

Section 1.1      <u>Additional Definitions.</u>

As used in this Agreement, the terms defined in the Recitals hereto shall have the respective meanings specified therein, capitalized terms not otherwise defined in this Agreement shall have the meaning set forth or provided for in the Loan Agreement (as defined herein) and the following terms shall have the respective meanings given to them below and in the Financing Documents (and any defined terms similar to those set forth below), which shall be deemed and

are hereby amended to include, in addition and not in limitation, each of the following, definitions:

"Bankruptcy Code" means the United States Bankruptcy Code, being Title 11 of the United States Code, as the same has been or may hereafter be amended, recodified, modified or supplemented, together with all, rules, regulations and interpretations thereunder or related thereto.

"Budget" means that certain budget containing cash flow projections, sales projections and other financial information that is attached to and incorporated into the Interim Financing Order and the Final Financing Order, as now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced with Lender Group's prior written consent, which may be given or withheld in its sole and absolute discretion.

"Carve-Out" has the meaning ascribed to it in the Interim Financing Order.

"Chapter 11 Case" has the meaning ascribed to it in the Recitals to this Agreement.

"Closing Date" means the date on which the Interim Financing Order is entered.

"Collateral" means, collectively, the Pre-Petition Collateral and the Post-Petition Collateral.

"Committee" means any creditors' or equity security holders' committee appointed in the Chapter 11 Case by the U.S. Trustee.

"Court" shall have the meaning ascribed to it in the Recitals to this Agreement.

"DIP Facility" shall have the meaning ascribed to it in the Recitals to this Agreement.

"Enforcement Costs" shall mean all of the Lender Group's reasonable costs, fees and expenses, including reasonable attorneys' fees, incurred by Lender and as set forth in Section 2.2 and Section 2.3 of the Notes.

"Final Financing Order" means a final, non-appealable order of the Court authorizing the granting of credit by the Lender Group to the Debtor pursuant to Section 364 of the Bankruptcy Code consistent with this Agreement and the Interim Financing Order, with only such other provisions that the Lender Group expressly deems to be acceptable in the exercise of its sole and absolute discretion.

"Financing Documents" shall mean collectively, this Agreement, the Loan Agreement, and the Notes, and any other instrument, agreement or document previously, simul-taneously or hereafter executed and delivered by the Debtor and/or any other Person, singly or jointly with another Person or Persons, evidencing, securing, guarantying or in connection with this Agreement, the Loan Agreement, any Note or Notes, any credit facilities, and/or any of the

Borrower's Obligations together with all supplements, agreements, notes, documents, instruments and guarantees at any time executed and/or delivered in connection therewith or related thereto, as all of the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"Financing Order" shall mean the reference to Interim Financing Order or the Final Financing Order, as the same may be in effect from time to time.

"Interim Financing Order" shall mean the order of the Bankruptcy Court approving this Agreement on an interim basis pursuant to Federal Rules of Bankruptcy Procedures 2002, 4001, and 9014 and Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code, which order shall be substantially in the form of **EXHIBIT A** attached to and made a part of this Agreement, with only those modifications that the Lender Group expressly deems to be acceptable in the exercise of its sole and absolute discretion.

"Loan Agreement" shall mean the Loan and Security Agreement dated April 9, 2018 among, *inter alia,* the Borrower and the Lender Group; as amended by that certain Amended and Restated Loan and Security Agreement dated September 8, 2022, all as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, including, without limitation, the same as effected by this Agreement.

Note or "Notes" shall mean any promissory note or notes that evidence all or any part of the Obligations of Borrower.

"Petition Date" means the date of the commencement of the Chapter 11 Case.

"Pre-Petition Collateral" means all "Collateral," as such term is defined in the Loan Agreement and all other security for the Pre-Petition Obligations as provided in the Financing Documents immediately prior to the Petition Date. For the avoidance of doubt, the Pre-Petition Collateral includes, without limitation, all proceeds and other consideration payable under a Sale Agreement.

"Pre-Petition Obligations" means all indebtedness, duties, obligations, and liabilities arising before the Petition Date of the Debtor to the Lender Group under, arising pursuant to, in connection with and/or on account of the provisions of the Loan Agreement, each Note, and any of the other Financing Documents, the Loan, and any credit facilities including, without limitation, the principal of, and interest on, each Note, late charges, the fees, Enforcement Costs, and prepayment penalties (if any), and letter of credit fees or fees charged with respect to any guaranty of any letter of credit; Pre-Petition Obligations also means the "Obligations of Borrower" (as that term is defined in the Loan Agreement) and all other indebtedness, liabilities and obligations arising before the Petition Date of the Debtor to the Lender Group of any nature whatsoever regardless of whether such debts, obligations and liabilities be direct, indirect, primary, secondary, joint, several, joint and several, fixed or contingent, and all Enforcement Costs with respect thereto.

"Post-Petition Collateral" means, collectively, all now existing or hereafter acquired property of the Debtor's estate, wheresoever located, of any kind or nature, whether now or hereafter owned, existing, acquired or arising and wherever now or hereafter located whether real or personal, and all cash and cash and non-cash proceeds, including, without limitation:

(1)    (a) all Accounts and all Goods whose sale, lease or other disposition by the Debtor has given rise to Accounts and have been returned to, or repossessed or stopped in transit by the Debtor; (b) all Chattel Paper, Instruments, Documents and General Intangibles (including, without limitation, all patents, patent applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, registrations, licenses, software, franchises, customer lists, tax refund claims, claims against carriers and shippers, guarantee claims, contract rights, payment intangibles, security interests, security deposits and rights to indemnification); (c) all Inventory; (d) all Goods (other than Inventory), including, without limitation, Equipment, vehicles and Fixtures; (e) all Investment Property; (f) all Deposit Accounts, bank accounts, deposits and cash; (g) all Letter-of-Credit Rights; (h) all commercial tort claims; (i) any other property of the Debtor now or hereafter in the possession, custody or control of the Lender Group or any agent or any parent, affiliate or subsidiary of the Lender Group or any participant with the Lender Group in the Loan, for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise); (j) without implying any limitation on the foregoing, all molds, tools and dies used in production and all General Intangibles related thereto; (k) any and all proceeds and other consideration payable under a Sale Agreement; and (l) all additions and accessions to, substitutions for, and replacements, products and Proceeds of, and supporting obligations related to, the foregoing property, including, without limitation, proceeds of all insurance policies insuring the foregoing property, and all of Debtor's books and records relating to any of the foregoing and to Debtor's business.

(2)    all present and future monies, securities, credit balances, deposits, deposit accounts and other property of the Debtor now or hereafter held or received by or in transit to the Lender Group or any of its affiliates or at any other depository or other institution from or for the account of the Debtor, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

(3) all products and proceeds of the foregoing, in any form, including, without limitation, insurance proceeds and all claims against third parties for loss or damage to or destruction of any or all of the foregoing; and

(4)    other than avoidance actions under Chapter 5 of the Bankruptcy Code, all claims and property received by, or on behalf of the Debtor or its estate, or any trustee of the Debtor (whether in the Chapter 11 Case or in any subsequent Chapter 7 case of the Debtor), as set forth in the Financing Order.

"Post-Petition Obligations" means all indebtedness, duties, obligations, and liabilities of the Debtor to the Lender Group arising on and after the Petition Date, whether the same is now existing or contemplated or hereafter arising, whether allowed in the Chapter 11 Case or any other insolvency proceeding, including, without limitation, those arising pursuant to, in connection with and/or on account of the provisions of this Agreement, each Note, and any of the other Financing Documents, the Loan, and any credit facilities including, without limitation, the principal of, and interest on, each Note, late charges, fees, Enforcement Costs, and prepayment penalties (if any); Post-Petition Obligations also means all future indebtedness, liabilities and obligations of the Debtor to the Lender Group of any nature whatsoever regardless of whether such debts, obligations and liabilities be direct, indirect, primary, secondary, joint, several, joint and several, fixed or contingent; and also means any and all renewals, extensions, substitutions, amendments, restatements and rearrangements of any such debts, obligations and liabilities, and all Enforcement Costs with respect thereto.

"Professional Expenses" means the fees and reimbursable expenses of a Professional Person as set forth in the Budget.

"Professional Person" means a Person who is an attorney, accountant, appraiser, auctioneer, broker, investment banker, or other professional person and who is retained, with Court approval, by (i) Debtor pursuant to Section 327 of the Bankruptcy Code or (ii) a Committee pursuant to Section 1103(a) of the Bankruptcy Code.

"Senior Secured Term Loan Facility" means the secured term loan facility with the Lender Group and CE CID, LLC and LEC, LLC, provided under that certain Loan and Security Agreement dated April 9, 2018 and as further evidenced by the 2018 Promissory Notes in the original principal amounts totaling $1,190,000.00 (all as the same may have been amended, modified, supplemented, extended, renewed, restated or replaced).

"Termination Date" means the date that is the first to occur of (a) March 3, 2023, unless on or prior to that date, the Court enters the Final Financing Order which is acceptable to the Lender Group in all respects; (b) the occurrence of, or at any time during the continuation of, any Event of Default; (c) the expiration of Debtor's authorization to borrow from the Lender Group or the Final Financing Order which shall be May 31, 2023; (d) the indefeasible payment in full of the Obligations of Borrower at closing of any transaction approved in a Sale Approval Order; (e) the effective date of a confirmed plan of reorganization under the Bankruptcy Code that is acceptable to the Lender Group in all respects, in its sole and absolute discretion or the date of entry of an Order by the Court confirming any other plan of reorganization under the Bankruptcy Code; (f) the date on which the Lender Group is granted relief from the automatic stay; or (g) the date on which the Chapter 11 Case is dismissed or converted to Chapter 7 under the Bankruptcy Code.

"U.S. Trustee" means the Office of the United States Trustee for the District of Maryland.

Section 1.2    <u>Definitions in Financing Documents.</u>

(a)    All references to the term "Collateral" in any of the Financing Documents or any other term referring to the security for the Pre-Petition Obligations in any of the Financing Documents shall be deemed and each such reference is hereby amended to mean, collectively, the Pre-Petition Collateral and the Post-Petition Collateral.

(b)    All references to the Debtor, including, without limitation, to the term "Borrower" and its successors and assigns (including any trustee or other fiduciary hereafter appointed as its legal representative or with respect to the property of the estate whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case).

(c)    All references to the term "Financing Documents" or "Other Agreements" in any of the Financing Documents shall be deemed and each such reference is hereby amended to include, in addition and not in limitation, all of the Financing Documents (except that the term "Other Agreements" does not include the Loan Agreement) as ratified, assumed and adopted by the Debtor pursuant to the terms of this Agreement, as amended and supplemented hereby, and the Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented extended, renewed, restated or replaced.

(d)    All references to the term "Loan Agreement" in any of the Financing Documents shall be deemed and each such reference is hereby amended to mean the Loan Agreement, as defined herein and amended hereby and ratified, assumed and adopted by the Debtor pursuant to the terms hereof and the Financing Order, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(e)    All references to the term "Obligations of Borrower" in this Agreement and in any of the Financing Documents shall be deemed and each such reference in the Financing Documents is hereby amended to mean, both the Pre-Petition Obligations and the Post-Petition Obligations.

Section 1.3    <u>Other Provisions for Definitions.</u>

(a)    For purposes of this Agreement, unless otherwise defined or amended herein, including, but not limited to, those terms used and/or defined in the recitals hereto, all terms used herein shall have the respective meanings assigned to such terms in the Loan Agreement (as defined herein).

(b)    All references to the terms "Borrower", "Debtor" and "Lender Group", or any other person pursuant to the definitions in the recitals hereto or otherwise shall include its respective successor and assigns.

(c)    All references to any term in the singular shall include the plural and all references to any term in the plural shall include the singular.

(d)     All terms not specifically defined herein which are defined in the UCC shall have the meaning set forth therein, except that the term, "Lien" or "lien" shall have the meaning set forth in § 101(37) of the Bankruptcy Code.

ARTICLE II
ACKNOWLEDGEMENT

Section 2.1     Pre-Petition Obligations.

The Debtor hereby acknowledges, confirms and agrees that:

(a)          As of January 31, 2023 (the Petition Date), the aggregate amount of principal and interest outstanding under the MCDJR Note was not less than $1,915,312.00, with an additional exit fee of $4,750,000.00.  Interest accrues on the unpaid balance of the MCDJR Note at a rate of 15% per year.

(b)     As of January 31, 2023 (the Petition Date), the aggregate amount of principal and interest outstanding under the PMCD Note was not less than $2,200,930.00, with an additional exit fee of $7,500,000.00.  Interest accrues on the unpaid balance of the PMCD Note at a rate of 15% per year.

(c)     The Pre-Petition Obligations also include unpaid fees and expenses due and owing to the Lender Group, including, without limitation, unpaid attorneys' fees and expenses incurred by the Lender Group in connection with the collection and enforcement of the Pre-Petition Obligations, to the extent the same are permitted by the Financing Documents and/or applicable Laws.

(d)          Subject to the effect of the Final Financing Order: Debtor agrees that there does not exist (or to the extent there does exist, Debtor hereby waives and releases) any defense or right of set-off, recoupment or counterclaim to the payment when due of those amounts due under the Loan or any of the other Pre-Petition Obligations, and that there does not exist (or to the extent there does exist, Debtor hereby waives and releases) any other claim against the Lender Group with respect to the Notes, the Pre-Petition Obligations, or otherwise. Debtor hereby releases, acquits and forever discharges each of the Lender Group, its officers, employees, and agents, from any and all claims, actions, causes of action, demands, rights, damages, costs, loss of services, expenses and compensation whatsoever, which now have or which may hereafter accrue on account of or in any way arise out of or resulting from the Borrower's Obligations, Financing Documents, any of the transactions, duties or obligations arising under or relating to the Borrower's Obligations or the other Financing Documents or which now have or which may hereafter accrue on account of or in any way arise out of or resulting from the Financing Documents

Section 2.2     Security for Post-Petition Obligations.

As security for the Post-Petition Obligations, the Debtor shall grant the Lender Group a security interest and priming lien on all of the Post-Petition Collateral as well as the Pre-Petition Collateral, which lien shall prime the lien priority of the lien held under the Senior Secured Term

Loan Facility. Subject to entry of the Final Financing Order, the Debtor hereby confirms and agrees that the Lender Group has and shall continue to have valid, enforceable and perfected first priority and senior security interests in and liens upon all Pre-Petition Collateral heretofore granted to the Lender Group pursuant to the Financing Documents as in effect immediately prior to the Petition Date to secure all of the Obligations of Borrower, as well as valid and enforceable first priority and senior security interests in and liens upon all Post-Petition Collateral granted to the Lender Group under the Financing Order or hereunder; provided, however, that in the event that the Bankruptcy Court or Maryland states court were to determine by a final order that Democracy Capital Corporation has a valid and enforceable secured claim in the Debtor's case, the lien held by Democracy Capital Corporation, in that event, shall have priority over any lien granted to the Lender Group under this Agreement.

Section 2.3    Binding Effect of Documents.

The Debtor hereby acknowledges, confirms and agrees that (a) each of the Financing Documents to which it is a party has been duly executed and delivered to the Lender Group by the Debtor and each is in full force and effect as of the date hereof, except that this Agreement is subject to the approval of the Bankruptcy Court in the Financing Order, (b) the agreements and Obligations of Borrower of the Debtor contained in the Financing Documents constitute the legal, valid and binding obligations of the Debtor enforceable against the Debtor in accordance with its respective terms and, subject to entry of the Final Financing Order, the Debtor has no valid defense, offset or counterclaim to the enforcement of the Borrower's Obligations, and (c) the Lender Group is and shall be entitled to all of the rights, remedies and benefits provided for in this Agreement, the Financing Documents and the Financing Order.

ARTICLE III
ADOPTION AND RATIFICATION

The Debtor hereby (a) ratifies, assumes, adopts and agrees to be bound by the Financing Documents and (b) agrees to pay all of the Obligations of Borrower in accordance with the terms of the Financing Documents and the Financing Order.

ARTICLE IV
SECURITY FOR OBLIGATIONS

Section 4.1    Administrative Priority.

Subject to the entry of the Interim Financing Order, the Lender Group, in addition to the lien granted under the Financing Order and this Agreement, shall be entitled to an allowed super-priority administrative expense claim under Section 364(c)(1)of the Bankruptcy Code,  having priority in payment over all other administrative expenses and unsecured claims against Borrower of any kind or nature, whether now existing or hereafter arising, including all administrative expenses of the kind specified in or arising or ordered under Section 105, 326, 328, 503(b), 506(e), 507(a), 507(b), 546(c) and 1114 of the Bankruptcy Code.

ARTICLE V
THE DIP FACILITY.

Section 5.1     Commitment.

Subject to the terms and conditions of this Agreement and the Loan Agreement (as amended hereby), the Lender Group, agrees to make the DIP Facility available to the Debtor from time to time from the Closing Date until the Termination Date up to but not exceeding the least of $1,250,000.00 (the "Facility Limit").  The Lender Group shall make $650,000.00 available upon entry of the Interim Financing Order, and the remaining $600,000.00 available upon entry of the Final Financing Order by the Court.  In the event the aggregate DIP Facility exceeds the Facility Limit (each an "Overadvance"), the excess amount shall nevertheless constitute the Obligations of the Borrower secured by the Collateral and entitled to all benefits of the Financing Documents.  Any funding or sufferance of an Overadvance shall not constitute a waiver of the Event of Default caused thereby.

Section 5.2     Interest.

Interest on the Obligations shall accrue at the rate of fifteen percent (15%) per annum.

Section 5.3     Use of Proceeds.

The proceeds of the DIP Facility and any other credit accommodations provided by the Lender Group to the Debtor pursuant to the Financing Order and this Agreement shall be used by the Debtor for general operating and working capital purposes and for payment of the Carve-Out and the costs of administration of the Chapter 11 Case including Professional Expenses, to the extent set forth in the Budget; and to pay the Obligations of the Borrower as they become due under the terms of this Agreement and the Financing Order.  No portion of any administrative expense claim or other claim relating to the Chapter 11 Case shall be paid with the proceeds of the DIP Facility provided by the Lender Group to the Debtor, except as set forth in the Financing Order.  Notwithstanding anything to the contrary contained herein, in no event shall proceeds of the DIP Facility be used to pay the Debtor's Professional Expenses incurred in connection with the assertion of or joinder in any claim, counterclaim, action, contested matter, objection, defense or other proceeding, the purpose of which is to seek or the result of which would be to obtain any order, judgment, declaration, or similar relief (a) seeking damages from the Lender Group on account of any alleged cause of action arising on, before or after the Petition Date; (b) invalidating, setting aside, avoiding or subordinating, in whole or in part, any of the Pre-Petition Obligations, Obligations of Borrower, or any of the Liens in any of the Collateral granted to the Lender Group under this Agreement or the Financing Order or under any of the Financing Documents; (c) preventing, enjoining, hindering or otherwise delaying the Lender Group's enforcement of any of the Financing Documents, or any realization upon any Collateral; (d) declaring any Liens granted or purported to be granted under any of the Financing Documents to have a priority other than the priority set forth therein; or (e) objecting to the amount or method of calculation by the Lender Group of the Prepetition Obligations or any of the Obligations, or any accounting rendered by the Lender Group with respect to any of those obligations. Nothing herein shall be construed to waive the Lender's right to object to any requests, motions or applications made in or filed with the Court.

Section 5.4    <u>Financing Order.</u>

The Lender Group shall have no obligation to provide any financing to the Debtor unless the Interim Financing Order, and subsequently the Final Financing Order, has been duly entered, and only so long as the Financing Order is valid, subsisting and continuing and has not been vacated, modified, reversed on appeal, or vacated or modified by any order of the Court and is not subject to any pending appeal or stay.

Section 5.5    <u>First Day Orders.</u>

The Lender Group shall have no obligation to provide any financing to the Debtor unless the Interim Financing Order is entered by the Court.

Section 5.6    <u>No Priming Liens.</u>

The Debtor agrees that the Debtor shall not in any way prime or seek to prime the security interests and liens provided to the Lender Group under the Financing Documents and the Interim Financing Order by offering a subsequent lender or lender group or a party-in-interest a superior lien or claim pursuant to Section 364(d) of the Bankruptcy Code or otherwise.

ARTICLE VI
<u>CONDITIONS FOR DIP FACILITY.</u>

In addition to the conditions for advances contained in the Loan Agreement, the Lender Group shall have no obligation to provide any financing to the Debtor unless the following conditions are met:

Section 6.1    <u>Budget</u>

(a)    All credit accommodations provided by the Lender Group to the Debtor pursuant to the Financing Order and this Agreement shall be used by the Debtor strictly in accordance with the Budget.    The Debtor acknowledges that the Budget that is attached to the Interim Financing Order (the "<u>Existing Budget</u>") only contains cash flow projections and other financial information through February 14, 2023.  On or before February 14, 2023, the Debtor shall provide the Lender Group with a new budget covering the period from February 14, 2023 through June 14, 2023 (the "<u>New Budget</u>"), which New Budget shall be in the same format and contain the same detail as the Existing Budget.  The New Budget shall be acceptable to the Lender Group in its sole and absolute discretion, and the Lender Group shall have no obligation to continue to provide any further advances to the Debtor under this Agreement and the Financing Order if the New Budget is not acceptable to the Lender Group in its sole and absolute discretion.

(b)    Notwithstanding anything contained in this Agreement or in any of the Financing Documents to the contrary, without the Lender Group's prior written consent, the Debtor shall not make any payments that in the aggregate exceed one hundred and ten (110%) percent of the amount set forth in the Budget, measured on a cumulative basis, for the period beginning on the Petition Date through February 14, 2023 and measured biweekly thereafter;

(c)   The Debtor shall provide the Lender Group with reports of all sales, revenues, cash receipts, expenses incurred, and expenses paid by the Debtor in form and substance satisfactory to the Lender Group on a biweekly basis on Tuesday of each two-week period.

Section 6.2       Bankruptcy Reports.

Debtor shall also provide the Lender Group with copies of all financial reports, schedules and other materials and information at any time furnished by Debtor, or on its behalf, to the Court, or the Office of the U.S. Trustee and, upon the Lender Group's reasonable request, to any creditors' committees concurrently with the delivery thereof to the Court, creditors' committee, or the Office of the U.S. Trustee as the case may be.

Section 6.3       Other Conditions.

The Lender Group shall have no obligation to provide any financing to the Debtor until the Interim Financing Order shall have been entered.

ARTICLE VII
AMENDMENTS

Section 7.1       Amendments to Definitions of Loan Agreement.

(a)       The following definitions contained in the Loan Agreement are hereby amended in their entirety to read as follows:

"**Post-Petition Loan Agreement**" means the Agreement for Post-Petition Financing dated January ___, 2023 between the Debtor and the Lender Group, as the same may be amended, restated, modified, substituted, extended and renewed from time to time.

(b)       All capitalized terms used but not defined in the Loan Agreement shall have the meaning ascribed to them in this Agreement.

(c)       Section 2.1 (Default and Remedies) is hereby amended by adding the following new subsections:

**Additional Defaults**.

(i)       The failure of the Debtor to comply with the terms of this Agreement or the occurrence of any "**Event of Default**", as defined in the Interim Financing Order or the Final Financing Order; or

(ii)       the occurrence of a Termination Date as provided for in the Interim Financing Order or the Final Financing Order; or

(iii)       the conversion of the Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code; or

(iv)    dismissal of the Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily or if Debtor shall apply for such a dismissal; or

(v)    the post-petition grant of a Lien on or other interest in any of a Debtor's property or the occurrence of an administrative expense claim (except for amounts as set forth in the Interim Financing Order for the Carve-Out) which is superior to or ranks in parity with the Lender Group's security interest in or Lien upon the Collateral or the application by Debtor for any of the foregoing; or

(vi)    the Final Financing Order is not issued on or before March 3, 2023, or the Interim Financing Order or the Final Financing Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Court without the prior written consent of the Lender Group (and no such consent shall be implied from any other authorization or acquiescence by the Lender Group); or

(vii)    the appointment of a trustee pursuant to Sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code; or

(viii)    the appointment of an examiner with special powers pursuant to section 1104(a) of the Bankruptcy Code; or

(ix)    unless otherwise consented in writing by the Lender Group, the filing of a Chapter 11 plan which does not provide for the payment in full of the Obligations on confirmation or which impairs the Lender Group's claim for the Obligations herein; or

(x)    the Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders, other than the Lender Group or other than with the Lender Group's prior written consent, of any security interest to permit the foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Debtor; or

(xii)    the Debtor fails to provide the Lender Group with the New Budget on or before February 14, 2023 or the New Budget is not acceptable to the Lender Group in its sole and absolute discretion.

## ARTICLE VIII
## OTHER AGREEMENTS

Section 8.1    Conditions of Lending

For the purposes of the Loan Agreement, the commencement and continuation of the Chapter 11 Case and the existence of the Pre-Petition Defaults shall be excluded in the determination as to whether a Default or an Event of Default exists.

Section 8.2    Enforcement Costs

Without implying any limitation on the definition of Enforcement Costs (as that term is defined herein), the Debtor shall, at its expense, at any time or times duly execute and deliver, or shall cause to be duly executed and delivered, such further agreements, instruments and documents, including, without limitation, additional security agreements, collateral assignments Uniform Commercial Code financing statements or amendments or continuations thereof, landlords or mortgagee's waivers of liens and do or cause to be done such further acts as may be necessary or proper in the Lender Group's opinion to evidence, perfect, maintain and enforce the security Interests of the Lender Group, and the priority thereof, in the Collateral and to otherwise effectuate the provisions or purposes of this Agreement or the Financing Order.  Upon the request of the Lender Group, at any time and from time to time, the Debtor shall, at its cost and expense, do, make, execute, deliver and record, register or file, financing statements, and other instruments, acts, pledges, assignments and transfers (or, cause the same to be done) and will deliver to the Lender Group such instruments evidencing items of Collateral as may be requested by the Lender Group.

Section 8.3    Effect of Termination.

On the Termination Date, all of the Obligations of the Borrower shall be immediately due and payable, and the Lender Group shall have no further obligation to make any further loans or financing. All undertakings, agreements, covenants, warranties and representations of the Borrower contained in the Financing Documents shall survive any such termination and the Lender Group shall retain its Liens upon all of the Collateral and all of its rights and remedies under the Financing Documents notwithstanding such termination until payment in full in cash of the Borrower's Obligations. Notwithstanding the payment in full in cash of the Obligations of the Borrower, the Lender Group shall not be required to release or terminate its Liens upon any of the Collateral arising under the Financing Documents unless with respect to any loss or damage the Lender Group may incur as a result of the dishonor or return of any items of payment applied to the Obligations of the Borrower, the Lender Group shall have received either (i) a written agreement, executed by the Borrower and any person whose loans or other advances to the Borrower are used in whole or in part to satisfy the Obligations of the Borrower, indemnifying the Lender Group from any such loss or damage, or (ii) a cash deposit in an amount as the Lender Group, in its reasonable credit judgment, may deem necessary to protect the Lender Group from any such loss or damage. Notwithstanding anything to the contrary in this Agreement, all Obligations of the Borrower to indemnify the Lender Group pursuant to this Agreement shall in all events survive any termination of the of Lender Group's commitment to provide the DIP Facility and shall survive any release or termination of Liens by the Lender Group.

Section 8.4    <u>Other Provisions.</u>

(a)    The parties hereto acknowledge, confirm and agree that the failure of the Debtor to comply with, any of the covenants, conditions and agreements contained herein shall constitute an Event of Default under the Financing Documents.

(b)    Neither this Agreement nor any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change waiver, discharge or termination is sought.

(c)    The headings used herein are for convenience only and do not constitute matters to be considered in interpreting this Agreement.

(d)    This Agreement may be executed in any number of duplicate originals or counterparts, each of such duplicate originals or counterparts shall be deemed to be an original and taken together shall constitute but one and the same instrument. The parties agree that their respective signatures may be delivered by facsimile. Any party who chooses to deliver its signature by facsimile agrees to provide promptly to the other parties a copy of this Agreement with its inked signature.

(e)    This Agreement shall become effective upon the execution hereof by the Lender Group and the Debtor and the entry of the Interim Financing Order, subject to the provisions hereof.

[Signatures Follow on Next Page]

## SIGNATURE PAGE TO AGREEMENT FOR POST-PETITION FINANCING

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**TESSEMAE'S LLC**
Debtor-in-Possession

By:_____
    Name:
    Title:

**PMCDTESSE, LLC**

By:_____
    Name:
    Title:

**MCDJR–Tesse, LLC**

By:_____
    Name:
    Title:

**Schedule 1**
**DIP Closing List**

$1,250,000.00 DIP FACILITY

DEBTOR:  TESSEMAE'S LLC

LENDER GROUP:  MCDJR–Tesse, LLC and PMCDTESSE, LLC

CLOSING DATE:  JANUARY 31, 2023

| | ITEM | STATUS |
|---|---|---|
| **A.** | **LOAN REQUIREMENTS** | |
| 1. | Budget for the Debtor | |
| **B.** | **LOAN DOCUMENTS** | |
| 2. | Post-Petition Financing Agreement | |
| 3. | SCHEDULES to Post-Petition Financing Agreement, as necessary. | |
| **C.** | **BANKRUPTCY DOCUMENTS** | |
| 4. | Interim DIP Financing Order | |
| 5. | First Day Motion/Orders | |
| **D.** | **ORGANIZATIONAL DOCUMENTS** (To be provided by Debtor and its Counsel) | |
| 6. | Resolutions | |

Execution Version

**EXHIBIT B**
**INTERIM FINANCING ORDER**

**EXHIBIT B**

**Tessemae's Interim DIP Budget**

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | | | Starting | WK 1 | WK 2 | WK 3 | WK 4 |
| 2 | | | | 1/30/2023 | 2/6/2023 | 2/13/2023 | 2/20/2023 |
| 3 | **Operational Income** | Notes | | | | | |
| 4 | Payments from Customers (Cash Inflow) | | | $ 243,521 | $ 276,076 | $ 291,756 | $ 317,958 |
| 5 | DIP Financing | $ 1,250,000 | | $ 650,000 | | $ 300,000 | $ 300,000 |
| 6 | Pre-Filing Financing | | | | | | |
| 7 | | | | | | | |
| 8 | **Operational Expenses** | | | | | | |
| 9 | Vendor Payments | | | $ (226,827) | $ (312,507) | $ (289,227) | $ (288,107) |
| 10 | SVB Finished Good | | | | | | |
| 11 | SVB Finished Good Pre-Purchase | | | (7,500) | (7,500) | (7,500) | (7,500) |
| 12 | 3PL & Cold Storage | -4% | | $ (9,741) | $ (11,043) | $ (11,670) | $ (12,718) |
| 13 | Freight | | | | | | |
| 14 | Payroll | | | $ (26,090) | $ (26,090) | $ (26,090) | $ (26,090) |
| 15 | 1099 Consultants | | | | | | |
| 16 | Healthcare | | | | | | |
| 17 | General Liability | DD 10th of each month $1727.38 | | | $ (1,727) | | |
| 18 | Commercial Umbrella | DD 10th each month 1,935.12 | | | $ (1,935) | | |
| 19 | Cyber Security | DD 14 of each month $1,527.50 | | | | $ (1,528) | |
| 20 | Travelers (Transit) | DD 17th each month $931.00 | | | | $ (931) | |
| 21 | New Benefits LTD AC Monthly Fee | DD 19th of each month $480.00 | | | | | $ (480) |
| 22 | D&O Insurance | 30th of each month $9,594.87 | | $ (9,595) | $ - | $ - | $ - |
| 23 | Clearview Accounting | | | | | | |
| 24 | Netsuite ERP | | | | | | |
| 25 | Critical Vendors | | | $ (458,382) | | | |
| 26 | | | | | | | |
| 27 | **Net Operational Cashflow** | | | $ 155,386 | $ (84,726) | $ 254,810 | $ 283,063 |
| 28 | | | | | | | |
| 29 | **Restructuring Expenses** | | | | | | |
| 30 | Cole Schotz | | $ (70,000) | | | | |
| 31 | Public Relations | | | | | | |
| 32 | UST Fees | | | | | | |
| 33 | OCUC Fees | | | | | | |
| 34 | Filing Fees | | $ (1,740) | | | | |
| 35 | **Total Restructuring Expenses** | | | $ - | $ - | $ - | $ - |
| 36 | **Net Weekly Cashflow** | | | $ 155,386 | $ (84,726) | $ 254,810 | $ 283,063 |
| 37 | Cash Balance | | $ 11,000 | $ 94,646 | $ 9,920 | $ 264,730 | $ 547,793 |
| 38 | Inventory Balance | $ 23.70 | | $ 1,216,545 | $1,138,595 | $1,215,573 | $ 1,167,462 |
| 39 | Accounts Receivable | | | $ 386,570 | $ 625,121 | $ 722,494 | $ 941,606 |
| 40 | | | $ (60,740) | | | | |