IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | |
|---|---|
| In re<br><br>**TESSEMAE'S LLC,**<br><br>　　　　Debtor | Case No. 23-10675-NVA |

**THE UNITED STATES TRUSTEE'S OBJECTION
TO THE APPLICATION OF DEBTOR FOR AUTHORITY TO
EMPLOY AND RETAIN AURORA MANAGEMENT PARTNERS INC.
AS FINANCIAL ADVISOR TO THE DEBTOR,
<u>*NUNC PRO TUNC* TO FEBRUARY 22, 2023</u>**

The Acting United States Trustee for Region Four, which includes the District of Maryland, files this Objection to the Application of Debtor for Authority to Employ and Retain Aurora Management Partners Inc. as Financial Advisor to the Debtor, *nunc pro tunc* to February 22, 2023, and as grounds therefor states as follows:

**FACTUAL BACKGROUND**

1.　Tessemae's, Inc. (the "Debtor") filed case 23-10675 on February 1, 2023 (the "Petition Date"), under Chapter 11 of the Bankruptcy Code. (*See* Doc. 1.)

2.　The Debtor filed its Motion for Authority to Employ and Retain Aurora Management Partners Inc. as Financial Advisor to the Debtor, *nunc pro tunc* to February 22, 2023 (the "Application to Employ AMP"), on February 27, 2023. (*See* Doc. 54.)

3.　Included as Exhibit A to the Application to Employ AMP was an affidavit

1

from David Baker, a principal at Aurora Management Partners, Inc. ("AMP"), addressing the qualifications and disinterestedness of AMP in support of the authorization of employment by the Debtor (the "Baker Declaration"). (*See* Doc. 54-1.)

4. Included as Exhibit B to the Application to Employ AMP was a document purporting to memorialize the terms of engagement between the Debtor and AMP (the "Engagement Letter"). (*See* Doc. 54-2.)

5. Also included as an attachment to the Application to Employ AMP is a proposed order (the "Proposed Order") which would, if granted by the Court as filed, authorize the employment and retention of AMP upon the terms set forth in the Application to Employ AMP, the Baker Declaration, and the Engagement Letter. (*See* Doc. 54-3.) Of the three documents referenced by the Proposed Order, only the Engagement Letter is included as an exhibit thereto.

## ARGUMENT

### A. The Attached Exhibit Renders the Proposed Order Impermissibly Vague.

The Engagement Letter consists of four parts: (i) a four-page letter addressed to Mr. Vetter[1], (ii) a signature page signed by AMP on February 20, 2023 and by the Debtor on February 22, 2023, (iii) a page titled "Schedule A", which describes the fee rates to be charged by AMP, broken down by position, and (iv) a final page which appears to be

---

1 Specifically, Mr. Greg Vetter in his capacity as the CEO of Tessemae's LLC.

2

supplemental terms of engagement between the Debtor and AMP, titled "Schedule B". (*See* Doc. 54-2.)

The Proposed Order authorizes the Debtor to "employ and retain AMP… upon the terms set forth in the Application, the Baker Declaration, and the Engagement Letter, as amended by the letter agreement attached hereto as **Exhibit A**, *nunc pro tunc* to February 22, 2023" [emphasis in original].  (*See* Doc. 54-3.[2])

Of the three documents cited in the proposed order, only the Engagement Letter was attached as an exhibit to the Proposed Order.  (*See* Doc. 54-3.)

Schedule B begins with the following opening paragraph: "Unless otherwise noted, all capitalized terms used below shall have the meanings set forth above in the Agreement." (*See* Doc. 54-3, p. 11.)

Beginning in the next sentence, and continuing an additional 10 times throughout the page, the capitalized term "Indemnified Party" is used.  This capitalized term is not defined in Schedule B, nor at any point elsewhere in the Engagement Letter.[3]  (*See* Doc. 54-3, p. 11.)

As such, it remains unclear precisely which parties are encompassed by the term Indemnified Party.  It is clear that Indemnified Party is not merely a pseudonym for AMP

---

2 As the document included as an exhibit to the Proposed Order is identical to the document attached as Exhibit B to the Application to Employ AMP, this Objection will hereafter cite exclusively to the Proposed Order and its exhibit, in the interest of considering only a single occurrence of a largely duplicated document.

3 In particular, "Indemnified Party" is not included in the opening paragraph of the Engagement Letter, which defines numerous other terms, including "Agreement," "Company," "Debtor," "Aurora,", and "Party."

3

for three reasons. First, there is already a defined term in the Engagement Letter to refer to AMP specifically: "Aurora." Second, Schedule B twice uses the plural term "Indemnified Parties," explicitly recognizing the existence of multiple Indemnified Parties. And third, Schedule B includes the statement "the Company further agrees that neither Aurora nor **any other Indemnified Party** shall…" [emphasis added] to explicitly recognize the existence of one or more Indemnified Parties separate and distinct from AMP. (*See* Doc. 54-3, pp. 5, 11.)

Notwithstanding the failure to adequately identify which party or parties are included the capitalized term "Indemnified Party," such party or parties are granted substantial powers and rights under the terms of Schedule B, and by the specific incorporation of such terms in the Proposed Order.

As each of the three substantial powers and rights, namely: indemnification, limitations on liability, and the power to veto settlements by the Debtor (to which they may or may not be parties), are in and of themselves further grounds for objection to the Motion, they will be addressed separately below.

    **B.**    **The Proposed Order Improperly Limits Liability of AMP.**

        **1.**    **The Acceptable Parameters of Indemnification Provisions For Investment Bankers and Financial Advisors.**

In *In re Baltimore Emergency Serv. II, LLC*, 291 B.R. 382 (Bankr. D. Md. 2003), Judge Derby discussed the parameters of a permissible indemnification provision in a

financial advisor's employment contract. Judge Derby explained that "it may be reasonable to indemnify a reorganizing debtor's financial advisor from something commonly described as ordinary negligence, without tolerating actions akin to gross negligence." *Id.* at 384. Thus, Judge Derby ruled that the reasonableness of an indemnification clause should be judged "by principles akin to the business judgment rule." *Id.*

In so recognizing, Judge Derby set out four overarching principles to which a permissible indemnification clause must adhere:

1. The financial advisor must remain liable for breaches of the duty of loyalty including conflicts of interest and nondisinterestedness;

2. The financial advisor must remain liable for breaches of the duty of care;

3. The financial advisor cannot be indemnified for contractual disputes with the debtor, including disputes over the services agreed to in the employment contract for which approval is being sought; and

4. The gross-negligence exclusion from indemnification cannot be limited to injuries or damages from acts that are "solely" or "primarily" caused by the advisor's gross-negligence.

*Id.* at 384-385.

After setting forth these general principles, Judge Derby applied them to the contract at issue in *Baltimore Emergency Services,* which contained an indemnification clause very

similar to that in the Engagement Letter. Among the bases for refusing to approve that indemnification clause, Judge Derby noted the following failures:

First, in excluding the acts of gross negligence from the scope of indemnification, the agreement limited the exclusion to acts "primarily" resulting from gross negligence. *Id.* at 385. Specifically, the agreement provided:

> [Debtor] will not, however, be liable under the foregoing indemnification provision for any losses, claims, damages or liabilities (or expenses relating thereto) that are finally judicially determined by a court of competent jurisdiction to have *primarily* resulted from the bad faith, gross negligence or willful misconduct of [the advisor].

*Id* (emphasis added). The agreement further provided:

> [Debtor] agree[s] that no Indemnified Party shall have any liability ... [to Debtor] for or in connection with the Engagement except for any such liability for losses, claims, damages or liabilities incurred by [Debtor] that are finally judicially determined by a court of competent jurisdiction to have *primarily* resulted from the bad faith, gross negligence or willful misconduct of [the advisor].

*Id* (emphasis added). According to Judge Derby, limiting language such as the term "primarily" used to modify the gross negligence exclusion "has no place" in a permissible indemnification clause. *Id.*

Second, the indemnification clause was broad enough that it arguably required indemnification for contractual disputes with the debtor. Judge Derby held that a permissible indemnification clause must contain an *express* exclusion for contractual disputes over the terms of the advisor's employment contract. *Id.* at 386.

Finally, the agreement failed to expressly recognize that the indemnity provisions did not cover the advisor's breaches of the duty of loyalty or the duty of care. Although the lack of such an express recognition in the *agreement* was not fatal, Judge Derby required that the *order approving the agreement* contain such an express disclaimer. *Id.*

As discussed below, the Engagement Letter, and by extension the Proposed Order which incorporates it, contains many of the same deficiencies as the contract in *Baltimore Emergency Services*.

### 2. The Proposed Order Improperly Restricts the Gross Negligence Exclusion to Injuries Resulting "Solely" From Gross Negligence.

Paragraph 4 of Schedule B, titled "Limitation of Liability" improperly limits the gross negligence exclusion to injuries resulting "solely" from AMP's gross negligence. Specifically, the Engagement Letter provides:

> The [Debtor] further agrees that neither Aurora nor any other Indemnified Party shall have any liability (whether direct or indirect and regardless of legal theory advanced) to the [Debtor]... except for losses, claims, damages or liabilities incurred by the [Debtor] finally judicially determined by a court of competent jurisdiction to have resulted *solely* from the willful misconduct or gross negligence of such Indemnified Party.

(*See* Engagement Letter, Doc. 54-3, at p. 11, 1st sentence of the 4th paragraph entitled "Limitation of Liability" (emphasis added).)

These provisions are nearly identical to those rejected in *Baltimore Emergency Services* and render the Engagement Letter (and by extension, the Proposed Order incorporating

it) inappropriate as drafted.  Indeed, *Baltimore Emergency Services* struck a provision which limited liability to actions found to be only **primarily** from willful misconduct or gross negligence on the part of the financial advisor.  The limitation of liability requested by AMP goes beyond even the impermissible provision in *Baltimore Emergency Services* and improperly attempts to limit its liability to actions found to be **solely** from willful misconduct or gross negligence on its part.[4]

### 3. The Proposed Order Improperly Requires Debtors to Indemnify AMP For Contractual Disputes With the Debtor.

The indemnification provision, included in the Proposed Order by incorporation of the Engagement Letter, also fails to exclude contractual disputes over AMP's employment pursuant to the Engagement Letter.  Indeed, the Engagement Letter not only lacks an express exclusion for contractual disputes as required by *Baltimore Emergency Services*, it seems to expressly *include* such contractual disputes. The fourth paragraph of Schedule B provides:

> [Debtor] further agrees that neither Aurora nor any other Indemnified Party shall have any liability (whether direct or indirect and *regardless of legal theory advanced*) to the [Debtor] ... related to or *arising out of the Agreement,* any transaction or proposed transaction, *or any actions taken or omitted to be taken by an Indemnified Party or the [Debtor] in connection with the Agreement* ....

---

[4] *See United Artists Theatre Co. v. Walton*, 315 F.3d 217, 234 (3d Cir. 2003) ("[Financial advisor] attempted to supplement its retention agreement with a provision in the retention application and approving order that in effect mandates indemnification to [financial advisor] for even its gross negligence if that negligence is not judicially determined to be "solely" the cause of its damages. In other words, the Debtors would be bound to indemnify [financial advisor] when its gross negligence contributed only in part to its damages. This attempted end run goes out of bounds for acceptable public policy.").

8

(*See* Engagement Letter, Doc. 54-3, at p. 11, 1st sentence of the 4th paragraph entitled "Limitation of Liability" (emphasis added).)

### 4. The Engagement Letter is Improperly Silent On The Fiduciary Duties of Loyalty and Care.

The third page of the Engagement Letter, the paragraph titled "Independent Contractor Relationship", states in its entirety:

> Aurora shall serve as an independent contractor to the [Debtor] in rendering its services under this Agreement. This agreement does not create, and shall not be construed to create, a relationship of principal/agent, joint venture, partnership, employer/employee, master/servant, or any comparable relationship, as between Aurora and the [Debtor], and the Parties expressly deny the existence of any such relationship.

In *Baltimore Emergency Services*, Judge Derby held that indemnification clauses are permissible because the advisor still remains liable for breaches of its fiduciary duties of loyalty and care. Thus, he recognized that a fiduciary relationship must exist between the advisor and the debtor. By disclaiming any relationship beyond "independent contractor," AMP is at a minimum silent on the existence of a fiduciary duty to the Debtor, and such paragraph could be construed to actively disclaim such relationship, including any duty of loyalty or care of the type which Judge Derby determined to be a necessary prerequisite to the allowance of an indemnification clause.

Although Judge Derby ruled that it was sufficient for the order approving the advisor's contract to expressly provide that the indemnification provisions do not require indemnification for injuries arising from an advisor's breaches of its fiduciary duties of loyalty and care, the United States Trustee believes that such provisions should be included in the agreement itself in addition to the order approving the agreement.

### 5. The Proposed Order Improperly Limits Liability to Fees Received.

In addition to the portions of the indemnification provision that conflict with *Baltimore Emergency Services* as discussed above, the United States Trustee objects to two other provisions of Schedule B.

First, the second paragraph of Schedule B, titled "Contribution", purports to limit the amount of AMP's liabilities (or those of some other unidentified "Indemnified Party" as discussed *supra*) to the fees actually received under the Engagement Letter. Such a limitation is inappropriate. If AMP, as a professional employed by the Debtor, commits wrongful acts that result in damage to Debtor or others, it must be liable for those damages regardless of whether they exceed the fees it received. There is simply no rational connection between the damage that a wrongful act may cause (which constitutes the basis for awards of damages under the American judicial system) and the fees the wrongful actor received. Thus, courts have found such limitations on liability to be inappropriate in the context of a bankruptcy professional. *In re Glosser Bros., Inc.,* 102

B.R. 38, 42 (Bankr. W.D. Pa. 1989); *see also In re Gillette Holdings*, 137 B.R. 452, 459 n.17 (Bankr. D. Colo. 1991).

### 6. The Proposed Order Improperly Restricts Debtor's Ability to Settle Legal Actions.

Secondly, the third paragraph of Schedule B, titled "Settlements", purports to limit Debtor's ability to settle legal actions brought against it by making a release of any and all "Indemnified Parties" (in a form acceptable to AMP) a prerequisite to any such settlement. As debtor-in-possession, the Debtor has a fiduciary obligation to its creditors. Fulfillment of those fiduciary obligations may require the Debtor to settle or compromise certain legal actions regardless of whether AMP (or other unidentified "Indemnified Parties") is released. Debtor cannot be contractually required to abandon its fiduciary obligations in deference to contractual obligations to AMP.

### C. The Debtor Has Failed to Meet Its Burden Justifying Employment be Authorized on a *Nunc Pro Tunc* Basis.

The Fourth Circuit has not promulgated an opinion on the authority of a bankruptcy court to approve a professional's employment retroactively. Several circuits have, and have articulated various standards for doing so. *In re Congressional Hotel Corp.*, No. 11-26732-PM, 2012 WL 1144421, at *4 (Bankr. D. Md. Apr. 4, 2012) (Which in turn cites to authority within each circuit enumerating the respective standard therein: "*In re Jarvis*, 53 F.3d 416 (1st Cir. 1995) ("extraordinary circumstances"); *In re Keren Limited Partnership*,

11

189 F.3d 86 (2d Cir. 1999) ("extraordinary circumstances"); *In re Arkansas*, 798 F.2d 645 (3d Cir. 1986) and *F/S Airlease II, Inc*., 844 F.2d 99 (3d Cir. 1988), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988) ("extraordinary circumstances"); *In re Singson*, 41 F.3d 316 (7th Cir. 1994) ("excusable neglect"); *In re Atkins*, 69 F.3d 970 (9th Cir. 1995) ("exceptional circumstances"); *In re Albrecht*, 233 F.3d 1258 (10th Cir. 2000) ("extraordinary circumstances").)

The First, Second, Third, and Tenth Circuits all use the "extraordinary circumstances" standard, the Ninth Circuit uses a similar "exceptional circumstances" standard,[5] while the Seventh Circuit uses the more lenient "excusable neglect" standard.

Within the Fourth Circuit, the United States District Court for the District of Maryland has considered the issue under all three standards, but declined to adopt one over the others. *Binswanger Companies v. Merry-Go-Round Enterprises, Inc.* 258 B.R. 608 (D. Md. 2001).

In *Congressional Hotel*, citing *Merry-Go-Round Enterprises*, the court summarized the three standards as follows:

> Several circuit courts are cautious in permitting retroactive appointment, requiring some sort of extraordinary circumstances. The Ninth Circuit requires 'professionals seeking retroactive approval [to] satisfy two requirements: they must (1) satisfactorily explain their failure to receive prior judicial approval; and (2) demonstrate that their services benefitted the bankrupt estate in a significant manner.' *Atkins*,

---

5 The Ninth Circuit standard includes a supplementary two-part test: (1) professionals must satisfactorily explain their failure to receive prior judicial approval; and (2) demonstrate that their services benefitted the bankruptcy estate in a significant manner. *Atkins*, 69 F.3d at 974.

12

> 69 F.3d at 974. The First Circuit requires, beyond the statutory requirements for any appointment, 'that the delay in seeking court approval resulted from extraordinary circumstances,' which do not include, for example, 'tardiness occasioned merely by oversight.' *Jarvis*, 53 F.3d at 418.... The Seventh Circuit has adopted a more lenient test of 'excusable neglect.' *In re Singson*, 41 F.3d 316 (7th Cir.1994).

*Congressional Hotel*, 2012 WL 1144421, at *4–5 (Bankr. D. Md. Apr. 4, 2012) (citing *Merry-Go-Round Enterprises*, 258 B.R. at 612-613).

Much like the professionals in both *Congressional Hotel* and *Merry-Go-Round Enterprises*, AMP cannot meet the standard for employment *nunc pro tunc* under any of the standards used by the various Circuit Courts. This Court, in *Congressional Hotel* emphasized "before it is not [the professional's] application, but Debtors' Application: Debtors alone had standing to file the Application." *Id.* at 5.

In precisely the same manner as the debtor in *Congressional Hotel*, the Debtor here has "not articulated any extraordinary circumstances or any reason whatsoever justifying retroactive approval." *Id*. In another marked similarity with *Congressional Hotel*, Debtor's counsel did not overlook the filing of its own employment application on the Petition Date. The Debtor was certainly aware of the requirement of timely application for the employment of professionals.

In fact, the Application to Employ AMP is completely silent on the subject of the *nunc pro tunc* employment date, with only three exceptions: (i) the title of the filing, (ii) a repeat of the title of the filing in the opening paragraph, and (iii) a single mention, without

13

comment or justification, in the sentence identifying the relief requested. (*See* Doc. 54, pp. 1-2.)

At no part of the "Basis for Relief Requested" is the subject of the *nunc pro tunc* authorization even mentioned. There is no justification provided for such relief, and as such the Application to Employ AMP cannot possibly meet even the most lenient of standards required to grant such relief.

## **CONCLUSION**

For the reasons stated above, the Court should deny the Debtor's Application of Debtor for Authority to Employ and Retain Aurora Management Partners Inc. as Financial Advisor to the Debtor, *nunc pro tunc* to February 22, 2023. If the Court does elect to grant the Application to Employ AMP, either at this time or in response to a future amended application, the Court should authorize the retroactive employment AMP only so far as the date the original Application to Employ AMP was filed, February 27, 2023.

## **Local Rule 9013-2 and 9013-6 Statements**

Pursuant to Local Bankruptcy Rule 9013-2, the U.S. Trustee states that he is not filing a separate memorandum of law in support of this motion and relies solely on the grounds and authorities set forth herein.

Pursuant to Local Rule 9013-6, the United States Trustee consents to entry of a final order or judgment in this matter by a bankruptcy judge.

Respectfully submitted,

John P. Fitzgerald, III
Acting United States Trustee, Region 4

Date: March 8, 2023      By: */s/  J. Dan Ford*
J. Dan Ford, Fed. Bar No. 21290
United States Department of Justice
101 W. Lombard Street, Suite 2625
Baltimore, MD 21201
(410) 962-4300
Fax: (410) 962-3537
E-mail: j.dan.ford@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 8, 2023, a copy of the foregoing document was mailed, first class, postage prepaid, to:

Ally Bank, c/o AIS Portfolio Services, LLC
4515 N Santa Fe Ave. Dept. APS
Oklahoma City, OK 73118

Alison D. Bauer
Foley Hoag LLP
1301 Avenue of the Americas, 25th Floor
New York, NY 10019

Jiun-Wen Bob Teoh
Foley Hoag LLP
1301 Avenue of the Americas
25th Floor
New York, NY 10019

I HEREBY FURTHER CERTIFY, that according to the Court CM/ECF system, a copy of the foregoing document was also served electronically upon:

- **Hugh M. (UST) Bernstein**    hugh.m.bernstein@usdoj.gov
- **Richard L. Costella**    rcostella@tydings.com, jmurphy@tydings.com
- **James Daniel (UST) Ford**    j.dan.ford@usdoj.gov
- **Catherine Keller Hopkin**    chopkin@yvslaw.com, pgomez@yvslaw.com, yvslawcmecf@gmail.com, hopkincr39990@notify.bestcase.com, schroppjr39990@notify.bestcase.com
- **Harry Conrad Jones**    HJones@coleschotz.com, bankruptcy@coleschotz.com, pratkowiak@coleschotz.com
- **Lawrence A. Katz**    lkatz@hirschlerlaw.com, llewis@hirschlerlaw.com, aklena@hirschlerlaw.com
- **C. Kevin Kobbe**    kevin.kobbe@us.dlapiper.com, docketing-baltimore-0421@ecf.pacerpro.com
- **Joyce A. Kuhns**    jkuhns@offitkurman.com
- **Gary H. Leibowitz**    gleibowitz@coleschotz.com, pratkowiak@coleschotz.com, bankruptcy@coleschotz.com, lmorton@coleschotz.com

- **Kimberly A. Manuelides**   kmanuelides@sagallaw.com
- **US Trustee - Baltimore**   USTPRegion04.BA.ECF@USDOJ.GOV
- **Irving Edward Walker**   iwalker@coleschotz.com, jdonaghy@coleschotz.com, pratkowiak@coleschotz.com

*/s/ J. Dan Ford*
J. Dan Ford