**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)**

In re:                                          (Chapter 11)

Tessemae's LLC,[1]                              Case No. 23-10675 (NVA)

          Debtor.

**MOTION OF THE DEBTOR AND DEBTOR-IN-POSSESSION FOR AN
ORDER (I) APPROVING BIDDING PROCEDURES, (II) SCHEDULING AN AUCTION
FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS AS A
GOING CONCERN, AND (III) GRANTING RELATED RELIEF**

Tessemae's LLC, the debtor and debtor-in-possession in the above-captioned chapter 11

case (the "Debtor" or "Tessemae's"), by its undersigned counsel, pursuant to Sections 105(a) and

363 of Title 11 of the United States Code (11 U.S.C. §§ 101, *et seq.*) (the "Bankruptcy Code"),

Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and

Rule 6004-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District

of Maryland (the "Local Rules"), hereby moves the Court (the "Motion") for entry of an order,

substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order") (i)

authorizing and approving certain proposed bidding and sale procedures (the "Bidding

Procedures"), as well as certain bid protections, substantially in the form attached as Exhibit 1 to

the Bidding Procedures Order, for the sale of all or substantially all of the Debtor's assets (the

"Purchased Assets"), (ii) scheduling an auction for the sale of the Purchased Assets (the "Auction"),

and (iii) granting related relief.

---

[1] The Debtor in this chapter 11 case and the last four digits of its federal tax identification are Tessemae's LLC (2871). The Debtor's principal address is 714 South Wolfe Street, P.O. Box No. 38438, Baltimore, Maryland 21231.

In support of this Motion, the Debtor relies upon and hereby incorporates by reference the *Declaration of Demian Costa in Support of First-Day Motions* [Doc. No. 8] (the "Costa Declaration"), and respectfully states as follows:

## PRELIMINARY STATEMENT

1.      While debtors in this jurisdiction customarily file a single motion seeking both approval of bidding procedures and the ultimate sale of assets, the success of the first 4 months of the Debtor's bankruptcy case has provided this Debtor with an unusual benefit in a chapter 11 case—time.  The Final Agreement for Post-Petition Financing (the "DIP Credit Agreement") with TESSE DIP FUND I, LLC (the "DIP Lender"), as approved by the Final DIP Order entered in this case on February 16, 2023 [Doc. No. 48], contains certain sale milestones as a condition of lending.  As a result of the Debtor's successful post-petition restructuring thus far, the Debtor does not need to draw the second tranche from the DIP Loan (defined below) at this time.  The Debtor can fund the administration of this case, and the marketing and sale process, from its monthly revenue for the foreseeable future.

2.      Accordingly, with the consent obtained from the DIP Lender, the Debtor is seeking entry of bidding procedures now while it continues to recapture shelf space with its prior and current retailers, as well as new entities.  If successful, the value of the Debtor's assets will increase for the benefit of the Debtor, the Debtor's creditors, and its estate.  The Debtor's investment banker can also penetrate the market to the fullest extent possible.  The Debtor will subsequently file a separate Sale Motion seeking approval of a stalking horse bidder subject to higher and better offers.

## JURISDICTION AND VENUE

3.      The United States Bankruptcy Court for the District of Maryland has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

4.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicates for the relief requested in this Motion are Sections 105(a) and 363 of the Bankruptcy Code, Rules 2002 and 6004 of the Bankruptcy Rules, and Local Rules 2002-1 and 6004-1.

## BACKGROUND

6.      On February 1, 2023 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.

7.      The Debtor continues to manage and operate its business as a debtor-in-possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

8.      No official committee of unsecured creditors has been appointed.

9.      No request for a trustee or examiner has been made in this chapter 11 case.

## I.    Overview of the Debtor's Business.

10.     Founded by Gregory Vetter and his family in 2009, Tessemae's quickly became one of the nation's premier organic salad dressing companies. It manufactures through a co-manufacturer and wholesales some of the most popular all-natural, organic salad dressings in the United States, which are ubiquitous in the world of "clean eating."  By carefully curating and combining healthy, organic ingredients using Mr. Vetter's mother's recipes as inspiration, Tessemae's allows its customers to choose from a variety of healthy dressings without sacrificing taste.

11.     Within three years of its founding, Tessemae's was the top selling salad dressing in the MidAtlantic region of WholeFoods and began expanding into other regions and other retailers. Its gluten free, sugar free, and vegan friendly products quickly became the #1 refrigerated salad dressing at WholeFoods and Safeway.  By 2021, at its peak, Tessemae's was producing 36 bottles of dressing per minute, which were retailed in 12,500 locations nationwide.

## II.    Events Leading to Bankruptcy.

12.     The Debtor's rapid growth created a consistent challenge as it required additional capital to fund the costs of manufacturing and keep pace with customer orders. Demand for the Debtor's products has always outpaced supply as the company expanded into additional retailers and markets nationwide.

13.     In 2020, like so many other manufacturers and wholesalers, the Debtor faced substantial challenges arising from the COVID-19 pandemic, including logistical issues related to its workforce presence and manufacturing capabilities, as well as the rising cost of raw materials. While the Debtor's sales remained strong, growth slowed, and by September 2021, the Debtor undertook cost-cutting and restructuring efforts focused on streamlining and becoming more profitable rather than continuing to pursue growth. As part of these efforts, the Debtor implemented two workforce reductions in late 2021, and elected not to replace employees who resigned in 2022. With profit margins becoming ever more compressed with the rising cost of materials, the Debtor reduced its promotional spending, cut sales to its least profitable and lowest volume customers, and implemented price increases.  By August 2022, customer orders were stable despite the price increases, but the lack of working capital rendered self-manufacturing to be too expensive.

14.     In these circumstances, the Debtor made the difficult decision in 2022 to shutter its manufacturing plant and outsource production.  Fortunately, over the course of the previous several years, the Debtor had developed a strategic partnership with a co-manufacturer that could replicate the Debtor's manufacturing processes and production standards, and unlike the early stages when third-party "clean manufacturing" was unavailable, the co-manufacturer was able to take over manufacturing and packaging the Debtor's products without any reduction in quality or modification to materials or processes.

15.     With the Debtor's workforce reduced to only key employees, it was able to procure and coordinate production and delivery of its products through its co-manufacturer and begin using a logistics company for smaller deliveries following production and packaging.

16.     Unfortunately, as further explained in the Costa Declaration, the Debtor faced a number of lawsuits by certain creditors, including one by Democracy Capital Corporation ("Democracy") in the Circuit Court for Baltimore County, Maryland, whereby Democracy sought in excess of $13.8 million on account of a loan in the original principal amount of $3,000,000.00 (the "Democracy Litigation").[2]  The Democracy Litigation lasted for more than 2 years before the Petition Date.  This was a substantial distraction to the Debtor's very lean staff, and the accompanying legal fees further drained the Debtor's already strained capital.

17.     Despite its strong customer base, for the reasons previously discussed, the Debtor was unable to service certain of its debts.  Demand remained high for the Debtor's products, but the Debtor did not have the capital necessary to fill the orders.

---

[2] Democracy's claim against the Debtor is currently the subject of a pending Motion for Relief from Stay filed by Democracy [Doc. No. 51] and an Adversary Proceeding filed by the Debtor (Adv. Pro. No. 23-00039) seeking, *inter alia*, (i) a determination of the claim's validity, (ii) equitable subordination of any claim held by Democracy, and (iii) a determination that any claim held by Democracy was acquired by a fraudulent conveyance.

18.     Seeking to stabilize its operations and focus the efforts of its reduced personnel on realizing the full potential of its brand, the Debtor recognized the need to restructure with the protection of the Bankruptcy Court.

**III.    The Chapter 11 Case and the Debtor's Post-Bankruptcy Performance.**

19.     Following the Petition Date, and with the protections and centrality afforded by the Bankruptcy Code, the Debtor has been able to stabilize its business and dramatically improve its order fulfillment rate, cash position, and operational outlook.  The Debtor received authorization from the Court to secure post-petition financing from the DIP Lender in the total principal amount of $1,250,000.00 [Doc. No. 48] (the "DIP Loan") but has taken only the first draw from the DIP Loan, in the amount of $650,000 and does not anticipate taking another draw.

20.     The Debtor continued to streamline its operations by converting from a co-manufacturing model to a "turnkey" model, whereby instead of the Debtor purchasing all of the raw materials necessary to manufacture its products, the Debtor's co-manufacturer purchases the raw materials for the manufacturing process, and the Debtor purchases the "finished product" from the co-manufacturer.  This process has allowed the Debtor's personnel to focus on improving operations and sales.  Additionally, the Debtor retained Aurora Management Partners Inc. ("AMP") as its Financial Advisor, effective as of February 17, 2023 [Doc. No. 93].  AMP helped the Debtor reconcile its financial records and prepare for the coming sale process.

21.     With these measures in place, after only two months in bankruptcy, the Debtor reported an end-of-month cash balance for March 31, 2023 of $1,153,789.26, as compared with its $11,000 cash balance on the Petition Date.  As of the date of this Motion, the Debtor has in excess of $1,600,000 of cash, plus two weeks of inventory and more than $750,000 of good accounts receivable.

22.     Given the Debtor's streamlined operations and financial improvement since the Petition Date, the Debtor is ready to set Bidding Procedures and prepare for a sale process. Accordingly, this Motion seeks approval of the Court of Bidding Procedures as the first step in a sale process. A subsequent sale motion will be filed with the Court at the appropriate time, seeking approval of the sale and related items, and seeking to set a hearing date for the Court to consider the proposed sale.

## IV.    Marketing Efforts.

23.     Effective as of March 14, 2023, the Debtor retained B. Riley Securities, Inc. ("B. Riley") as its investment banker [Doc. No. 133]. B. Riley familiarized itself with the Debtor's business and, along with AMP, advised the Debtor concerning its strategic alternatives. With the input of its professionals, it is the Debtor's business judgment that the value of the Debtor's business will be maximized through a sale process. To that end, B. Riley has prepared an informational "teaser" to solicit interest in purchasing the Debtor's assets, which it will disseminate by email, industry marketing, and other direct contact through its proprietary database. Any interested parties will be required to execute a non-disclosure agreement ("NDA") before receiving access to the full Confidential Information Memorandum ("CIM") and virtual data room prepared and maintained by B. Riley to conduct due diligence. At least one interested party has already submitted a signed NDA and requested the CIM.

## V.    Potential Stalking Horse Bidders and Bid Protections.

24.     The Debtor also determined, in its business judgment, that the net proceeds of the sale of the assets will be maximized by soliciting bids for a "stalking horse" purchaser (a "Stalking Horse Bidder") and then conducting an auction to solicit higher or otherwise better bids. In order to garner the interest of a potential Stalking Horse Bidder and incentivize the submission of an offer,

the Debtor proposes including certain bidder protections, which will be included in the Asset Purchase Agreement, including a 2% Break-Up Fee (defined below).  If a Stalking Horse Bidder is selected, the Debtor will file a notice with the Court within two (2) business days and will provide notice to interested parties.

25.    To effectuate the sale process, the Debtor is asking the Court to authorize the scheduling of the Auction, as set forth in the Bidding Procedures Order, for August 11, 2023 at 10:00 am (Eastern), in a location to be determined by the Debtor, of which the Debtor will provide notice at least 48 hours prior to the Auction.  In the unlikely event that no Qualified Bids are submitted before the Bid Deadline (both defined in the Bidding Procedures), the Debtor will cancel the Auction and seek to consummate the proposed sale with the Stalking Horse Bidder.

**VI.    Proposed Bidding Procedures and Key Dates.**

26.    The Bidding Procedures, attached to the Bidding Procedures Order as Exhibit 1, are designed to promote participation and active bidding and ensure an orderly marketing and sale process. The Bidding Procedures describe, among other things, the manner in which a potential Stalking Horse Bidder may enter into a Stalking Horse Agreement, procedures for interested parties to access due diligence, the process for submitting written, irrevocable offers ("Bids"), the manner in which bidders and bids become "qualified," the receipt and negotiations of Bids received, the conduct of any Auction, the selection and approval of any ultimately Successful Bidder and Back-up Bidder (both defined below), and the deadlines with respect to the foregoing. The Bidding Procedures will allow the Debtor to conduct the sale process in a fair, orderly, and transparent manner that will maximize value for all stakeholders.  The Debtor reserves the right, in its sole discretion, to modify the Bidding Procedures.  In the event of any such modification, the

Debtor will file a notice of such modification with the Court, in accordance with Bidding Procedures Order.

27.     In accordance with Local Bankruptcy Rule 6004-1(c), below is a summary of the material terms of the Bidding Procedures:[3]

| BIDDING PROCEDURES |
|---|
| **A. Indications of Interest.**  Unless otherwise ordered by the Bankruptcy Court, in order to participate in the bidding process, on or before **June 30, 2023**, each person who wishes to participate in the bidding process (a "<u>Potential Bidder</u>") must deliver to the Notice Parties (as defined below) to the extent not previously delivered, an executed confidentiality agreement containing standard non-solicitation provisions (to be delivered prior to the distribution of any confidential information by the Debtor to a Potential Bidder) in form and substance satisfactory to Debtor's counsel, and a summary of deal terms, including proposed purchase price. |
| **B. Due Diligence.**  Upon execution of a valid confidentiality agreement in form and substance reasonably acceptable to the Debtor, the Debtor will afford any Potential Bidder such due diligence access or additional information as the Debtor, in consultation with its advisors, deem appropriate, between now and **July 19, 2023**, or such other dates as the Debtor deems appropriate, including, in the Debtor's discretion, the opportunity to meet (virtually) with the Debtor's management.  The Debtor will limit access to due diligence to those parties it believes, in the exercise of its reasonable judgment, are pursuing the transaction in good faith and are capable of submitting a Qualified Bid (as defined below). |
| **C. Stalking Horse Submissions.**  On or before **July 19, 2023**, all Potential Bidders interested in serving as the Stalking Horse Bidder must deliver to the Debtor and B. Riley Securities, Inc., a final, marked proposed asset purchase agreement, in a form to be obtained from the Debtor, to include proposed purchase price for the Purchased Assets, a description of the specific assets that the Potential Bidder intends to purchase, the Potential Bidder's conditions for closing, and an acknowledgement that the Potential Bidder intends to purchase the property with no financing contingency, together with all exhibits and schedules thereto (the "<u>Bidder Purchase Agreement</u>").  If a Stalking Horse Bidder is selected, the Debtor will file a notice with the Court within two (2) business days and will provide notice to interested parties. |

---

[3] The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures. In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall govern. Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms have the meaning ascribed to them in the Bidding Procedures.

**D. Bid Deadline** – **August 7, 2023, 5:00 p.m. (Eastern).** In order to participate in the Auction, a Potential Bidder must submit a Qualified Bid (defined below), in writing or by email, so as to be actually received by the Bid Deadline, to: (a) counsel for the Debtor, Gary H. Leibowitz, Esq., Cole Schotz P.C., 300 E. Lombard Street, Suite 1111, Baltimore, MD 21202, gleibowitz@coleschotz.com; (b) counsel for TESSE DIP FUND I, LLC, Richard Costella, Esq., Tydings & Rosenberg LLP, 1 E Pratt St., Suite 901, Baltimore, MD 21202; and, (c) B. Riley Securities, Inc., c/o Michael Fixler, mfixler@brileyfin.com (the "<u>Notice Parties</u>").

**E. Qualified Bid Requirements.**

To constitute a Qualified Bid, a bid must:

1) fully disclose the identity of the Potential Bidder and include contact information for the specific person(s) the Debtor should contact if they have any questions about the Potential Bidder's bid;

2) state that the Potential Bidder offers to purchase the Purchased Assets or some substantial portion thereof;

3) include a signed writing that the Potential Bidder's offer is formal, binding, unconditional, and irrevocable until (i) the closing of the transaction with the Successful Bidder (as defined below) and (ii) for two (2) business days after the earlier of the closing of the sale transaction with the Successful Bidder or the termination of the Successful Bid, if such bidder is designated the Back-Up Bidder (as defined below) at the conclusion of the Auction;

4) confirm that there are no conditions precedent to the Potential Bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the bid;

5) include a duly authorized and executed copy of a Bidder Purchase Agreement, including the purchase price for the Purchased Assets (the "<u>Purchase Price</u>"), together with all exhibits and schedules thereto, together with copies marked to show any amendments and modifications to any fully executed Bidder Purchase Agreement and the proposed order to approve the sale; provided, however, that such Bidder Purchase Agreement shall not include any financing or diligence conditions;

6) include written evidence of sufficient cash on hand to fund the Purchase Price or sources of immediately available funds that are not conditioned on further third party approvals or commitments, that will allow the Debtor to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the transaction contemplated by the Bidder Purchase Agreement, and such other financial information as may be acceptable to the Debtor in its reasonable discretion (collectively, the "<u>Financials</u>") of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Purchased Assets, the Financials of the Potential Bidder's equity holder(s) or other financial backer(s);

7) provide for a cash Purchase Price of at least the purchase price offered by any Stalking Horse Bidder *plus* 2.5% of that proposed purchase price (collectively, the "<u>Minimum</u>

Overbid"), and otherwise have a value to the Debtor, in the Debtor's business judgment, that is greater or otherwise better than the value offered under any fully executed Stalking Horse Agreement, including the impact of any liabilities assumed in said Stalking Horse Agreement;

8)    provide a commitment to close the transactions contemplated by the Bidder Purchase Agreement by no later than **August 25, 2023**;

9)    identify with particularity which executory contracts and unexpired leases the Potential Bidder wishes to assume and provide for the Potential Bidder to pay related cure amount;

10)    contain sufficient information concerning the Potential Bidder's ability to provide adequate assurance of future performance with respect to executory contracts and unexpired leases to be assumed and assigned.

11)    include an acknowledgement and representation that the bidder: (A) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer; (B) has relied solely on its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; (C) did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction (defined below), except as expressly stated in the Bidder Purchase Agreement; and (D) is not entitled to any expense reimbursement, breakup fee, or similar type of payment in connection with its bid;

12)    be accompanied by a good faith deposit in the form of a wire transfer, certified check or such other form acceptable to the Debtor, payable to the order of the Debtor (or such other party as the Debtor may determine, including an escrow agent) in an amount equal to no less than ten percent (10%) of the Purchase Price;

13)    state that the Potential Bidder agrees to serve as a Back-Up Bidder (as defined below) if such bidder's Qualified Bid is selected as the next highest or otherwise next best bid after the Successful Bidder (as defined below) with respect to the Purchased Assets;

14)    state that the Potential Bidder consents to the jurisdiction of the Bankruptcy Court; and

15)    contain such other information reasonably requested by the Debtor.

**F. Credit Bids.** On or before the Bid Deadline, parties holding a valid lien on some or all of the Debtor's assets that secures an undisputed bona fide claim, in the Debtor's discretion, may submit a credit bid for some or all of such assets to the fullest extent permitted under section 363(k) of the Bankruptcy Code.

**G. Auction.** If two or more Qualified Bids, or one Qualified Bid following execution of a Stalking Horse Agreement, are received on or before the Bid Deadline, the Debtor shall

conduct the Auction commencing on **August 11, 2023 at 10:00 a.m. (Eastern)**, at such time and place designated by the Debtor through a notice filed with the Court at least 48 hours before the Auction and served in accordance with the Court's Bidding Procedures Order. The Auction may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Auction. The Debtor reserves the right to cancel the Auction if the requisite Bids described above are not received as of the Bid Deadline.

**H.  Auction Procedures.**  Only a person or entity that has submitted a Qualified Bid (a "Qualified Bidder") to the Notice Parties, and such person's or entity's respective advisors, are eligible to participate in the Auction. All participants shall appear in person, by telephone (with prior written authorization by the Debtor, in the Debtor's sole discretion), or through a duly authorized representative. Prior to the Auction, the Debtor, in consultation with the DIP Lender, shall select the Qualified Bid that, in its business judgment, reflects the highest or otherwise best value for the Debtor's estate as the starting bid (the "Starting Auction Bid") and advise all participants in the Auction of the terms of the Starting Auction Bid. Qualified Bidders may then submit bids that are better and higher than the Starting Auction Bid in an initial increment equal to the aggregate amount of the Starting Auction Bid plus $250,000, and in subsequent increments of at least $250,000 unless and until the Debtor, in its sole discretion, lifts or modifies this requirement (collectively, the "Overbid Increments").

The Debtor may adjourn, continue, re-open or terminate the Auction, and reserve the right to adopt other and further rules and procedures for the Auction that, in its business judgment, will better promote the goals of the Auction.

**I.  Selection of Successful Bidder and Back-Up Bidder.**  The Debtor may designate, in its sole discretion and in consultation with the DIP Lender, in its business judgment, pursuant to these Bidding Procedures, the highest or otherwise best Bid and the Successful Bidder or Bidders. The Debtor may also designate, in its business judgment, the second highest or otherwise best Bid as the Back-Up Bidder or Bidders.

**J.  Reservation of Rights.**  The Debtor reserves the right to reject, without liability, any bid that the Debtor, in its reasonable discretion and in consultation with the DIP Lender, determines to be (a) inadequate or insufficient, (b) not in conformity with the Bidding Procedures, the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, or (c) contrary to the best interests of the Debtor and its estate. The Debtor also reserves the right to modify these Bidding Procedures, in its sole discretion and in consultation with the DIP Lender, without the need for any further order of the Bankruptcy Court, including, without limitation, (i) extending the deadlines set forth in the Bidding Procedures; provided any such extension complies with the terms of the DIP Credit Agreement, (ii) adjourning the Auction, and (iii) withdrawing any Assets from the sale process at any time prior to or during the Auction.

28.     A summary of the timeline for the Bidding Procedures and Auction is as follows:

| Event | Date |
|---|---|
| Indications of Interest Due | June 30, 2023, 5:00 pm (Eastern) |

| Event | Date |
|---|---|
| Due Diligence Period for Interested Parties | Until July 19, 2023 |
| Stalking Horse Submissions, with Proposed Asset Purchase Agreement | July 19, 2023, 5:00 pm (Eastern) |
| Debtor to File Motion Seeking Approval of Sale | July 24, 2023 |
| Deadline for Qualified Bids | August 7, 2023, 5:00 pm (Eastern) |
| Auction | August 11, 2023, 10:00 am (Eastern) |
| Proposed Sale Hearing | August 16, 2023 (subject to the Court's availability) |
| Closing | On or before August 25, 2023 |

## BASIS FOR RELIEF REQUESTED

29.     The instant Bidding Procedures Motion is the first step in a two-step process, whereby the Debtor intends ultimately to sell all or substantially all of its assets, with Court approval.  The Debtor intends to continue its robust marketing efforts and conduct the Auction with a Stalking Horse Bidder and active participation from as many interested parties as possible, and to file a sale motion on or before July 24, 2023.  The Debtor, with the advice of its professionals, believes that this course of action will maximize the value of the Debtor's business as a going concern and result in the best possible recovery to the Debtor's creditors.  While the instant Motion does not seek authorization to consummate a sale, the legal standard is nevertheless set forth in brief below in anticipation of the forthcoming sale motion.

**I.      Section 363(b) of the Bankruptcy Code authorizes the sale of assets under these circumstances.**

30.     Section 363(b) of the Bankruptcy Code authorizes a debtor-in-possession, following notice and a hearing, to sell property outside the ordinary course of business. 11 U.S.C. § 363(b)(1). This Court's power to authorize a sale under Section 363 is bolstered by Section

105(a), which provides in relevant part, that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *Id.*

31.     Courts review a debtor's decision to use, sell, or lease out of the ordinary course under the business judgment rule. *See In re Modanlo*, 412 B.R. 715, 732 (Bankr. D. Md. 2006) *subsequently aff'd*, 266 F. App'x 272 (4th Cir. 2008).  "The factors the Court must find for approval of a sale are: (i) a sound business reason justifying the sale, (ii) adequate and reasonable notice of the sale to all parties, (iii) that the sale has been proposed in good faith and (iv) that the purchase price is fair and reasonable." *In re Siskind*, 2008 WL 2705528, at *6 (Bankr. D. Md. July 3, 2008) (citing *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991)).

32.     Once the Debtor articulates a valid business justification under the business judgment rule, there is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *Yost v. Early*, 87 Md. App. 364, 589 A.2d 1291, 1296-98 (1991) (applying Maryland law); *see also Continuing Creditors' Comm. Of Star Telecomms., Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (articulating same presumption under Delaware law); *Lake Monticello Owners' Ass'n v. Lake*, 250 Va. 565, 571 (1995) (articulating same presumption under Virginia law).  "[A]s long as the trustee acts reasonably and in the best interests of the estate and as long as [ ]he obtains fair value for the property under the circumstances of the case, [his] choice of method of disposition will be respected." *In re Merry–Go–Round Enterprises, Inc.,* 180 F.3d 149, 162 (4th Cir. 1999).

33.     The Debtor's forthcoming sale motion will address the afore-mentioned legal standard in greater detail.

**II.     The Bidding Procedures are fair and are designed to elicit the highest or otherwise best possible value for the sale of the Debtor's assets.**

34.     There is ample authority for approving the Bidding Procedures described above. The purpose of sale and bidding procedures is to promote competition in order to maximize the value of the Debtor's assets.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Official Comm. Of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992).

35.     The Bidding Procedures are appropriate in this context. The Debtor designed the Bidding Procedures to ensure a fair and reasonable process that will yield the maximum value for the Debtor's assets. The proposed Bidding Procedures will facilitate a competitive process in which all Potential Bidders are encouraged to participate and submit bids (while affording Potential Bidders flexibility in structuring their Bids). The Bidding Procedures also provide Potential Bidders with sufficient notice and opportunity to acquire information necessary to submit timely and informed bids at each stage of the sale process. Thus, the Debtor and all parties in interest can be assured that the Debtor will have the opportunity to consider all competing bids in a fair process and that the consideration received will be the highest and best available.

**III.     The Court should authorize the Break-Up Fee and Overbid.**

36.     The Debtor has determined, in its reasonable business judgment, that a sale of the Purchased Assets according to the Bidding Procedures, even without a Stalking Horse Bidder in place, is warranted. The Debtor requests that it be authorized in its discretion to enter into an agreement that provides a bidder who is willing to serve as a Stalking Horse Bidder a break-up fee of up to 2% of the guaranteed value offered by such Stalking Horse Bidder in its Bid (the "Break-Up Fee").

37.     Break-up and other termination fees are a normal, and in some cases necessary, component of sales outside the ordinary course of business under section 363 of the Bankruptcy Code. *See, e.g., In re Integrated Resources, Inc.*, 147 B.R. 650, 660 (S.D.N.Y. 1992) (noting that Break-up fees may be legitimately necessary to convince a single "white knight" to enter the bidding by providing some form of compensation for the risk it is undertaking).

38.     The United States Court of Appeals for the Fourth Circuit has established standards for determining the propriety of bidding incentives in the bankruptcy context. *In re Lamb*, 2002 WL 31508913, at *1 (Bankr. D. Md. Oct. 11, 2002) (denying break up fee under different circumstances); *See O'Brien Envtl. Energy, Inc.*, 181 F.3d at 533–38; *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 205 (3d Cir. 2010) (noting that *O'Brien* "set forth the controlling legal principles" applicable to bidding incentives). The Court has held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context. *See In re Lamb,* 2002 WL 31508913, at *1; *O'Brien Envtl. Energy*, 181 F.3d at 535. Accordingly, bidding incentives must provide some post-petition benefit to a debtor's estate in order to be approved. *See In re Energy Future Holdings Corp.*, 904 F.3d 298, 314 (3rd Cir. 2018); *O'Brien Envtl. Energy*, 181 F.3d at 533.

39.     The ability of the Debtor to offer potential purchasers bid protections is beneficial to the Debtor's estate and stakeholders because the Debtor can provide the incentive required to induce a bidder to submit or increase its Bid prior to the Auction. *See e.g. In re Williamson*, 327 B.R. 578, 581 (Bankr. E.D. Va. 2005) ("It is reflected in some chapter 11 cases by the use of 'stalking horses', break-up fees and other devices, all of which encourage broad participation in a bankruptcy sale and recognize the risks inherent in participation from the peculiar requirements of

bankruptcy sales."). The ability to offer the Break-Up Fee may induce Bids for some or all of the assets that would not otherwise be made. In addition, to the extent Bids can be improved prior to the Auction, a higher floor is established for further bidding at the Auction. Thus, even if a Stalking Horse Bidder is awarded a Break-Up Fee, but is not a winning bidder, the Debtor and its estate will have benefited from the higher floor established by such Bid. The Debtor will exercise prudent business judgment before offering or agreeing to any bid protection and will only do so if such protection, in the reasonable business judgment of the Debtor, will likely result in the realization of greater value for the Debtor and its estate.

40.    A break-up fee that constitutes a fair and reasonable percentage of the proposed purchase price, and which is reasonably related to the risk, effort, and expenses of the prospective purchaser is generally permissible. *See, e.g., In re 995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24, 28-9 (Bankr. S.D.N.Y. 1989). *Accord In re Integrated Resources, Inc.*, 147 B.R. at 662 (holding that the proposed break-up fee was a reasonable percentage of the proposed purchase price and in accord with industry averages).

41.    In the present case, the Break-Up Fee payable in the event that a Stalking Horse Bidder is outbid at the Auction would not exceed 2% of the projected guaranteed value of the Stalking Horse Bidder's Bid. This percentage is of the same order of magnitude as break-up fees approved in other cases. *See, e.g., Consumer News & Business Channel Partnership v. Financial News Network, Inc.* (*In re Financial News Network, Inc.*), 980 F.2d 165, 167 (2d Cir. 1992) (noting without discussion $8.2 million Break-up fee on $149.3 million transaction (5.5% of consideration offered)); *Cottle v. Stores Communications*, 849 F.2d 570, 578-79 (11th Cir 1988) (approving $29 million fee on $2.5 billion transaction, 1.16%); *see also LTV Aerospace & Defense Co. v.*

*Thomson-CSF, S.A.* (*In re Chateguay Corp.*), 1998 B.R. 848, 861 (S.D.N.Y. 1996) (enforcing $20 million "reverse Break-up fee" payable to debtor on $450 million offer (4.4% of consideration)).

42.     The Debtor believes that the ability to offer a Break-Up Fee to induce a party to act as a Stalking Horse Bidder and submit a significant and valued Bid in advance of the Auction, and thereby establish a committed baseline, or floor, upon which all other Bids can be compared and evaluated, is beneficial to the Debtor's estate and its stakeholders.  If any such Break-Up Fee is ultimately payable to a Stalking Horse Bidder—by definition, because the Debtor has received a higher or otherwise better offer and has closed on a superior transaction—the Stalking Horse Bidder's bid will have benefited the estate, particularly in the context of the total consideration received.  In addition, the Debtor intends to require interested bidders to provide an overbid of at least the purchase price offered by any Stalking Horse Bidder *plus* 2.5% of that proposed purchase price, which will offset the Break-up Fee if triggered.

43.     The Debtor submits that the proposed Break-up Fee will not chill bidding and is reasonable and therefore meets the requirements of the business judgment rule. Additionally, the requested authority to offer the proposed Break-Up Fee shall be subject to the Court's final approval as part of the approval of any proposed sales transaction.

## NOTICE

44.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Purchased Assets; (b) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Purchased Assets; (c) the Internal Revenue Service and all state and local taxing authorities in the states in which the Debtor has or may have any tax liability; (d) Democracy Capital Corporation; (e) the DIP Lender; (f) the Office of the

United States Trustee; and (g) those parties who have filed the appropriate notice requesting notice of all pleadings filed in this chapter 11 case.

### NO PRIOR REQUEST

45.     The Debtor has not previously sought the relief requested herein from this Court or any other court.

### CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that the Court enter the Bidding Procedures Order, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated:  May 31, 2023               **COLE SCHOTZ P.C.**

                    By:  _/s/ Gary H. Leibowitz_____
                         Gary H. Leibowitz (Bar No. 24717)
                         Irving E. Walker (Bar No. 00179)
                         H.C. Jones III (Bar No. 20064)
                         300 East Lombard Street, Suite 1800
                         Baltimore, MD  21202
                         (410) 230-0660
                         (410) 230-0667 (fax)
                         gleibowitz@coleschotz.com
                         iwalker@coleschotz.com
                         hjones@coleschotz.com

                         *Counsel for Debtor and Debtor-in-Possession*

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2023, I reviewed the Court's CM/ECF system and it reports that an electronic copy of the **Motion of the Debtor and Debtor-in-Possession for an Order (I) Approving Bidding Procedures, (II) Scheduling an Auction for the Sale of Substantially All of the Debtor's Assets as a Going Concern, and (III) Granting Related Relief** (the "Motion") will be served electronically by the Court's CM/ECF system on the following:

J. Dan Ford, Assistant United States Trustee
Office of the United States Trustee
101 West Lombard Street, Suite 2625
Baltimore, MD 21201

Gerard R. Vetter
Assistant U.S. Trustee
Office of the U.S. Trustee
101 West Lombard Street, Suite 2625
Baltimore, MD 21201

Lawrence A. Katz, Esquire
Hirschler Fleischer
1676 International Drive, Suite 1350
Tysons, VA 22102

Joyce A. Kuhns, Esq.
Mark J. Dimenna, Esq.
Offit Kurman, P.A.
300 E. Lombard Street, Suite 2010
Baltimore, MD 21202

Catherine Keller Hopkin
YVS Law, LLC
185 Admiral Cochrane Drive, Suite 130
Annapolis, MD 21401

Monique D. Almy, Esquire
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004

Hugh M. Bernstein, Assistant United States Trustee
Office of the United States Trustee
101 West Lombard Street, Suite 2625
Baltimore, MD 21201

Richard L. Costella, Esquire
Tydings & Rosenberg, LLP
1 East Pratt Street, Suite 901
Baltimore, MD 21202

C. Kevin Kobbe, Esquire
DLA Piper LLP (US)
The Marbury Building
6225 Smith Avenue
Baltimore, MD 21209

Kimberly A. Manuelides, Esq.
Sagal, Filbert, Quasney & Betten, P.A.
600 Washington Avenue, Suite 300
Towson, MD 21204

Bryan M. Mull, Esq.
Gordon Feinblatt, LLC
1001 Fleet Street, Suite 700
Baltimore, MD 21202

Alison D. Bauer, Esquire
Jiun-Wen Bob Teoh, Esquire
Foley Hoag LLP
1301 Avenue of the Americas, 25th Floor
New York, NY 10019

65577/0002-45460720v4

Sudipta Das, Esq.                              Craig B. Leavers, Esq.
Gordon Feinblatt, LLC                          The Law Offices of Craig B. Leavers, LLC
1001 Fleet Street, Suite 700                   P.O. Box 306
Baltimore, MD 21202                            Cockeysville, MD 21030

I further certify that on May 31, 2023, a copy of the Motion was served via First-Class mail,

postage prepaid, on the parties listed on the attached service list.

I further certify the foregoing statements made by me are true.  I am aware that if any of the

foregoing statements made by me are willfully false, I am subject to punishment.

Dated:  May 31, 2023                           **COLE SCHOTZ P.C.**

                                    By:  */s/ Gary H. Leibowitz*
                                            Gary H. Leibowitz (Bar No. 24717)
                                            300 East Lombard Street, Suite 1111
                                            Baltimore, MD  21202
                                            (410) 230-0660
                                            (410) 230-0667 (fax)
                                            gleibowitz@coleschotz.com

                                            *Counsel for Debtor and Debtor-In-Possession*

65577/0002-45460720v4

**SERVICE LIST**

| | |
|---|---|
| Ally Bank, c/o AIS Portfolio Services, LLC<br>4515 N Santa Fe Ave. Dept. APS<br>Oklahoma City, OK 73118 | CE CID LLC<br>2410 Evergreen Road, Suite 201<br>Gambrills, MD 21054 |
| LEC LLC<br>845 E. Heartstrong St.<br>Superior, CO 80027 | Vetter Brothers Manufacturing, LLC<br>Attn: Brian Vetter<br>595 Owensville Road<br>West River, MD 20775 |
| Peter R. McDermott<br>1 Pond Dr.<br>Englewood, CO 80113 | Robert F. McDermott, Jr.<br>4455 South Holly Street<br>Englewood, CO 80111-1142 |
| Robert F. McDermott, Jr.<br>4455 South Holly Street<br>Cherry Hills Village, CO 80111 | Benjamin H. Griswold IV<br>2838 Butler Road<br>Reisterstown, MD 21136 |
| Benjamin H. Griswold IV<br>901 S. Bond St., Suite 400<br>Baltimore, MD 21231 | Jupiter Fund LLC<br>102 W. Pennsylvania Avenue, Suite 100<br>Towson, MD 21204 |
| Clearview Group<br>Attn: Brian Davis<br>11155 Red Run Blvd., Suite 410<br>Owings Mills, MD 21117 | Fleet Street Club III L.P.<br>11770 US Highway 1, Suite 503<br>Palm Beach Gardens, FL 33408 |
| K2 Trust, LLC<br>5244 N. 37th Place<br>Paradise Valley, AZ 85253 | David Charles Moran<br>375 W. Royal Flamingo Dr.<br>Sarasota, FL 34236 |
| GP Stamas Family Trust<br>8 Waterbury Court<br>Baltimore, MD 21212 | Tenacious Adventures<br>Attn: Kipp Lassetter<br>24546 N. 91st Street<br>Scottsdale, AZ 85255-2911 |
| GP Stamas Family Trust<br>11173 Turtle Beach Road<br>North Palm Beach, FL  33408 | C&J Irrevocable Trust<br>5973 West Cielo Grande<br>Glendale, AZ 85301 |
| M&C Irrevocable Trust<br>5973 West Cielo Grande<br>Glendale, AZ 85301 | Scott Carmel<br>3301 NE 1st Ave., PH 2<br>Miami Beach, FL 33139 |
| John Ege<br>100 St. Paul St., Suite 800<br>Denver, CO 80206 | Brown, Goldstein & Levy, LLP<br>120 E. Baltimore Street, Suite 2500<br>Baltimore, MD 21202 |
| Christina Pagano<br>14 Lost Run Trail<br>Zionsville, IN 46077 | Falling Green Capital LLC<br>408 Woodland Estates Way<br>Millersville, MD 21108 |

| | |
|---|---|
| Altus Receivables Management, Trust Account<br>2400 Veterans Memorial Blvd.<br>Kenner, LA 70062 | Deborah Grove Living Trust<br>Attn: Deborah M. Grove<br>5936 Elmer Derr Rd.<br>Frederick, MD 21703 |
| Donald McDonald<br>2180 Royal Oaks Dr.<br>Rockledge, FL 32955 | Robert A. Gaumont, Esq.<br>Gordon Feinblatt, LLC<br>1001 Fleet Street, Suite 700<br>Baltimore, MD 21202 |
| Internal Revenue Service<br>Centralized Insolvency Operation<br>P.O. Box 7346<br>Philadelphia, PA 19101-7346 | Comptroller of the Treasury<br>Compliance Division, Room 409<br>301 W. Preston Street<br>Baltimore, MD 21201-2305 |
| TESSE DIP FUND I, LLC<br>Richard L. Costella, Esquire<br>Tydings & Rosenberg, LLP<br>1 East Pratt Street, Suite 901<br>Baltimore, MD 21202 | MCDJR-TESSE, LLC<br>c/o Richard L. Costella, Esq.<br>Tydings & Rosenberg LLP<br>One East Pratt Street, Suite 901<br>Baltimore, MD 21202 |
| PMCDTESSE, LLC<br>c/o Richard L. Costella, Esq.<br>Tydings & Rosenberg LLP<br>One East Pratt Street, Suite 901<br>Baltimore, MD 21202 | Democracy Capital Corporation<br>c/o Joyce A. Kuhns, Esq.<br>Offit Kurman, P.A.<br>1954 Greenspring Drive, Suite 605<br>Timonium, MD 21093 |
| Clearview Consulting, Inc.<br>Gordon Feinblatt LLC<br>c/o Robert A. Gaumont<br>1001 Fleet Street, Suite 700<br>Baltimore, MD 21202 | Gregory Vetter<br>VBM LLC<br>Catherine Keller Hopkin, Esquire<br>YVS Law, LLC<br>185 Admiral Cochrane Drive, Suite 130<br>Annapolis, MD 21401 |

65577/0002-45460720v4