**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)**

| | |
|---|---|
| In re:<br><br>Tessemae's LLC,[1]<br><br>           Debtor. | (Chapter 11)<br><br>Case No. 23-10675 (NVA) |

**REPLY IN SUPPORT OF THE
DEBTOR'S SALE PROCEDURES MOTION**

Tessemae's LLC, the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Debtor" or "Tessemae's"), by its undersigned counsel, hereby files this Reply (the "Reply") in further support of the Debtor's Motion of the Debtor and Debtor-in-Possession for an Order (I) Approving Bidding Procedures, (II) Scheduling an Auction for the Sale of Substantially All of the Debtor's Assets as a Going Concern, and (III) Granting Related Relief [Doc. No. 146] (the "Sale Procedures Motion"), in order to address the objections raised by Democracy Capital Corporation ("DCC") [Doc. No. 152] (the "DCC Objection") and the United States Trustee ("UST") [Doc. No. 159] (the "UST Objection").

**PRELIMINARY STATEMENT[2]**

The Sale Procedures Motion seeks the Court's approval of Bidding Procedures and related relief in anticipation of a sale of substantially all of the Debtor's assets as a going concern. Since

---

[1] The Debtor in this chapter 11 case and the last four digits of its federal tax identification are Tessemae's LLC (2871). The Debtor's principal address is 714 South Wolfe Street, P.O. Box No. 38438, Baltimore, Maryland 21231.

[2] Terms not otherwise defined herein shall be given the meaning ascribed to them in the Sale Procedures Motion.

65577/0002-45601986v6

the early weeks of these proceedings, the Debtor has made clear to the Court and all creditors that it intended to conduct a sale process during this chapter 11 case. The Court's Final DIP Order—negotiated in conjunction with counsel for DCC and entered on February 16, 2023—authorized the DIP Credit Agreement containing specific milestones for the sale of the Debtor's "business and assets" as a condition of lending and called for a closing date of no later than September 30, 2023 [Doc. No. 48, pp.33, Section 5.2]. When the Debtor filed its application to retain B. Riley Securities, Inc. ("B. Riley") as its investment banker for purposes of, *inter alia*, conducting a sale [Doc. No. 85], DCC filed an objection to the fee structure stating that, DCC "does not object to B. Riley Securities being retained by the Debtor to market and sell the company and/or its assets" [Doc. No. 105].[3]

Despite the foregoing, DCC, joined by the UST, now objects to a standard bidding procedures motion—the clearcut first step toward a sale. The DCC Objection raises numerous arguments that have no bearing on the Court's determination of whether to approve the proposed bidding and sale procedures, presumably to stymy the sale process before it begins. DCC also relies on spurious factual allegations and perfunctory legal arguments and seeks to impute bad faith to the Debtor and its counsel with no grounds. These tactics serve only to impedethe Debtor's legitimate efforts in administering a successful chapter 11 case and cause the estate to incur unnecessary legal fees.

The purpose of the DCC Objection is as unclear as its foundation. DCC has asserted secured claims[4] in the bankruptcy case totaling well over $16,000,000, which would enjoy priority

---

[3] The Court entered an order authorizing the retention of B. Riley on April 27, 2023 [Doc. No. 133].

[4] In addition to its own claim, DCC has asserted claims on behalf of several other creditors [See Claim No. 68-1].

over all other secured claims if not disallowed or subordinated. In other words, if DCC were to prevail on its claims against the Debtor, DCC would stand first in line among the secured creditors to receive a distribution following a sale. On the other hand, if the Debtor succeeds in having DCC's claims disallowed, then DCC would have no claim in the Debtor's estate in the first place and no reason to interfere. In either event, there is no legitimate benefit to DCC in seeking to impede the sale process, which raises a question as to why DCC would want to frustrate the Debtor's efforts to conduct a sale process in the manner that the Debtor, in its business judgment and with the recommendations of its investment banker, believes will achieve the best possible outcome for creditors and other parties in interest.

The UST Objection suffers from similar flaws and a few of its own. It essentially objects to the approval of any sale procedures motion. It also fails to recognize that, consistent with how bankruptcy sales are conducted, not only in Maryland but in courts throughout the country, it is important for the chapter 11 debtor to have discretion to modify sale procedures as the sale process unfolds. Rather than address all of the complaints the UST raises with respect to the proposed sale procedures, at the hearing on this matter the Debtor will present evidence confirming that every term and provision of the proposed sale procedures are designed with one goal in mind: to achieve the highest and best price for the sale of substantially all of the assets of the Debtor, in a manner consistent with the Bankruptcy Code and Bankruptcy Rules.

## ARGUMENT

Motions seeking an order establishing bidding and sale procedures are not unusual in the District of Maryland or elsewhere. Rule 6004-1(c) of the Local Rules of the United States Bankruptcy Court for the District of Maryland (the "Local Rules") specifically contemplates a "sales procedures motion" in chapter 11 cases, as opposed to a "sale motion" contemplated by

Local Rule 6004-1(b).  The Local Rules call for entirely separate provisions to be highlighted in each such motion.  Accordingly, no weight should be accorded to DCC's and the UST's implication that the Sale Procedures Motion, which seeks the establishment of Bidding Procedures and related relief, is somehow unusual just because it is not coupled with a sale motion.  Indeed, just last week Judge Chavez-Ruark entered a bidding procedures order on June 14, 2023 arising from a stand-alone bidding procedures motion.[5]

The argument by DCC and the UST that the Sale Procedures Motion is somehow premature or "not yet ripe" is equally mistaken.  The Court's Final DIP Order, which incorporates the DIP Credit Agreement and was negotiated in conjunction with counsel for DCC, explicitly calls for a sale motion and bidding procedures motion to be filed by May 31, 2023 but grants the DIP Lender the exclusive right to modify that requirement.  Accordingly, the Sale Procedures Motion was filed on May 31, 2023 seeking the entry of the Bidding Procedures only, with the express permission of the DIP Lender, as noted in the Sale Procedures Motion.  It is therefore unclear why DCC and the UST argue that the Sale Procedures Motion itself is inappropriate.

The DCC Objection lists 7 separate objections in Part I, "*Overview of Objections*," but appears to explain only 3 of them in Part III, "*Legal Arguments*."  Nevertheless, the Debtor has attempted to address each of the objections raised by DCC, in turn, which also will address similar arguments raised by the UST.

---

[5] *See Wellstat Therapeutics Corp., v. Wellstat Biologics Corp.*, Case No. 23-122201 (Jointly Administered) [Doc. No. 68].  Copies of Judge Chavez-Ruark's order and the motion for bidding procedures order will be provided at the Court's request.  Notably, another partner at DCC's counsel's firm, Offit Kurman, also filed a stand-alone bid procedures motion in *In re Federated Sports & Gaming, Inc. et al.* (Case No. 12-13521 (WIL)) [Doc. No. 93], which was granted by Judge Wendelin I. Lipp.

I.       **Access to Due Diligence and to Determination of "Qualified Bidders."**

DCC and the UST take issue with the Debtor's right to determine who is eligible to receive access to the Debtor's data room and who is deemed a Qualified Bidder. This argument is illogical. To begin with, *someone* must determine which interested parties can be granted access to the sensitive information necessary to evaluate a potential sale and to participate in the auction. The logical choice is the Debtor, in consultation with its advisors, including its investment banker, B. Riley. DCC does not suggest an alternative but implies it should have the right to help make the determination itself. Elsewhere in the DCC Objection, however, DCC suggests that it may be a Potential Bidder.[6] But DCC cannot simultaneously act as bidder and gatekeeper to bidders.

It is unclear whether DCC or the UST has considered the implications of this objection. For example, Potential Bidders will have to demonstrate their ability to close on a sale by providing sensitive financial information to the Debtor and its professionals in order to assess the bona fides of a potential transaction. These potential bidders could not be expected to provide such information to competing bidders. Indeed, Appendix J to the Local Rules, *Amended Complex Chapter 11 Case Procedures*, specifically states that, "secured creditors or committee members who are potential bidders may not participate in the adoption or implementation of sale procedures and may not receive information that is not generally available to [] all potential bidders." ¶ 11. It is also noteworthy that this Court has routinely entered orders in the past approving bidding procedures where the debtor, in consultation with its professionals, makes the determination of qualified bidders, and the winning bid (and a creditors committee if one exists). *See, e.g., In re*

---

[6] By email dated June 20, 2022, counsel for DCC requested an NDA from B. Riley so that DCC could participate in the sale process as a potential purchaser. Debtor's counsel provided the NDA on June 21, 2023.

*Game Trading Technologies, Inc. et al*. (Case No. 12-11519 (NVA)) [Doc. Nos. 115, 119]. Accordingly, there is no basis to object to the Bidding Procedures on these grounds.

**II.     Identification of a Stalking Horse Bidder.**

DCC objects to the Sale Procedures Motion on the grounds that no stalking horse bidder is identified. However, the Sale Procedures Motion is not a sale motion; it is a motion to establish bidding and sale procedures only. Even if it were a sale motion, however, there is no requirement that a Debtor enter into an auction process with a stalking horse bidder. Local Rule 6004-1(b) lists a number of requirements for a sale motion, but none of them includes the identification of a stalking horse bidder. In any event, the Sale Procedures Motion explicitly contemplates the identification of a potential stalking horse bidder and a subsequent motion to approve a sale. DCC will have the right to object to any such stalking horse and the merits of a Section 363 sale in response to the anticipated sale motion after it is filed.

**III.    *Pro-Forma* Asset Purchase Agreement.**

DCC and UST object to the Sale Procedures Motion on the grounds that no *pro forma* asset purchase agreement is provided. But Local Rule 6004-1(c), governing sales procedures motions, does not require a form asset purchase agreement, and DCC's objection on this point ignores the reality of soliciting bids for the purchase of a company's assets. The Debtor seeks to negotiate a stalking horse agreement in order to potentially solicit higher and better bids. The negotiation of an asset purchase agreement will happen at that point, but not before. This is another example of DCC, as well as the UST, conflating the propriety of a sale motion with that of a sale procedures motion. The Sale Procedures Motion specifically calls for a date by which the Debtor would submit a proposed stalking horse contract with proposed asset purchase agreement for the approval of the Court, and DCC and UST may raise any legitimate objection then.

**IV.** **Bidder Protections.**

It is well settled that a bankruptcy court's approval of proposed procedures for soliciting potential offers for a sale or financing is subject to the business judgment rule. The business judgment rule "'is a presumption that in making a business decision the [debtor] acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company.'" *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985). Consistent with this rule, courts eschew judicial second-guessing and will not interfere with a debtor in possession's business judgment so long as the following elements are present: "(1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets." *Integrated Resources*, 147 B.R. at 656. In the present case, and as will be confirmed at the hearing on this matter, all of these elements are present, and all will serve to enhance the success of the sale process.

Confusingly, DCC argues that the proposed Break-Up Fee and Minimum Overbid are inappropriate because they are not tied to a particular purchase price. This argument ignores the basic fact that both the Break-Up Fee and Minimum Overbid are, themselves, percentages. In this instance, the Break-Up Fee is to be 2% of the guaranteed Purchase Price of any Stalking Horse Bidder. This method of determining the Break-Up Fee is therefore intrinsically tied to the purchase price and forecloses the arguments raised by DCC on this point. Indeed, the reason the Break-Up Fee is tied to the Purchase Price in this manner is that the Debtor seeks to induce a serious stalking horse bidder that is willing to provide the maximum possible initial bid. It is also worth noting that the Debtor's business was subject to a sale process pre-petition, from which the Debtor withdrew. Many of the same potential purchasers involved then have been or will be solicited in

connection with this sale process. The Bidding Procedures, and the Break-Up Fee, are designed to ensure that all interested potential purchasers are comfortable in the knowledge that the Debtor is making concrete progress toward commencing a sale in this chapter 11 case.

Similarly, the Minimum Overbid is a percentage, inherently tied to the guaranteed Purchase Price of any Stalking Horse Bidder and is designed to stimulate competitive bidding for benefit of the Debtor's estate and its creditors. The Sale Procedures Motion proposes a 2.5% Minimum Overbid, which would ensure that, whatever the Stalking Horse Purchase Price, if an Overbid is submitted, the Debtor's estate would realize a monetary benefit of at least .5% above the Break-Up Fee. In other words, the Break-Up Fee will not swallow the entire Overbid. This benefit, of course, is in addition to the fact that the mere existence of an Overbid, and therefore an auction, provides a benefit to the Debtor's estate and creditors because it will result in competitive bidding, which time and time again has proven to generate the best possible outcomes in countless bankruptcy sales.

If required, the Debtor and B. Riley will submit evidence at a hearing on the Sale Procedures Motion that (i) 2% is at or below the industry standard for break-up fees in chapter 11 cases of this size, and (ii) the Break-Up Fee provides a necessary incentive for potential bidders to undertake the time and expense of due diligence for a transaction with a company that was on the market less than 3 years ago, but withdrew from the process.

### V. **Credit Bidding.**

DCC argues that the Debtor seeks to prevent it from bidding at the forthcoming sale. This is untrue. In fact, DCC never asked to participate in the sale process prior to filing the DCC Objection. Once DCC finally asked on June 20, 2023, an NDA was provided to DCC the next day, on June 21, 2023. Moreover, DCC's argument concerning credit bidding is patently false.

First, as a matter of law, section 363(k) of the Bankruptcy Code provides that a creditor with a lien that secures an *allowed* claim can offset such claim against the purchase price of the property, but such right is not absolute.  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 644 n.2 (2012) (the right to credit bid is not absolute); *In re The Free Lance-Star Publishing Co.*, 512 B.R. 798, 806–08 (Bankr. E.D. Va.) (finding cause to limit a credit bid by an entity that engaged in inequitable conduct).  Courts have found "cause" under section 363(k) "to bar a secured creditor from credit bidding when the creditor's lien is questioned or otherwise in dispute."  *In re Olde Prairie Block Owner, LLC*, 464 B.R. 337, 348 Bankr. N.d. Ill. 2011); *see also In re Fisker Auto. Holdings, Inc.,* 510 B.R. 55, 61 (Bankr. D. Del. 2014) (credit bid not permitted where amount of allowed secured claim had not yet been determined); *In re Daufuskie Island Props., LLC*, 441 B.R. 60, 64 (Bankr. D.S.C. 2010) (creditor was not entitled to credit bid where its mortgage was in dispute); *Nat'l Bank of Commerce v. McMullan (In re McMullan),* 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) (holding that "at any such sale, [the secured creditor] shall not be entitled to offset any of its claimed liens or security interests under 11 U.S.C. § 363(k) because the validity of its liens and security interests are unresolved") *aff'd*, 162 F.3d 1164 (8th Cir. 1998).

This makes sense because it would be unfair to the estate and its stakeholders for a purportedly secured creditor to credit bid for assets and obtain an offset against the purchase price based on a secured claim that is later disallowed.  Courts require a showing that a "sufficient dispute exists regarding the lien forming the basis for a credit bid." *In re Merit Group, Inc.*, 464 B.R. 240, 252 (Bankr. D.S.C. 2011); *Ratcliff v. Rancher's Legacy Meat Co.*, No. 20-CV-834 (NEB), 2020 WL 4048509 at *4, 2020 U.S. Dist. LEXIS 127276 at *13 (D. Minn. July 20, 2020) (recognizing that "Bankruptcy courts may also prohibit credit bidding entirely where the validity of the creditor's lien is genuinely in dispute" and describing the dispute as "bona fide"); *In re*

*Octagon Roofing,* 123 B.R. 583, 592 (Bankr. N.D. Ill. 1991) (conditioning credit bid where lien was subject to a "bona fide dispute" within the meaning of Bankruptcy Code section 363(f)(4)).

Nevertheless, the Debtor does not seek to take away the right to credit bid, or otherwise prevent DCC or any other alleged secured creditor from credit bidding at this time. Credit bidding rights, consistent with the requirements of Section 363(k), will be preserved in the forthcoming sale motion. If the Successful Bidder at auction is an alleged secured creditor, its credit bidding rights will be preserved until the validity, extent, priority, and amount are determined by the Court. If allowed, such creditor can then setoff the amount of its claim and the Debtor will return any cash posted equal to that amount. DCC's argument that the Debtor is wrongfully preventing DCC from seeking to credit bid is therefore false.

**VI.    The Debtor's Intellectual Property.**

DCC's argument concerning the Debtor's intellectual property has no bearing on the Sale Procedures Motion and is wrong as a matter of law. To begin with, there is no requirement that licenses to use trademarks are registered with the United States Patent and Trademark Office. Beyond that, the Debtor entered into a license agreement with Alta-Tesse, LLC ("Alta") to use its trademarks as part of Alta's packaging on May 19, 2022.[7] Surely DCC could have inquired about the existence of a license before making reckless statements in its Objection and endangering the sale process, but it chose to not even ask. A copy of the license was willingly provided to counsel for DCC on June 20, 2023. Moreover, sales to Alta account for a significant portion of the Debtor's revenue, so the license agreement with Alta provides substantial value to the Debtor's business.

---

[7] The Debtor is amending Schedule G to list the license with Alta.

Page **10** of **16**

**VII.**     **Section 363 Sale.**

DCC's and the UST's objection that no Section 363 showing is made in the Sale Procedures Motion is also off base. The Debtor explained that the Section 363 standard will be satisfied in detail in the forthcoming sale motion. The DCC and UST Objections cite to no requirement that the Debtor make a Section 363 showing at the bidding procedures stage. Moreover, DCC contradicts itself because it argues that the Debtor has failed to set a mechanism by which it will set a floor for bidding, but simultaneously objects to bid protections—the Break-Up Fee and Minimum Overbid—which are expressly intended to insure the best possible initial offers for a Stalking Horse Bid and initial bid at any potential auction.

As stated in the Sale Procedures Motion, the Debtor's request to approve the Bidding Procedures is just the first step in a two-step process. The Debtor will demonstrate at the hearing that, in its reasonable business judgment and in consultation with its professionals, a sale process at this time is the best way to maximize the value of the Debtor's business as a going concern and therefore the return to stakeholders.

**VIII.**     **The UST's Concerns about the DIP Lender's Role in the Sale Process.**

Lastly, the UST argues that the proposed Bid Procedures give the DIP Lender unfair advantages in the bidding process. UST Objection at 15-17. This objection fails to understand a basic principle governing the proposed sale process. The DIP Lender, to the Debtor's knowledge, has no interest in submitting a bid to purchase the Debtor's business and assets. If it did, the DIP Lender would not be permitted to serve in any role other than as a bidder. The same is true for Democracy.

## **CONCLUSION**

The Bidding Procedures, including the proposed Break-Up Fee and Minimum Overbid, are carefully designed to elicit the highest and best bids from Potential Purchasers in order to maximize the value of the Debtor's business as a going concern, and therefore achieve the best possible outcome for creditors and other parties in interest. The Debtor therefore respectfully requests that the Court grant the Sale Procedures Motion and enter the Bidding Procedures Order.

Dated:  June 23, 2023      **COLE SCHOTZ P.C.**

By: */s/ Gary H. Leibowitz*
Gary H. Leibowitz (Bar No. 24717)
Irving E. Walker (Bar No. 00179)
H.C. Jones III (Bar No. 20064)
300 East Lombard Street, Suite 1111
Baltimore, MD  21202
(410) 230-0660
(410) 230-0667 (fax)
gleibowitz@coleschotz.com
iwalker@coleschotz.com
hjones@coleschotz.com

*Counsel for Debtor and Debtor-in-Possession*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 23, 2023, I reviewed the Court's CM/ECF system and it reports that an electronic copy of the **Reply in Support of the Debtor's Sale Procedures Motion** (the "Reply") will be served electronically by the Court's CM/ECF system on the following:

| | |
|---|---|
| J. Dan Ford, Assistant United States Trustee<br>Office of the United States Trustee<br>101 West Lombard Street, Suite 2625<br>Baltimore, MD 21201 | Hugh M. Bernstein, Assistant United States Trustee<br>Office of the United States Trustee<br>101 West Lombard Street, Suite 2625<br>Baltimore, MD 21201 |
| Gerard R. Vetter<br>Assistant U.S. Trustee<br>Office of the U.S. Trustee<br>101 West Lombard Street, Suite 2625<br>Baltimore, MD 21201 | Richard L. Costella, Esq.<br>Tydings & Rosenberg, LLP<br>1 East Pratt Street, Suite 901<br>Baltimore, MD 21202 |
| Lawrence A. Katz, Esq.<br>Hirschler Fleischer<br>1676 International Drive, Suite 1350<br>Tysons, VA 22102 | C. Kevin Kobbe, Esq.<br>DLA Piper LLP (US)<br>The Marbury Building<br>6225 Smith Avenue<br>Baltimore, MD 21209 |
| Joyce A. Kuhns, Esq.<br>Mark J. Dimenna, Esq.<br>Offit Kurman, P.A.<br>1954 Greenspring Drive, Suite 605<br>Timonium, MD 21093 | Kimberly A. Manuelides, Esq.<br>Sagal, Filbert, Quasney & Betten, P.A.<br>600 Washington Avenue, Suite 300<br>Towson, MD 21204 |
| Catherine Keller Hopkin, Esq.<br>YVS Law, LLC<br>185 Admiral Cochrane Drive, Suite 130<br>Annapolis, MD 21401 | Craig B. Leavers, Esq.<br>The Law Offices of Craig B. Leavers, LLC<br>P.O. Box 306<br>Cockeysville, MD 21030 |
| Monique D. Almy, Esq.<br>Crowell & Moring LLP<br>1001 Pennsylvania Avenue, NW<br>Washington, D.C. 20004 | Alison D. Bauer, Esq.<br>Jiun-Wen Bob Teoh, Esq.<br>Foley Hoag LLP<br>1301 Avenue of the Americas, 25th Floor<br>New York, NY 10019 |
| Robert A. Gaumont, Esq.<br>Bryan M. Mull, Esq.<br>Sudipta Das, Esq.<br>Gordon Feinblatt, LLC<br>1001 Fleet Street, Suite 700<br>Baltimore, MD 21202 | |

I further certify that on June 23, 2023, a copy of the Reply was served via First-Class mail, postage prepaid, on the parties listed on the attached service list.

I further certify the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated:  June 23, 2023　　　　　　　**COLE SCHOTZ P.C.**

By: */s/ Gary H. Leibowitz*
Gary H. Leibowitz (Bar No. 24717)
300 East Lombard Street, Suite 1111
Baltimore, MD  21202
(410) 230-0660
(410) 230-0667 (fax)
gleibowitz@coleschotz.com

*Counsel for Debtor and Debtor-In-Possession*

**SERVICE LIST**

| | |
|---|---|
| Ally Bank, c/o AIS Portfolio Services, LLC<br>4515 N Santa Fe Ave. Dept. APS<br>Oklahoma City, OK 73118 | CE CID LLC<br>2410 Evergreen Road, Suite 201<br>Gambrills, MD 21054 |
| LEC LLC<br>845 E. Heartstrong St.<br>Superior, CO 80027 | Vetter Brothers Manufacturing, LLC<br>Attn: Brian Vetter<br>595 Owensville Road<br>West River, MD 20775 |
| Peter R. McDermott<br>1 Pond Dr.<br>Englewood, CO 80113 | Robert F. McDermott, Jr.<br>4455 South Holly Street<br>Cherry Hills Village, CO 80111 |
| Clearview Group<br>Attn: Brian Davis<br>11155 Red Run Blvd., Suite 410<br>Owings Mills, MD 21117 | Jupiter Fund LLC<br>102 W. Pennsylvania Avenue, Suite 100<br>Towson, MD 21204 |
| K2 Trust, LLC<br>5244 N. 37th Place<br>Paradise Valley, AZ 85253 | Fleet Street Club III L.P.<br>11770 US Highway 1, Suite 503<br>Palm Beach Gardens, FL 33408 |
| Benjamin H. Griswold IV<br>901 S. Bond St., Suite 400<br>Baltimore, MD 21231 | Benjamin H. Griswold IV<br>2838 Butler Road<br>Reisterstown, MD 21136 |
| David Charles Moran<br>375 W. Royal Flamingo Dr.<br>Sarasota, FL 34236 | GP Stamas Family Trust<br>11173 Turtle Beach Road<br>North Palm Beach, FL  33408 |
| GP Stamas Family Trust<br>5 Waterbury Court<br>Baltimore, MD 21212 | Tenacious Adventures<br>Attn: Kipp Lassetter<br>24546 N. 91st Street<br>Scottsdale, AZ 85255-2911 |
| M&C Irrevocable Trust<br>5973 West Cielo Grande<br>Glendale, AZ 85301 | C&J Irrevocable Trust<br>5973 West Cielo Grande<br>Glendale, AZ 85301 |
| John Ege<br>100 St. Paul St., Suite 800<br>Denver, CO 80206 | Scott Carmel<br>3301 NE 1st Ave., PH 2<br>Miami Beach, FL 33139 |
| Christina Pagano<br>14 Lost Run Trail<br>Zionsville, IN 46077 | Brown, Goldstein & Levy, LLP<br>c/o Nina Pughsley<br>120 E. Baltimore Street, Suite 2500<br>Baltimore, MD 21202 |
| Altus Receivables Management, Trust Account<br>2400 Veterans Memorial Blvd.<br>Kenner, LA 70062 | Falling Green Capital LLC<br>408 Woodland Estates Way<br>Millersville, MD 21108 |

65577/0002-45601986v6

| | |
|---|---|
| Donald McDonald<br>2180 Royal Oaks Dr.<br>Rockledge, FL 32955 | Deborah Grove Living Trust<br>Attn: Deborah M. Grove<br>5936 Elmer Derr Rd.<br>Frederick, MD 21703 |