# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MARYLAND
# (Baltimore Division)

| | |
|---|---|
| In re:<br><br>Tessemae's LLC,[1]<br><br>              Debtor. | (Chapter 11)<br><br>Case No. 23-10675 (NVA) |

**DEBTOR'S OPPOSITION TO DEMOCRACY CAPITAL CORPORATION'S
MOTION TO CONVERT CHAPTER 11 CASE TO CHAPTER 7 CASE
PURSUANT TO 11 U.S.C.§ 1112(b)**

Tessemae's LLC, the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Debtor" or "Tessemae's"), by its undersigned counsel, submits this opposition (the "Opposition") to Democracy Capital Corporation's ("DCC") Motion to Convert Chapter 11 Case to Chapter 7 Pursuant to 11 U.S.C. § 1112(b) (the "Conversion Motion"). For the reasons set forth below, the Court must deny the Motion.

**PRELIMINARY STATEMENT**

1. With an auction date rapidly approaching, a Plan of Liquidation [Dkt. No. 160] on file, and no decision from the Maryland state court on DCC's Motion for Summary Judgment, DCC's desperation has now reached a crescendo. By filing the Conversion Motion, DCC launched one final desperate attempt to destroy the value and market for the Debtor's assets, so it can walk off with the Debtor's valuable intellectual property, without paying a dollar to the estate.

---

[1] The Debtor in this chapter 11 case and the last four digits of its federal tax identification are Tessemae's LLC (2871). The Debtor's principal address is 714 South Wolfe Street, P.O. Box No. 38438, Baltimore, Maryland 21231.

**BACKGROUND**

2.  As this Court is aware, DCC provided an approximate $3.0 million prepetition loan to the Debtor with a draconian "loan-to-own" exit provision under which DCC could essentially take control of the company in the event of default. To DCC's surprise and dismay, the Debtor timely paid off the principal and interest of the loan in full, preventing DCC from wresting the company from its current owners. Not to be outdone, DCC manufactured a default, and then sued the Debtor in Maryland state court seeking an incredible $16.0 million in damages (more than 5 times the loan amount). The Debtor filed this bankruptcy case on February 1, 2023 (the "Petition Date"), in part, to put a stop to DCC's improper conduct.

3.  But DCC quickly pivoted and redirected its efforts to end the bankruptcy case before it even got out of the gate. DCC objected at the first-day hearing to the Debtor's DIP financing, use of cash collateral, use of its cash management system, critical vendor payments to shippers, and payment of prepetition wages and obligations. [Dkt. Nos. 21, 44]. The relief sought by the Debtor was critical and necessary for the company to continue in business and not unusual for a bankruptcy case in this jurisdiction. After its objections were overruled, DCC continued to try to torpedo the case every time the Debtor sought relief. DCC filed five objections seeking to block the Debtor's assumption of executory contracts which were required to operate, as well as objections to the use of accountants in the ordinary course, retention of investment bankers to market the assets, and other important motions. [*see e.g.* Dkt. Nos. 94, 95, 96, 97, 98, 105, 152, 191]. DCC also sought relief from the automatic stay seeking to allow a Maryland state court to rule on a motion for summary judgment it filed against the Debtor before the Petition Date, repeatedly representing to this Court that the matter was fully briefed by the parties and the state

court was set to issue a ruling just moments before the bankruptcy was filed. [Dkt. No. 51].[2] On August 10, 2023, this Court modified the stay based in part on DCC's representation. As predicted by the Debtor, it has now been almost 4 months, and the state court has not issued a decision.

4. A review of DCC's filings in this case as whole shows its ulterior motive. Its repeated unfounded objections are not simple errors in judgment with logical explanations. The string of reckless filings all point in the same direction. By repeatedly impugning the Debtor, its management, and professionals, and alleging that the Debtor fraudulently transferred assets, without a shred of actual evidence, it appears that DCC sought to "poison the well" and the potential success of the sale process by placing inaccurate and false statements into the record in the this case and the marketplace.

5. Indeed, if DCC truly believed that the Debtor fraudulently transferred assets prior to the filing of the case, then why has it not (i) propounded a "*Cybergenics* demand letter" on the Debtor demanding the prosecution of avoidance actions over the 9 months this case has been pending; (ii) filed a motion seeking derivative standing to bring fraudulent transfer actions; or (iii) conducted a Rule 2004 examination on the Debtor to obtain evidence in support of its baseless allegations? The answer is obvious. DCC does not actually want the records reflecting the Debtor's divestiture of its underperforming salad kit business because it already knows that Alta-Tesse's assumption of millions of dollars of debt and PACA claims from the Debtor far exceeded the *de minimis* assets it received, and it could no longer scream "fire" in the case.[3]

---

[2] Presumably, DCC's convoluted legal arguments about the subject loan it made in state court would not likely survive scrutiny in this Court.

[3] DCC seemingly believes that because Alta-Tesse is now a successful company, its must have been successful at the time it separated from the Debtor too.

6. In the face of DCC's continued misconduct, the Debtor still tried to work with DCC and facilitate a global resolution in the case. By email dated August 31, 2023, Debtor's counsel provided a 12-point outline (or term sheet) to counsel for both DCC and the prepetition lenders for a settlement which would resolve the case. DCC agreed to participate in discussions, and the Debtor patiently waited for the parties to finish their negotiations. After waiting over six weeks, on October 18, 2023, Debtor's counsel advised DCC's counsel by email that the Debtor cannot wait any longer on DCC, and it must proceed with an auction and Plan.

7. By email on November 1, 2023, Debtor's counsel confirmed that DCC and its counsel was available to attend an auction on December 18, 2023 along with the DIP Lender and Jupiter Funds. On November 6, 2023, Debtor's counsel also advised DCC's counsel:

> If you don't have the word version of the APA, please let us know and we can send one. There will be a court reporter present to transcribe the auction. If you want to submit a stalking horse bid, please call me to discuss. We are in discussions with an equity fund that is also considering submitting a stalking horse bid with the bid protections obtained in the Bid Procedures Order. We will provide copies of the stalking horse bid to all other bidders. If you are aware of other potential bidders, please put them in contact with us ASAP so we can review their financial qualification package.

8. On November 16, 2023, Debtor's counsel provided DCC and the DIP Lender's respective counsel a copy of the form Asset Purchase Agreement ("APA") to submit a bid including a credit bid. DCC's counsel participated in a conference call on November 17, 2023 at 12:00 noon where counsel asked questions about the bidding process and the likely bidders and range of bids. DCC's counsel was reminded that in accordance with the Bid Procedures Order entered in the case, DCC would be required to post cash to be held in escrow if it credit bids at the

auction because its alleged secured claim is disputed.[4] DCC then surreptitiously filed its Conversion Motion after business hours on Friday, November 17th, less than 5 hours later, presumably to stop the auction and avoid having to pay cash for the Debtor's assets and outbid other interested parties. DCC played its last card.

9. In the Conversion Motion, DCC asks this Court to take the extraordinary step of converting this chapter 11 case to a chapter 7 case just thirty days before the auction of the Debtor's assets scheduled for December 18, 2023 (the "Auction"). It seeks this relief despite knowing that (i) the principals of the DIP Lender and prepetition lenders (MCDJR-Tesse LLC and PMCDTesse, LLC) are attending the auction to submit a credit bid, (ii) the largest unsecured creditor group in the case, Jupiter Funds, is attending to make a cash offer; and (iii) a financial buyer (represented by Taft, a law firm with more than 850 lawyers), has been updating its due diligence and advised Debtor's counsel that a signed APA will be submitted imminently. In addition, the Conversion Motion relies on factual allegations that bear little resemblance to the truth.

## DCC'S MISLEADING AND/OR FALSE STATEMENTS

10. The Conversion Motion is replete with misrepresentations, misstatements, and half-truths. The following provides an overview of the complete lack of candor contained in the Conversion Motion, and the actual truth which does not support the relief requested:

---

[4] At no point did DCC's counsel raise any issue about the status of the case and/or auction on the call.

**False Statement No. 1:** DCC alleges ". . . Debtor has paid and/or incurred more than $2.2 million in administrative expenses . . ." ¶ 3.

**The Truth:** The allegation is false. The following administrative expenses have been paid since the Petition Date:

| Firm | Total Cumulative Paid |
|---|---|
| Cole Schotz | $699,002 |
| Aurora Mgmt Partners | $202,938 |
| B. Riley | $245,000 |
| **Total Paid** | **$1,146,940** |

Even if the following amounts are included—

(i) $375,000 potential success fee for B.Riley;[5]

(ii) $54,814.50 of unpaid accounting fees for Larry Strauss;

(iii) $116,714 of accrued but unpaid/holdback amounts for Cole Schotz; and

(iv) $2,714.50 of accrued but unpaid/holdback amounts for Aurora;

—the total would still only equal $1,723,183 (which is $500,000 less than $2.2 million DCC alleges. The irony of DCC's assertion should not be lost on the Court. Despite the fact that DCC's calculations are wrong, the amount of legal fees incurred by the Debtor is almost entirely attributable to being forced to respond to DCC's unnecessary and unsuccessful objections, most of which could have been resolved by a single phone call from its counsel.

**False Statement No. 2:** DCC alleges that the Debtor has been "consistently operating in the red, losing over $538,000 from operations in the same period." ¶ 3.

**The Truth:** This is false. The Debtor's Income Statement, and MOR's filed in the case through September 2023, demonstrate that the Debtor's Net Ordinary Income since the Petition Date is actually $1.12 million, operating in the black for 8 of the 11 months that this case has been pending. The Debtor also increased its cash position from $11,000 on the Petition Date to an average of between $500,000 and $1.0 million during the case.

---

[5] Under the April 27, 2023 Order Authorizing Retention of B.Riley Securities as it modifies the March 1, 2023 engagement agreement, the first 5 monthly payments of $35,000 are credited against the success fee (Note: the engagement terminated in October 2023) [Dkt. Nos. 85, 133].

**False Statement No. 3:** DCC alleges that the Debtor's "revenues have declined from a high of $1.6 million per month in February 2023 to a low of $461,600 in September 2023." ¶ 3.

> **The Truth:** DCC's statement is misleading. Sales in February 2023 were $1,250,144.11, not $1.6 million. Additionally, Demian Costa already testified in this case that sales are seasonal, as salad consumption peaks in the first quarter following typical post-holiday overeating in the U.S., and hits a low in the 4th Quarter due to the holidays. The decline does not demonstrate a loss.

**False Statement No. 4:** DCC alleges that "It has less than a handful of employees . . . whom work off site." ¶ 3.

> **The Truth:** DCC's statement is misleading. The Debtor had only a handful of employees when the case started, and all of them worked off site because the Debtor switched to co-manufacturing to reduce costs and increase margins for the benefit of the creditors and estate. It was a positive change that drove up cash and net revenue. Ironically, DCC sought to remove Greg Vetter and Matt Vetter from the staff at the first-day hearing.

**False Statement No. 5:** DCC alleges that Greg Vetter owns an equity interest in Debtor's co-manufacturer. ¶ 3.

> **The Truth:** DCC's statement is misleading. It was already placed on the record before this Court that Greg Vetter owns a minority interest in an entity called Vetter Brothers Manufacturing, LLC ("VBM"), and VBM owns a minority interest in the co-manufacturer. Facts matter, especially when raising serious allegations and the Debtor's assets are being marketed to the public.

**False Statement No. 6:** DCC alleges that "Demian Costa has recently joined the Camden Partners team as an operating partner . . ." ¶ 3.

> **The Truth:** This is a half-truth and misleading. Counsel for DCC was advised many weeks ago that Mr. Costa was transitioning from a W2 employee to a 1099 consultant, and no issue was raised. The move reduced payroll and allowed Mr. Costa to remain involved in the case on a daily basis. The Conversion Motion conveniently omits these facts in an attempt to make it look like the Chief Strategy Officer is no longer affiliated with the company or providing services. ¶ 3. In fact, Mr. Costa has a lead role in working with the interested bidders in the sale process.

**False Statement No. 7:** DCC alleges that "The Debtor aborted the sale process on August 28, 2023 . . . this was the Debtor's third attempt at a sale of the Company . . ." ¶ 4.

> **The Truth:** DCC's statement is false. The Debtor did not abort the sale process whatsoever. To the contrary, it continued the auction date to maximize the value of the Debtor's assets for the benefit of the creditors and estate consistent with its fiduciary duty and the Bidding Procedures Order. Indeed, DCC knows the Auction is set for December 18, 2023 as it advised Debtor's counsel that it will attend. Also, this is the second attempt to sell the company, not the third, and the first attempt before the Petition Date, in 2021, was very different as the company had a failing salad kit business, in-house manufacturing, and revenues over $60.0 million. It was a very different business.

**False Statement No. 8:** DCC alleges that "These other claims [MCDJR-Tesse, LLC, PMCDTesse, LLC, CE CID, LLC, and Vetter Brothers Manufacturing, LLC] . . . have not been the subject of objection by the Debtor of any kind. ¶ 7.

> **The Truth:** DCC's statement is misleading. The Debtor's Amended Schedule D expressly lists the claims of MCDJR-Tesse, LLC, PMCDTesse, LLC, CE CID, LLC, and VBM as "disputed" just like DCC's claim [Dkt. No. 162], and they will be the subject of objections post-confirmation pursuant to Article VII of the Plan. [Dkt. No. 160].

**False Statement No. 9:** DCC alleges that ". . . it is concerned about what assets are being sold, including whether as yet-to-be evaluated or valued potential claims and causes of action are to be included." ¶ FN 2.

> **The Truth:** DCC's statement is misleading. DCC has repeatedly intimated that the Debtor intended to sell potential avoidance actions. But DCC received a copy of the APA by email pursuant to its request which clearly does not include causes of action as included assets in the sale.

## ARGUMENT

11. Based on these inaccurate representations, DCC seeks its drastic relief for four posited reasons: (i) that the Debtor's negative cash flow is depleting the Debtor's estate and there is no reasonable likelihood that the Debtor is susceptible to "rehabilitation;" (b) that the Debtor-in-Possession has conflicts of interest in investigating insider transactions (e.g., the 2022 Alta-Tesse transaction) in the run up to the filing of the chapter 11 case; (c) that there are no relevant activities the Debtor as Debtor-in-Possession can take that a Chapter 7 trustee cannot; and (d) that

the ongoing administrative burn would be lessened by conversion. Each of these allegations lacks merit.

### A.     Legal Standard.

12.     Section 1112 of the Bankruptcy Code provides that a bankruptcy court may convert a case from chapter 11 to chapter 7 upon a showing of "cause." 11 U.S.C. § 1112(b)(1). The burden is on the movant to establish "cause" by a preponderance of the evidence. *Id.*; *In re 4 C Sols., Inc.,* 289 B.R. 354, 364 (Bankr. C.D. Ill. 2003). "Cause" must be assessed against the backdrop that conversion is a "drastic measure" and should not be granted prematurely. *In re Waterworks, Inc.,* 538 B.R. 445, 460 (Bankr. N.D. Ill. 2015) (quoting *In re Bovino,* 496 B.R. 492, 499 (Bankr. N.D. Ill. 2013)). Even if a movant establishes "cause," a court "is not obligated to convert the case—the decision remains within the court's discretion." *In re The 1031 Tax Grp., LLC,* 374 B.R. 78, 93 (Bankr. S.D.N.Y. 2007). Section 1112(b)(2) "explicitly provides for this discretion" where conversion "is not in the best interests of creditors and the estate." *Id.*

13.     Here, DCC bases its showing of "cause" solely on § 1112(b)(4)(A). Specifically, its seeks to convert this case on an allegation that the Debtor's negative cash flow is depleting the estate and there is an absence of reasonable likelihood of rehabilitation. To succeed, DCC must prove that there is both (i) substantial or continuing loss to or diminution of the estate, ***and*** (ii) the absence of a reasonable likelihood of rehabilitation. (emphasis added). *See In re Landmark Atlantic Hess Farm, LLC*, 448 B.R. 707, 713 (Bankr. Md. 2011) and *In re Modanlo,* 413 B.R. at 271; *see also In re AdBrite Corp.*, 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003). It cannot make this showing.

### B.     The Debtor Has Not Suffered a "Substantial or Continuing Loss."

14.     DCC argues that the Debtor will necessarily suffer a "continuing loss" if

it remains in chapter 11 because it must pay bankruptcy-related administrative expenses (namely, professional fees) which are depleting the estate, and its cash flow cannot continue to cover those expenses.  Conversion Motion ¶ 10.  This is false.

15. Here, the administrative expenses incurred by the Debtor are mainly in response to DCC's unsuccessful scorched earth campaign.  In addition, the professional fees incurred thus far are associated with corresponding gains in the case to offset them.  For example, the Debtor had approximately $11,000 of cash on the Petition Date, but has consistently maintained a cash and receivables balance of between $430,000 and $1.5 million since that time as the professionals helped stabilize the business.  An Auction is set for December 18, 2023 and the Debtor expects to sell substantially all of its assets to the winning bidder at the auction for millions of dollars.  The proceeds will fund the Plan in the case.  Contrary to DCC's assertions, the sale of the Debtor's assets will net millions of dollars for the estate, or reduce secured debt by millions of dollars through credit bids, which will dwarf the administrative expenses.

16. The fact that the Debtor has never even drawn the remaining $600,000 under the DIP Loan, and has operated in the black on just its initial draw of $650,000 and positive monthly cash flow, demonstrates that there is no continuing or substantial loss.

17. Also, as a matter of law, the Debtor is not even incurring actual operating losses.  Courts have recognized that the mere accrual of professional fees cannot be deemed "continuing losses" to the estate.  *In re Gabriel Techs. Corp.,* 2013 WL 2318581, at *2-3 ("[T]he accrual of liabilities are not the same as the incurring of actual out-of-pocket losses, such as the dissipation of assets that diminishes the estate.  Leaving the Debtors in possession of the chapter 11 estate is not risking some ever-diminishing pool of assets."); *In re TMT Procurement Corp.,* 534 B.R. at

920 ("In a case where the debtor has few, if any, tangible assets remaining, the mere accrual of professional fees must be distinguished from actual out-of-pocket losses.").

18. DCC fails to cite a single case to support its argument with analogous facts—*i.e.*, where a debtor's administrative expenses were mainly professional fees and the debtor had secured a source of recovery that would entirely cover the cost of those expenses. Because DCC cannot show the existence of a continuing or substantial loss, cause for conversion does not exist pursuant to § 1112(b)(4)(A) and the Court need not even consider the "rehabilitation" aspect of § 1112(b)(4)(A).

### C. There is a Reasonable Likelihood of Rehabilitation.

19. Even assuming, arguendo, that DCC could establish a "continuing loss", which it cannot, it would also need to prove the "absence of a reasonable likelihood of rehabilitation." The purpose of § 1112(b)(4)(A) is to "prevent []the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation." *In re Lizeric Real-ty Corp.,* 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995). This generally occurs where an operating entity is languishing in bankruptcy and burning through estate resources without any hope of maximizing the value of estate assets. Here, the case is a only 9 months old, and the Debtor has taken extensive efforts to maximize the value of its assets. It stabilized its revenue streams, recouped markets share, penetrated the market with the assistance of professionals, reduced payroll, instituted an orderly sale process under § 363, and an Auction is set.

20. Under applicable case law, the Debtor need not demonstrate that it will "reorganize" to stave off conversion as a liquidating plan is sufficient. *Loop Corp. v. United States Tr.,* 379 F. 3d. 511, 516 (8th Cir. 2004) ("rehabilitation" under § 1112(b)(4)(A) is not synonymous with reorganization). Rehabilitation refers to the debtor's ability to restore the viability of a

business. *In re Landmark Atlantic Hess Farm, LLC*, 448 B.R. at 714-15 (the determination is not whether a debtor can confirm a plan, but whether the debtor has sufficient business prospects). Here, the Debtor's business has been completely restored during the case as it recaptured shelf space with retailers it lost prepetition, increased its cash position, and stabilized its relationship with critical vendors and contract parties in advance of a sale. The delay in effectuating the sale appears to be more a factor of market conditions and DCC's determined efforts to drive off bidders with baseless accusations of fraud in its filings. The Debtor intends to select the winning bidder at the Auction, proceed to a sale hearing, and then renew the prosecution of its Plan of Liquidation and Disclosure Statement it previously filed.

### D. There is No Conflict of Interest.

21. As it has done over and over in this case, DCC attempts to argue that the Debtor has a conflict of interest in properly investigating and pursuing potential avoidable transfers against insiders. DCC alleges that the Debtor has failed and refused to object to any claim other than DCC and/or investigate possible causes of action against insiders. This too is false.

22. As previously stated, the Debtor's Amended Schedule D expressly lists the claims of MCDJR-Tesse, LLC, PMCDTesse, LLC, CE CID, LLC, and VBM as "disputed" [Dkt. No. 162] and they will be the subject of objections post-confirmation pursuant to Article VII of the Plan. [Dkt. No. 160]. All of the disputed secured claims will be the subject of objections at the appropriate time. But even more disturbing is that DCC's counsel has been repeatedly advised that an investigation into the divestment of Alta-Tesse was in fact conducted, and there is insufficient evidence that the subject transaction was fraudulent. DCC may not like this determination, but that does not mean there is a conflict of interest. Again, DCC could have exercised its rights under applicable law to challenge the transaction, but it failed to do so.

### D. Unusual Circumstances Exist Such That Conversion to Chapter 7 is Not in the Best Interests of the Debtor, Creditors and the Estate.

23. Even if DCC were able to establish "cause" for conversion to chapter 7, "unusual circumstances" establish that conversion is not appropriate. 11 U.S.C. § 1112(b)(2). Section 1112(b)(2) gives courts discretion to deny conversion where unusual circumstances establish that conversion is not in the best interests of creditors and the estate, and the party opposing conversion demonstrates that (i) there is a reasonable likelihood that a plan will be confirmed within a reasonable time, and (ii) the grounds for conversion include an act or omission "for which there exists a reasonable justification" and "that will be cured within a reasonable period of time." *Id.* Courts have substantial discretion to determine whether there are unusual circumstances that weigh against conversion. *See In re The 1031 Tax Group, LLC,* 374 B.R. at 93.

24. The circumstances here are unusual. To begin with, DCC has taken the radical step of filing the Conversion Motion just 30 days before the Debtor conducts the Auction. DCC is well aware that the DIP Lender and prepetition lenders, Jupiter Funds, and a financial buyer intend to attend the auction and bid. The timing of DCC's Conversion Motion shows that DCC continues to try to seize control of Debtor's assets and deprive all other creditors of the opportunity to realize the significant and immediate gain that a sale would provide. It also asks the Court to take the extraordinary measure of displacing management at the most important time in the case, similar to what the court described in *In re MatlinPatterson Glob. Opportunities Partners II L.P.,* 644 B.R. at 438 (noting that "[c]hanging horses midstream [by appointing a chapter 7 trustee] . . . would be inefficient, costly, slow, and contrary to the estates' interests in timely and cost-effective resolution"). Moreover, courts recognize that liquidation through chapter 11, as opposed to chapter 7, is often in the best interests of all stakeholders. *See In re Deer Park, Inc.,* 136 B.R. at 818 ("[A] debtor's continuing participation in a planned, orderly liquidation may in fact be

necessary to bring about the maximum recovery for the creditors, as opposed to the amount realized from a forced sale."); *In re Honx, Inc.,* 2022WL 17984313, at *3 ("[S]ometimes, a plan of liquidation is better for all parties than . . . allowing the provisions of chapter 7 or a race to the courthouse to dictate the liquidation process."). Among other things, a chapter 7 liquidation requires a trustee to use considerable time and resources to become familiar with the facts and circumstances of a case, whereas liquidation under a chapter 11 allows knowledgeable management and professionals who are already familiar with the case to administer the liquidation process. As the Ninth Circuit has observed:

> A liquidation under Chapter 11 allows the debtor in possession, one who is presumably more familiar with the assets of the debtor's organization and its respective values, the ability to plan for an orderly divestiture of the assets over time as opposed to a Chapter 7 trustee, who is generally less familiar with the debtor's assets. A Chapter 11 plan, even though a liquidating plan, must still conform to the same statutory requirements of any other Chapter 11 reorganization. A liquidating plan is desirable when the debtor in possession can bring about a greater recovery for the creditors than would a straight liquidation under Chapter 7.

*In re Deer Park, Inc.,* 136 B.R. at 818; *see also In re All Am. of Ashburn, Inc.,* 40 B.R. 104, 108-10 (Bankr. N.D. Ga. 1984) (case should not be converted because administrative expenses would be greater under chapter 7 due to duplication of legal work). The Debtor's primary assets here are the formulas and manufacturing processes, which are proprietary, complex, and require the existing staff to sell.

25. In addition to "unusual circumstances" militating against conversion, there is a reasonable likelihood that the Debtor will be able to confirm a plan within a reasonable time, which satisfies the requirements of § 1112(b)(2)(A)-(B). It is entirely "reasonable" to expect that the sale after the Auction—which resulted from a good faith, arm's-length process—will be approved,

which will facilitate the Debtor's efforts to build consensus for a confirmable chapter 11 plan, a version of which is already on file in the case.

26. To the extent there is any question about DCC's true intent, the November 21, 2023 status conference provides additional evidence. DCC's counsel advised the Court that it does not need to adhere to the 30-day hearing requirement under § 1112(b)(3), and a hearing in late January would suffice. The entire purpose of § 1112(b) is to provide a movant with an immediate hearing to stem a continuing or substantial loss to the estate. By agreeing to extending the deadline, DCC admits that cause does not exist to convert the case as there is no urgent cash burn or loss to stem.

## CONCLUSION

27. For the foregoing reasons, the Debtor respectfully requests that the Court deny the Conversion Motion, and grant such other and further relief as is just and proper.

Dated:  December 1, 2023  **COLE SCHOTZ P.C.**

By:  */s/ Gary H. Leibowitz*
Gary H. Leibowitz (Bar No. 24717)
Irving E. Walker (Bar No. 00179)
H.C. Jones III (Bar No. 20064)
J. Michael Pardoe (Bar No. 20730)
1201 Wills Street, Suite 320
Baltimore, MD  21202
(410) 230-0660
(410) 230-0667 (fax)
gleibowitz@coleschotz.com
iwalker@coleschotz.com
hjones@coleschotz.com
mpardoe@coleschotz.com

*Counsel for Debtor and Debtor-in-Possession*