## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | |
|---|---|
| In re: | (Chapter 11) |
| Tessemae's LLC,[1] | Case No. 23-10675 (NVA) |
| Debtor. | |

**MOTION OF THE DEBTOR AND DEBTOR-IN-POSSESSION FOR AN ORDER (I) APPROVING THE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS TO PANOS BRANDS, LLC FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (II) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS; AND (III) GRANTING RELATED RELIEF**

Tessemae's LLC, the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Debtor" or "Tessemae's"), by its undersigned counsel, pursuant to Sections 105, 363, and 365 of Title 11 of the United States Code (11 U.S.C. §§ 101, *et seq.*) (the "Bankruptcy Code"), Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Maryland (the "Local Rules"), hereby moves the Court (the "Sale Motion") for the entry of an Order, substantially in the form of proposed Sale Order submitted herewith as **Exhibit A**, (I) approving the sale of substantially all of the Debtor's assets to PANOS Brands, LLC (the "Purchaser" or "PANOS") pursuant to the terms of the Asset Purchase Agreement dated as of December 18, 2023, a copy of which is attached as **Exhibit B** (the **"PANOS APA"**), free and clear of liens, claims, encumbrances, and interests (the "Sale"); (II) authorizing the assumption and

---

[1] The Debtor in this chapter 11 case and the last four digits of its federal tax identification are Tessemae's LLC (2871). The Debtor's principal address is 714 South Wolfe Street, P.O. Box No. 38438, Baltimore, Maryland 21231.

assignment of the Assumed Contracts (defined below) in connection with the Sale; and (III) granting related relief.  In support of this Motion, the Debtor relies upon and incorporates by reference the *Declaration of Demian Costa in Support of First-Day Motions* [Doc. No. 8] (the "Costa Declaration") and will present additional testimony in support of the Sale Motion at the Sale Hearing.

## PROVISIONS HIGHLIGHTED
## PURSUANT TO LOCAL RULE 6004-1(b)

As explained below, the Purchaser was the Stalking Horse Bidder and also the winning bidder after an auction conducted on December 18, 2023 (the "Auction").

| Provisions to be Highlighted | Location of and Justification for Provisions |
|---|---|
| Sale to Insider | Not applicable.  PANOS is not an insider, and is unrelated to the Debtor. |
| Agreements with Management | Not applicable.  The PANOS APA includes no such provision. |
| Releases | Not applicable.  The PANOS APA includes no such provision. |
| Private Sale/No Competitive Bidding | Not applicable.  The PANOS APA resulted from a robust marketing effort and the Auction, which involved competitive bidding. |
| Closing and Other Deadlines | On the date five (5) business days after entry of the Sale Order |
| Good Faith Deposit | The Purchaser has made a good faith deposit of $200,000 which is being held by the Debtor's Escrow Agent. |
| Interim Arrangements with Proposed Buyer | Not applicable. |
| Use of Proceeds | A portion of the sale proceeds will be used to pay the undisputed amount owed to the DIP Lender upon closing.  The balance of the sale proceeds will be received by the Debtor for payment of the administrative expenses of the estate and, upon Court approval, funding of the Debtor's Chapter 11 plan. |
| Records Retention | Seller may retain copies. |
| Sale of Avoidance Actions | Not applicable.  Avoidance Actions are excluded from the Sale. |
| Requested Findings as to Successor Liability | The Sale Motion and the PANOS APA require a finding that the Purchaser shall have no successor liability.  See PANOS APA; §5.3(b)(iv), proposed Sale Order, ¶¶W, 9. |
| Sale Free and Clear of Unexpired Leases | The PANOS APA and Sale Motion require that the sale be free and clear of all liens, claims and interests.   See PANOS APA;§ 5.3(b)(iv), proposed Sale Order, ¶¶H, I, P, T, and 2. |
| Credit Bid | Not applicable.  While credit bidding was permitted at the Auction, the Purchaser did not make any such credit bid. |
| Relief from Bankruptcy Rule 6004(h) | The Sale Motion and the PANOS APA provide for relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h).  See Sale Motion, §55, Sale Order, ¶¶W. 23. |

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Maryland (this "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157(b) and 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested in this Motion are Sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rules 2002-1 and 6004-1 of the Local Bankruptcy Rules.

## BACKGROUND[2]

4.      On February 1, 2023 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.

5.      The Debtor continues to manage and operate its business as a debtor-in-possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

6.      No official committee of unsecured creditors has been appointed.

7.      No request for a trustee or examiner has been made in this chapter 11 case.

**I.      Overview of the Debtor's Business.**

8.      Founded by Gregory Vetter and his family in 2009, Tessemae's quickly became one of the nation's premier organic salad dressing companies. It manufactures through a co-manufacturer and wholesales some of the most popular all-natural, organic salad dressings in the United States, which are popular in the world of "clean eating."   By carefully curating and

---

[2] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion of the Debtor and Debtor-in-Possession for an Order (I) Approving Bidding Procedures, (II) Scheduling an Auction for the Sale of Substantially all of the Debtor's Assets as a Going Concern, and (III) Granting Related Relief [Doc. No. 146] (the "Bidding Procedures Motion").

combining healthy, organic ingredients using Mr. Vetter's mother's recipes as inspiration, Tessemae's allows its customers to choose from a variety of healthy dressings without sacrificing taste.

9. Within three years of its founding, Tessemae's was the top selling salad dressing in the MidAtlantic region of WholeFoods and began expanding into other regions and other retailers. Its gluten free, sugar free, and vegan friendly products quickly became the #1 refrigerated salad dressing at WholeFoods and Safeway. By 2021, at its peak, Tessemae's was producing 36 bottles of dressing per minute, which were retailed in 12,500 locations nationwide.

**II.    Events Leading to Bankruptcy.**

10. The Debtor's rapid growth created a consistent challenge as it required additional capital to fund the costs of manufacturing and keep pace with customer orders. Demand for the Debtor's products prior to bankruptcy outpaced supply as the company expanded into additional retailers and markets nationwide.

11. In 2020, like so many other manufacturers and wholesalers, the Debtor faced substantial challenges arising from the COVID-19 pandemic, including logistical issues related to its workforce presence and manufacturing capabilities, as well as the rising cost of raw materials. While the Debtor's sales remained strong, growth slowed and, by September 2021, the Debtor undertook cost-cutting and restructuring efforts focused on streamlining and becoming more profitable rather than continuing to pursue growth. As part of these efforts, the Debtor implemented two workforce reductions in late 2021, and elected not to replace employees who resigned in 2022. With profit margins becoming ever more compressed with the rising cost of materials, the Debtor reduced its promotional spending, cut sales to its least profitable and lowest volume customers, and implemented price increases. By August 2022, customer orders were

stable despite the price increases, but the lack of working capital rendered self-manufacturing to be too expensive.

12.    The Debtor made the difficult decision in 2022 to shutter its manufacturing plant and outsource production.  Fortunately, over the course of the previous several years, the Debtor had developed a strategic partnership with a co-manufacturer that could replicate the Debtor's manufacturing processes and production standards, and unlike the early stages when third-party "clean manufacturing" was unavailable, the co-manufacturer was able to take over manufacturing and packaging the Debtor's products without any reduction in quality or modification to materials or processes.

13.    With the Debtor's workforce reduced to only key employees, it was able to procure and coordinate production and delivery of its products through its co-manufacturer and begin using a logistics company for smaller deliveries following production and packaging.

14.    Unfortunately, as further explained in the Costa Declaration, the Debtor faced a number of lawsuits by certain creditors, including one by Democracy Capital Corporation ("DCC") in the Circuit Court for Baltimore County, Maryland, whereby Democracy sought in excess of $13.8 million on account of a loan in the original principal amount of $3,000,000.00 (the "Democracy Litigation").[3]  The Democracy Litigation lasted for more than 2 years before the Petition Date.  This was a substantial distraction to the Debtor's very lean staff, and the accompanying legal fees further drained the Debtor's already strained capital.[4]

---

[3] DCC's claim against the Debtor is currently the subject of an Adversary Proceeding filed by the Debtor (Adv. Pro. No. 23-00039) seeking, *inter alia*, (i) a determination of the claim's validity, (ii) equitable subordination of any claim held by DCC, and (iii) a determination that any claim held by DCC was acquired by a fraudulent conveyance.

[4] On December 11, 2023, the Circuit Court of Maryland for Baltimore County granted summary judgment, in part, in favor of DCC on Count I of its Second Amended Complaint, awarding $8,706,250 in damages.  The Baltimore County Court's judgment expressly provides that it is not

15.     Despite its strong customer base, for the reasons previously discussed, the Debtor was unable to service certain of its debts.  Demand remained high for the Debtor's products, but the Debtor did not have the capital necessary to fill the orders.

16.     Seeking to stabilize its operations and focus the efforts of its reduced personnel on realizing the full potential of its brand, the Debtor recognized the need to restructure with the protection of the Bankruptcy Court.

**III.     Post-Bankruptcy Performance and Operational Outlook.**

17.     Tessemae's filed its voluntary chapter 11 petition on February 1, 2023.  With the protections afforded by the Bankruptcy Code, the Debtor has been able to stabilize its business and dramatically improve its order fulfillment rate, cash position, and operational outlook.  The Debtor received authorization from the Court to secure post-petition financing from the DIP Lender in the total principal amount of $1,250,000.00 [Doc. No. 48] (the "DIP Loan") but took only the first draw from the DIP Loan, in the amount of $650,000.00 and did not need further funds from the DIP Loan as its operations provided sufficient liquidity.

18.     The Debtor continued to streamline its operations by converting from a co-manufacturing model to a "turnkey" model, whereby instead of the Debtor purchasing all of the raw materials necessary to manufacture its products, the Debtor's co-manufacturer purchases the raw materials for the manufacturing process, and the Debtor purchases the "finished product" from the co-manufacturer.  This process has allowed the Debtor's personnel to focus on improving operations and sales. Additionally, the Debtor retained Aurora Management Partners Inc. ("AMP") as its Financial Advisor, effective as of February 17, 2023 [Doc. No. 93].  AMP helped the Debtor

---

a final judgment.  Accordingly, the time for an appeal of the judgment, which the Debtor maintains is erroneous, has not yet begun to run.  In addition, due to the pendency of the Debtor's Adversary Proceeding, DCC's claim in this case remains subject to dispute.

reconcile its financial records and prepare for the sale process.  The Debtor also retained Larry Strauss to prepare and file its tax returns for 2022.

19.     With these measures in place, the Debtor has reported an average monthly cash position since June 1, 2023 between $500,000 and $1.0 million.  As of the date of this Motion, the Debtor also has more than $800,000 of accounts receivable.

20.     Notwithstanding these improvements, the business requires additional capital in order to hire salespeople and pay for advertising and marketing.  With Demian Costa switching to a consultant and Matt Vetter's exit from the business, the Debtor would benefit from additional management personnel as well.  Accordingly, to preserve and maximize the value of the Debtor's estate and its prospective business operations, the Debtor determined in its business judgment, and in consultation with its professionals, that a sale of substantially all of its assets as a going concern is the best available path forward at this time.

## SALE PROCESS

### I.     Marketing Efforts and Bidding Procedures.

21.     To capitalize on its stability and momentum following the Petition Date, the Debtor retained B. Riley Securities, Inc. ("B. Riley") as its investment banker as of March 14, 2023 [Doc. No. 133].  Among other things, B. Riley familiarized itself with the Debtor's business and, along with AMP, advised the Debtor of its strategic alternatives, including a sale of the Debtor's business as a going concern.  B. Riley ran a marketing campaign intended to maximize the value of the Debtor's estate and the return to creditors.

22.     To adhere to the terms of the Debtor's debtor-in-possession financing agreement ("DIP Loan") and demonstrate concrete progress toward a sale to the market, the Debtor filed a standalone Bidding Procedures Motion on May 31, 2023, seeking approval of Bidding Procedures

and certain Bidder Protections, as well as to set an Auction date [Doc. No. 146]. The Court granted the Bidding Procedures Motion by Order dated June 29, 2023 [Doc. No. 167] (the "Bidding Procedures Order").

23.    Pursuant to the Bidding Procedures Order, the Debtor, through B. Riley, solicited Indications of Interest by preparing and distributing a one-page "teaser" document describing the history of the Debtor and key financial metrics (the "Teaser") to 102 potentially interested bidders (the "Potential Bidders"), including 45 "strategic" Potential Bidders, i.e., competitors and those already engaged in a business similar or adjacent to the Debtor's business (the "Strategic Potential Bidders") and 57 "financial" Potential Bidders, i.e., private equity and other firms engaged in the business of buying companies in and out of distressed situations (the "Financial Potential Bidders"). B. Riley further prepared a confidential information memorandum providing a detailed overview of the Debtor's financial records and certain projections designed to permit Potential Bidders to analyze the bona fides of a purchase (the "CIM").

24.    Following the solicitation process, a total of 31 Potential Bidders signed non-disclosure agreements ("NDAs"), including 14 Strategic and 17 Financial Potential Bidders), and were thereafter provided a copy of the CIM. After review of the CIM, 19 Potential Bidders, including 10 Strategic and 9 Financial Potential Bidders requested access to the virtual data room hosted by B. Riley for purposes of allowing due diligence (the "Data Room").

25.    B. Riley conducted calls or meetings with several Potential Bidders as part of its marketing process, and at least two Potential Bidders met with the Debtor's management team to vet a potential transaction. Unfortunately, no Potential Bidders submitted APA's before the deadlines in the Bidding Procedures Order. On August 28, 2023, the Debtor temporarily suspended the bid deadlines and Auction date and filed a Notice with the Court [Doc. No. 208].

26.     After learning in October that its investment banker was no longer with B.Riley, the Debtor notified B.Riley that it would proceed without B.Riley going forward.  The Debtor's financial advisor, David M. Baker from Aurora Management Partners, advised the Debtor on the completion of the sale process and attended the Auction virtually to assist the Debtor in analyzing and comparing bids received.[5]

27.     On November 9, 2023, the Debtor filed a Notice to reset the Auction for December 18, 2023 [Doc. No. 238].  Any party who wished to participate was instructed to contact counsel or submit a form APA provided by counsel.  DCC, Tesse DIP Fund I, LLC and Jupiter Funds, were consulted on the Auction date and all agreed to the date by email.  They were each invited to attend and participate in the Auction as well.

28.     Following these extensive marketing efforts, on December 15, 2023, the Debtor received a $1.5 million purchase offer from PANOS.  The Debtor consulted with its professionals on the bid and, after arm's-length negotiations over the next 2 days, entered into an asset purchase agreement (the "Stalking Horse APA") with PANOS (the "Stalking Horse Bidder").  As required by the Stalking Horse APA, PANOS wired the $200,000 deposit to the Debtor's escrow agent.

29.     The Auction was conducted on December 18, 2023 at the offices of Cole Schotz P.C. in Baltimore, MD.  Counsel for the Debtors, DCC, and the "McDermott Group" (comprised of the principals of Tesse DIP Fund I, LLC) participated in person along with the Debtor.  Counsel for PANOS and representatives from PANOS, DCC, and the McDermott Group participated virtually.  After the submission of more than 10 bids between PANOS and the McDermott Group, the Debtor designated the PANOS bid of $4.5 million (which did not include the Accounts

---

[5] Aurora has served as an advisor in § 363 transactions in chapter 11 cases across the country and in federal and state court receiverships.

Receivable as a purchased asset) as the highest or otherwise best Bid, and PANOS as the Successful Bidder.[6]  The Debtor further designated the McDermott Group as the second highest or otherwise best Bid and Back-Up Bidder with a Bid of $4.75 million (which included the Accounts Receivable as a purchased asset), to consummate the Sale in the event that the sale to PANOS does not close.  A copy of the Back-Up Bid is attached hereto as **Exhibit C**.[7]

## II.    The Sale Hearing.

30.    At the Court's hearing on this Motion (the "Sale Hearing"), the Debtor will seek approval of (i) the Sale, free and clear of all liens, claims, interests and encumbrances, pursuant to section 363 of the Bankruptcy Code, to PANOS pursuant to the PANOS APA, with all liens, claims, interests and encumbrances to attach to the net sale proceeds with the same validity and in the same order of priority as they attached to the Purchased Assets (as defined in the PANOS APA) prior to the Sale; and (ii) the assumption by the Debtor and assignment to PANOS of the Assumed Contracts (as defined and designated in the PANOS APA) pursuant to section 365 of the Bankruptcy Code. The Debtor will submit and present additional evidence at the Sale Hearing demonstrating that the Sale is fair, reasonable, and in the best interest of the Debtor's creditors and the Debtor's bankruptcy estate.

---

[6] In accordance with Rule 6004-1(b) of the Local Rules, the Debtor notes that, due to the nature of the Sale as going concern, the Purchased Assets were not appraised and the Debtor's Schedules do not place a value on the Purchased Assets.

[7] The Back-Up Bid included herewith as Exhibit C, executed by the Back-Up Bidder and not yet executed by the Debtor, is subject to ongoing discussions between the Back-Up Bidder and the Debtor concerning the language used to memorialize the legally binding agreement placed on the record at the Auction.  As such, the language of the Back-Up Bid may be modified before the Sale Hearing.  The Debtor will file a Line supplementing Exhibit C.

## RELIEF REQUESTED

31.     The Debtor respectfully requests that, following the Sale Hearing, the Court enter an Order substantially in the form the proposed attached hereto as **Exhibit A** authorizing and approving:

(I)     the Sale, free and clear of liens, claims, and encumbrances, to (a) PANOS, or (b) the Back-Up Bidder, should PANOS fail to close on the Sale within the time required by the PANOS APA;

(II)    in connection with the Sale, the assumption and assignment of the Assumed Contracts, as applicable, and

(III)   granting related relief.

## BASIS FOR RELIEF REQUESTED

**I.      Section 363(b) of the Bankruptcy Code Authorizes the Sale.**

32.     Ample authority exists for approving the Sale. Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). This Court's power under Section 363 of the Bankruptcy Code is supplemented by Section 105(a) of the Bankruptcy Code, which provides in relevant part: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *Id*.

33.     Courts review a debtor's decision to use, sell, or lease out of the ordinary course under the business judgment rule. *See In re Modanlo*, 412 B.R. 715, 732 (Bankr. D. Md. 2006) *subsequently aff'd*, 266 F. App'x 272 (4th Cir. 2008); *In re Fischer*, Case No. 03-13704, 2010 WL 2746329, at *10 (Bankr. D. Md. July 9, 2010); *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [Debtor] to show that a sound business purpose justifies such actions.' If the [Debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should

11

approve the sale.") (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)).

34.     Courts typically consider the following factors in determining whether a proposed sale satisfies the business judgment standard described above: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. *See In re Decora Indus., Inc.*, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)). Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. at 656 (quoting *Van Gorkum*, 488 A.2d 858, 872 (Del. 1985)).

35.     Once the Debtor articulates a valid business justification under the business judgment rule, there is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *Yost v. Early*, 87 Md. App. 364, 589 A.2d 1291, 1296-98 (1991) (applying Maryland law); *see also Continuing Creditors' Comm. Of Star Telecomms., Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (articulating same presumption under Delaware law); *Lake Monticello Owners' Ass'n v. Lake*, 250 Va. 565, 571 (1995) (articulating same presumption under Virginia law).

36.     Here, there is a sound business justification for the Sale because the Debtor and its professionals have undertaken significant steps to make the Debtor's business an attractive

investment as a going concern.  The Debtor stabilized its business in bankruptcy and increased its cash on hand from $11,000 to between $500,000 and $1.0 million.  Moreover, the Debtor increased its fulfillment rate of customer orders to over 90%, which was the Debtor's primary operational challenge before bankruptcy.  With the Debtor's new "turnkey" business model in place, the Debtor has streamlined its business in a manner that it can be operated with minimal staff and is poised for a purchaser to have the potential to expand the business and grow the customer base to the levels reached in the years prior to bankruptcy and beyond.  Moreover, the Debtor and its professionals believe that the now is the best time to conduct the Sale because the first quarter is usually a strong sales quarter for the Debtor.  Accordingly, there is a strong business justification for the Sale.

37.    The Sale Process was also carefully designed to garner maximum interest in the Debtor's business and to solicit the highest and best possible Bids.  The Debtor and its professionals contacted more than 100 Potential Bidders curated from B.Riley's proprietary database of potential purchasers, including competitors and private equity firms known to purchase assets in chapter 11.  B. Riley conducted numerous meetings with Potential Bidders and conducted additional marketing efforts to maximize interest.  The Debtor and Aurora then stepped in to negotiate with PANOS and obtain an offer.  The PANOS initial purchase offer then was subjected to competitive bidding in an open auction, which resulted in a substantial increase in the purchase price.  The Debtor and its professionals therefore believe that the PANOS APA represents the highest and best bid available, and that the process was appropriately designed to achieve the highest possible sale price.  The fact that the final purchase price was 300% higher than the Stalking Horse Bid demonstrates the success of the process.

38.     In addition to the foregoing, a Sale is the best option at this time for maximizing the value of the Debtor's estate and generating a return to creditors.  Given the Debtor's prior borrowing record and the present nature of the credit markets, the Debtor cannot obtain new financing to fund a chapter 11 plan, future capital requirements, and distributions to creditors; nor could the Debtor attract new investors to provide new capital at the time of this Motion. Consequently, the Sale represents the only viable exit plan from this chapter 11 bankruptcy and the best option for maximizing the value of the Debtor's estate and a return to creditors and other stakeholders.

**II.    The Sale Will Satisfy the Requirements of Section 363(f) of the Bankruptcy Code**.

39.     Section 363(f) of the Bankruptcy Code provides for a sale "free and clear" of an entity's interest in property of the estate if:

      i.     applicable non-bankruptcy law permits sale of such property free and clear of such interest;

      ii.    such entity consents;

      iii.   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

      iv.    such interest is in bona fide dispute; or

      v.     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

40.     Section 363(f) of the Bankruptcy Code is stated in the disjunctive; therefore, it is only necessary to meet one of the five conditions of section 363(f) in a sale under section 363(b) of the Bankruptcy Code.  *In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions

are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

41.    Here, the Debtor anticipates that any Sale will satisfy Section 363(f) of the Bankruptcy Code by virtue of either the consent of the lienholders or on other grounds set forth in Section 363(f)(1),(3), (4) or (5).

42.    The Debtor will send a sale notice to, among others, all parties who assert liens or claims against the Purchased Assets, and any holder of a claim against or interest in the Purchased Assets who does not timely object to the Sale shall be deemed to have consented to the sale of the Purchased Assets free and clear of its claim or interest.  11 U.S.C. § 363(f)(2); *see In re Heritage Home Grp. LLC*, Case No. 18-11736 (KG), 2018 WL 4684802 (Bank. D. Del. Sept. 27, 2018); *Hargrave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994); *In re Daufuskie Island Properties, LLC*, 431 B.R. 626, 640 (Bankr. D.S.C. 2010).  Moreover, the Debtor believes that any parties that object to the "free and clear" Sale will either (a) be holders of liens or claims that are subject to a bona fide dispute or (b) would be compelled to accept cash in satisfaction of their interests. 11 U.S.C. §§ 363(f)(3) and (5).

43.    Any lienholder also will be adequately protected by having its liens, if any, attach to the proceeds of the Sale, in the same order of priority and with the same validity, force, and effect, that such creditor had prior to the sale, subject to any claims and defenses that the Debtor and its estate may possess with respect thereto. 11 U.S.C. § 363(f)(3). Therefore, pursuant to Section 363 of the Bankruptcy Code, the Debtor may sell the Purchased Assets free and clear of all liens, claims, and encumbrances, except to the extent of any permitted encumbrances designated in the PANOS APA.

44.     The Debtor also submits that it is appropriate to sell the Purchased Assets free and clear of any successor liability relating to the Debtor's business.  Courts have consistently held that a buyer of a debtor's assets pursuant to a Section 363 sale takes free and clear from successor liability relating to the debtor's business. *See, e.g., In re Trans World Airlines, Inc.*, 322 F.3d 283, 288–93 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 585–87 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes).

45.     The purpose of an order authorizing the transfer of assets free and clear of all liens, claims, encumbrances, and all other interests would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct. Moreover, without such assurances, the Debtor would run the risk that potential bidders may not enter the Auction or, if they did, would do so with reduced bid amounts.  To that end, PANOS, or the Back-Up Bidder, should not be liable under any theory of successor liability relating to the Debtor's business but should acquire the Purchased Assets free and clear.

III.    **PANOS and the Back-Up Bidder Are Entitled to the Protections of Section 363(m) of the Bankruptcy Code**.

46.     Section 363(m) of the Bankruptcy Code provides, in relevant part, that the reversal or modification on appeal of an authorization under Section 363(b) of a sale or lease of property does not affect the validity of a sale or lease under such authorization to a buyer who bought or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.  *See* 11 U.S.C. § 363(m). Pursuant to Section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *E.g., Willemain v. Kivitz*, 764

F.2d 1019, 1023 (4th Cir. 1985) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1197 (7th Cir. 1978)).

47.     The Debtor's marketing efforts and negotiations with all Potential Bidders were undertaken at arm's-length and without collusion, with all parties being represented or at least having the opportunity to be represented by their own counsel.  Accordingly, the Debtor's request, and will demonstrate at the Sale Hearing, that PANOS and the Back-Up Bidder should be deemed a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code.

48.     Additionally, the Bidding Procedures were designed to prevent the Debtor or the Successful Bidder from engaging in any conduct that would cause any Sale to the Successful Bidder to be avoided under Section 363(n) of the Bankruptcy Code.

## IV.    Assumption of Executory Contracts Should be Authorized.

49.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a).  Bankruptcy courts apply a reasonable business judgment standard when considering a debtor's decision to assume or reject an executory contract or unexpired lease.  *See, e.g., In re Cho*, 581 B.R. 452, 456 (Bankr. D. Md. 2018) ("A debtor in possession's decision to assume or reject an executory contract or unexpired lease is subject to a business judgment standard."); *In re HQ Glob. Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (recognizing that a debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was the "product of bad faith, whim, or caprice"); *see also In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39–40 (3d Cir. 1989) (same).

50.    A debtor has exercised its reasonable business judgment if it can demonstrate that assumption or rejection of an executory contract will benefit the estate. *See Sharon Steel Corp.*, 872 F.2d at 36, 39–40; *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003); *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987). "[M]ore exacting scrutiny would slow the administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

51.    Any assumption of the Assumed Contracts is an exercise of the Debtor's sound business judgment because the transfer of such contracts is necessary to the Debtor's ability to obtain the best value for the Purchased Assets.  The assumption and assignment of the Assumed Contracts is a critical component of the PANOS APA.  Given that consummation of the Sale is critical to the Debtor's efforts to maximize value for its estate and creditors, the Debtor's assumption of the Assumed Contracts is an exercise of sound business judgment and should therefore be approved.

52.    The consummation of the Sale, which involves the assignment of the Assumed Contracts, will be contingent upon the Debtor's compliance with the applicable requirements of Section 365 of the Bankruptcy Code.  Section 365(b)(1) of the Bankruptcy Code requires any outstanding defaults under the Assumed Contracts be cured or that the Debtor provide adequate assurance that such defaults will be promptly cured. The Debtor's assumption and assignment of

the Assumed Contracts will be contingent upon payment of any Cure Amount and effective only upon the closing of the Sale.  But the Debtor does not believe any Cure Amounts exists.[8]

53.     Pursuant to Section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract if "adequate assurance of future performance by the assignee of such contract or lease is provided."   The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) (finding that, "[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance").  Among other things, adequate assurance may be provided by evidencing the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when the prospective assignee of a lease has financial resources and has expressed willingness to devote sufficient funding to the business to give it a strong likelihood of succeeding).

54.     Alta-Tesse, LLC consents to the assumption and assignment of the May 1, 2022 License Agreement and Supply Agreement. To the extent necessary, the Debtor will present

---

[8] While the PANOS APA lists three (3) Assumed Contracts, the Kalsec, Inc contract is expired. The other two are agreements (a license and supply agreement with Alta-Tesse LLC) with the Debtor's founder Greg Vetter's other company, who confirmed on the record at the Auction that the agreements can be assumed and assigned.

evidence at the Sale Hearing to show the financial wherewithal, willingness, and ability of PANOS to perform under the Assumed Contracts.

## WAIVER OF BANKRUPTCY RULES
### 6004(h) AND 6006(d)

55.     The Debtor requests that the Court waive the fourteen-day stay requirements under Bankruptcy Rules 6004(h) and 6006(d).  The Debtor needs the flexibility to close the Sale within five (5) business days of the entry of the Sale Order to adhere to the PANOS APA.  Accordingly, given the lack of prejudice to any party, the Debtor respectfully requests that the Sale Order be effective immediately upon entry and that the fourteen day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) be waived.

## NOTICE

56.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) PANOS, (b) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Purchased Assets; (c) the Internal Revenue Service and all state and local taxing authorities in the states in which the Debtor has or may have any tax liability; (d) Democracy Capital Corporation; (e) the DIP Lender; (f) the Office of the United States Trustee; (g) those parties who have filed the appropriate notice requesting notice of all pleadings filed in this chapter 11 case; and (h) all other creditors and parties in interest in this case.

## NO PRIOR REQUEST

57.     The Debtor has not previously sought the relief requested herein from this Court or any other court.

## WAIVER OF MEMORANDUM

58.     Pursuant to Local Rule 9013-2, the Debtor states that, in lieu of submitting a separate memorandum in support of this Motion, it will rely solely upon the grounds and authorities set forth in this Motion.

**WHEREFORE**, the Debtor respectfully requests that the Court, following the Sale Hearing, grant the Motion and enter the Sale Order in substantially the form of the proposed order submitted herewith and grant such other and further relief as is just and proper.

Dated:  December 21, 2023          **COLE SCHOTZ P.C.**

By:   */s/ Gary H. Leibowitz*_____
       Gary H. Leibowitz (Bar No. 24717)
       Irving E. Walker (Bar No. 00179)
       H.C. Jones III (Bar No. 20064)
       J. Michael Pardoe (Bar No. 20730)
       1201 Wills Street, Suite 320
       Baltimore, MD  21231
       (410) 230-0660
       (410) 230-0667 (fax)
       gleibowitz@coleschotz.com
       iwalker@coleschotz.com
       hjones@coleschotz.com
       mpardoe@coleschotz.com

       *Counsel for Debtor and Debtor-in-Possession*

21

**<u>EXHIBIT A</u>**
**Proposed Sale Order**

## EXHIBIT B

**PANOS APA**

## EXHIBIT C

**Back-Up Bid[9]**

---

[9] Reservation: The Back-Up Bid, executed by the Back-Up Bidder and not yet executed by the Debtor, is subject to ongoing discussions between the Back-Up Bidder and the Debtor concerning the language used to memorialize the legally binding agreement placed on the record at the Auction.  As such, the language of the Back-Up Bid may be modified before the Sale Hearing.  As noted in the Sale Motion, the Debtor will file a Line supplementing this Exhibit.